# EXHIBIT E

**Atkinson-Baker, Inc.**
**www.depo.com**

1   UNITED STATES PATENT AND TRADEMARK OFFICE

2   BEFORE THE PATENT TRIAL AND APPEAL BOARD

3

4   SMARTMATIC USA CORPORATION
          Petitioner

5

        vs.

6

    ELECTION SYSTEMS AND SOFTWARE, LLC,

7        Patent Owner

8

9              CASE IPR2019-00531

10             Patent No. 8,096,471

11

12                    - - -

13

                   DEPOSITION OF

14         MICHAEL I. SHAMOS, PH.D., J.D.
              PITTSBURGH, PENNSYLVANIA

15              DECEMBER 20, 2019

16

17

18

19   ATKINSON-BAKER, INC.
     (800)288-3376

20   www.depo.com
     REPORTED BY:  LOIS SIKOSKI

21   FILE NO.:  AD0C56D

22

23

24

25

                                                      1

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 1

1    UNITED STATES PATENT AND TRADEMARK OFFICE

2    BEFORE THE PATENT TRIAL AND APPEAL BOARD

3

4    SMARTMATIC USA CORPORATION
          Petitioner

5

        vs.

6

ELECTION SYSTEMS AND SOFTWARE, LLC,

7         Patent Owner

8

9              CASE IPR2019-00527

10             Patent No. 7,753,273

11

12

13

14             Deposition of MICHAEL I. SHAMOS, PH.D.,

15   J.D., taken on behalf of the Petitioner, pursuant to

16   the Pennsylvania Rules of Civil Procedure, at the law

17   offices of Clark Hill, One Oxford Centre, 14th Floor,

18   Pittsburgh, Pennsylvania 15219, on Friday, December 20,

19   2019, scheduled at 9:30 a.m., before Lois Sikoski, a

20   Court Reporter-Notary Public in and for the

21   Commonwealth of Pennsylvania.

22

23

24

25

2

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 2

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1              A P P E A R A N C E S

 2                    - - -

 3   On behalf of the Plaintiff:

 4         Harpreet Singh, Esquire
           Larissa Bifano, Esquire
 5         Michael Van Handel, Esquire
           DLA Piper LLP
 6         33 Arch Street, 26th Floor
           Boston, MA  02110-1447
 7         michael.vanhandel@us.dlapiper.com

 8

 9   On behalf of the Defendant:

10         Kyle G. Gottuso, Esquire
           Robert M. Evans, Jr., Esquire
11         STINSON, LLP
           7700 Forsyth Boulevard, Suite 1100
12         St. Louis MO  63015
           robert.evans@stinson.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 3

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1                  I N D E X

 2   WITNESS              EXAMINATION BY        PAGE

 3   MICHAEL I. SHAMOS, PH.D. Mr. Singh           5

 4

 5

 6   PLAINTIFF                   MARKED FOR

 7   EXHIBITS                 IDENTIFICATION

 8   1001 US Patent Cummings          27

 9   1005 Nguyen, et al U.S.          50

10        Patent 7128263

11   1007 US Patent Application       71

12        Publication Neff

13   2001 First Declaration           7

14        of Michael L. Shamos, Ph.D.

15   2003 U.S. Patent Application   101

16        10/454345

17   2004 Resume of Michael I.       16

18        Shamos, PH.D.

19   1    Patent Owner's Contingent  94

20        Motion to Amend Under 37 C.F.R.

21        Section 42.121

22

23

24

25
```

4

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 4

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1              P R O C E E D I N G S
 2         MICHAEL I. SHAMOS, PH.D., J.D.,
 3   the witness, having been first duly sworn, was examined
 4   and testified as follows:
 5                  CROSS-EXAMINATION
 6   BY MR. SINGH:
 7      Q.   Could you please state your name for the
 8   record?
 9      A.   Michael Ian, I-A-N, Shamos, S-H-A-M-O-S.
10      Q.   Good morning, Dr. Shamos.  My name is Harpreet
11   Singh from DLA Piper.  I represent Smartmatic.  And
12   with me are my colleagues, Larissa Bifano and Michael
13   Van Handel.
14         Do you understand that you're being deposed
15   today because you submitted a Declaration in IPR
16   2019-009527, which involves U.S. Patent No. 7753273?
17      A.   Yes, I do.
18      Q.   And if I refer to this patent as the '273
19   patent today, is that okay with you?
20      A.   Yes.
21         Would you like opposing counsel to introduce
22   themselves?
23              MR. SINGH:  Sure.
24              MR. GOTTUSO:  Kyle Gottuso representing
25   ES&S.
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 5

**Atkinson-Baker, Inc.**
**www.depo.com**

1          MR. EVANS:  Robert Evans representing ES&S

2     as well.

3     BY MR. SINGH:

4     Q.   All right.  So you're under oath.  So it has

5     the same effect as if you were testifying in court.

6     You need to give your full and accurate testimony.  The

7     court reporter here will transcribe the depo.  Please

8     answer orally.  And let's try not to talk over each

9     other, so that when I ask a question, let me finish

10    before you begin your answer.  If you don't understand

11    a question, please let me know.  If you answer a

12    question, I'll assume you understood the question.

13         Your counsel could object to my questioning,

14    but you still have to answer unless instructed not to

15    do so.

16         Let me know if you need a break.  We can take a

17    break after about an hour or so.

18         Are there any physical or medical conditions

19    today that would impair you from testifying accurately

20    today?

21    A.   No.

22    Q.   Okay.  For today's deposition, what did you do

23    to prepare?

24    A.   I met with counsel two days ago.  And prior to

25    that time, I reviewed the materials that were filed in

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 6

**Atkinson-Baker, Inc.**
**www.depo.com**

1    this IPR.

2        Q.    And which counsel did you meet with?  The names

3    of the counsel?

4        A.    Mr. Gottuso and Mr. Evans.

5        Q.    And how long did you meet with counsel?

6        A.    We met for probably six hours, but that was

7    covering both patents.

8        Q.    Did you have any other communication with

9    counsel, outside of that meeting for six hours?

10       A.    I had conversations before the depo yesterday.

11   I had a conversation before the depo today.

12       Q.    Okay.  And, again, which documents did you

13   review in preparation for today's depo?

14       A.    The documents that were filed in this IPR.

15       Q.    Did you read anything else that was not filed

16   in the IPR?

17       A.    No, not in preparation for the depo.

18            (Deposition Exhibit No. 2001 marked for

19   identification.)

20   BY MR. SINGH:

21       Q.    Okay.  I'm going to hand you the Declaration

22   you filed in this IPR.  It has an exhibit of 2001.  Do

23   you see that it's labeled Exhibit 2001?

24       A.    Yes.

25       Q.    So I'm going to refer to this Declaration as

7

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 7

**Atkinson-Baker, Inc.**
**www.depo.com**

1    Exhibit 2001.  Is that okay with you?

2        A.    Yes.

3        Q.    Can you confirm that Exhibit 2001 is a copy of

4    your Declaration?

5        A.    It's a copy of my Declaration.  It doesn't have

6    any exhibits or appendices.

7        Q.    Okay.  Did you draft all parts of this

8    Declaration?

9        A.    All parts?  If you mean every word, no.

10       Q.    Which -- how would you -- which words did you

11   not draft?  Or I mean, which portions were not drafted

12   by you?

13       A.    No.  It's not portioned.  They're not divided

14   into segments.  The drafting is a collaborative

15   process.  It's supposed to support a response by the

16   patent owner.  And so I was provided with a detailed

17   outline of the points to be made and then I put flesh

18   on those bones.

19       Q.    So how much time did you spend putting the

20   flesh on the bones of this Declaration?

21       A.    I'm really estimating here because I don't have

22   my time sheets in front of me.  I would say 10 to 12

23   hours, something like that.

24       Q.    Are the opinions in the Declaration -- do you

25   still stick by those opinions that are stated in the

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 8

**Atkinson-Baker, Inc.**
www.depo.com

1    Declaration?

2        A.    Yes, except for the possibility of a

3    typographical error.

4        Q.    Would that be the only correction you would

5    want to make is a typographical error?

6        A.    Yes.

7        Q.    And where is that typographical error?

8        A.    I'm not sure.  We might come to it.  There were

9    a subsection where there are several paragraphs where I

10   was talking about prior art reference, and all of a

11   sudden in the last paragraph, I just switched the name

12   of the reference to something that was incorrect.  It

13   should be clear from context, but I don't recall what

14   page it's on.

15       Q.    What materials did you review when you were

16   drafting this Declaration?

17       A.    I wouldn't say I reviewed substantially more

18   than the documents that were referred to -- well, the

19   documents that were filed, at that time in the IPR.

20   Principally, this is a Rebuttal to the Bederson

21   Declaration.  And so my, my method of operation there

22   is I used the document that I'm rebutting as a guide.

23   So I don't, I don't recall reviewing any, any documents

24   other than the ones in the IPR, or that are referred to

25   in here, which I don't think is a larger set than that.

9

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

**Atkinson-Baker, Inc.**
**www.depo.com**

1    Q.   Let's turn to paragraph 38 in your Declaration.

2    A.   Yes.

3    Q.   So in this paragraph you say, quote, "It is my

4    opinion that a POSITA with respect to the '273 patent

5    would have at least a bachelor's degree in electrical

6    engineering or computer science and at least two years

7    experience with user interfaces and internal software

8    and mechanical mechanisms of electronic voting

9    machines," end quote.

10        Is that correct?

11   A.   Yes.

12   Q.   How did you come up with this definition for a

13   POSITA?

14   A.   Yeah.  So my understanding is that a POSITA has

15   to be able to understand the specification and be able

16   to make and use the invention without undue

17   experimentation.  And so I read through the patent and

18   I looked at the claims, and I decide, on that basis,

19   what kind of expertise the person would need.

20        And I found that the characterization given by

21   Dr. Bederson, or by Petitioner was insufficient because

22   mere experience with voting systems -- it could have

23   been confined to solely electronic systems, not ballot

24   handling systems.  So I didn't find that sufficient.

25        But I certainly agree about the level of

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 10

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1    education.  And I just thought that more and different
 2    experience would have been required in order to be able
 3    to make one of these things.
 4         Q.   You mentioned ballot handling systems.  Is the
 5    '273 patent a claimed ballot handling systems?
 6         A.   No, it doesn't, but the specification describes
 7    them.
 8         Q.   So the claims don't mention ballot handling?
 9         A.   No, they don't.
10         Q.   In your definition of the POSITA, you mentioned
11    experience with user interfaces.  How would you define
12    a user interface?
13         A.   Well, it's a mechanism by which a human being
14    interacts with the computer system.  The user interface
15    can be -- can take on many forms.  It could be a
16    touchscreen.  It could be a computer screen and mounts.
17    It could be push buttons.  There are all kinds of user
18    interfaces.
19              You just have to understand that there are many
20    design issues that are important when we're dealing
21    with the entire public.  We can't assume any level of
22    education or sophistication among voters because
23    everybody has equal access to the polls.  And so there
24    are very heavy requirements for creating useable
25    non-confusing interfaces.
```

11

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 11

**Atkinson-Baker, Inc.**
**www.depo.com**

1    Q.   But this definition is for a POSITA not the

2   general public?

3    A.   No.  No.  What I'm saying is the POSITA needs

4   to be able to design a user interface that the general

5   public is going to be able to use, without the need for

6   training, for example, or experience.

7    Q.   You mentioned that the POSITA would have at

8   least two years of experience with user interfaces.

9   What type of experience are you referring to?

10    A.   Okay.  So I say "two years of experience with",

11   and then I give a list of, I think, three things:

12   Internal software and electrical and mechanical

13   mechanisms of electronic voting machines.  So the two

14   years' experience, I don't think -- again, you don't

15   need two years' experience in each of those three

16   things.  You need a total of two years' experience,

17   during which you're being exposed to those things.

18    Q.   And what type of experience --

19    A.   The last one, I didn't answer your question.  I

20   clarified it.  Now I can answer your question.

21    Q.   Sure.

22    A.   I think you asked me what does it mean to have

23   experience with user interfaces.  So, was that the

24   question?

25    Q.   That's the question.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 12

```
 1      A.   Yes.  So, certainly one needs to be familiar
 2   with the spectrum of user interfaces.  One needs to
 3   understand what the advantages and disadvantages of
 4   various mechanisms are, and in particular, what
 5   benefits and difficulties users find in various user
 6   interfaces and what types of errors does the user
 7   interface make them likely to commit.
 8      Q.   Does this experience also include designing
 9   interfaces or just using interfaces and knowing about
10   interfaces?
11      A.   No.  It would be designing interfaces.  I think
12   while a degree of book knowledge and exposure to
13   interfaces is useful, until you actually try to create
14   them yourself, I don't think you appreciate all the
15   issues.
16      Q.   So a POSITA would be a person who has
17   experience designing interfaces?
18      A.   I think design is a component of experience
19   with user interfaces.
20      Q.   Do you have experience designing interfaces?
21      A.   Plenty.
22      Q.   Can you explain or give examples of where
23   you've designed an interface or interfaces before?
24      A.   Sure.  So, at Carnegie Mellon between the years
25   1999 and 2018, I ran a program in e-business
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 13

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1   technology.  It was a Master's program in which we
 2   trained students to create e-business systems.  Every
 3   summer we had anywhere from 5 to 12 sponsored projects
 4   by outside commercial sponsors in which the students
 5   were required to produce a working prototype, according
 6   to the needs of the sponsor.  Almost all of these
 7   systems required human user interfaces because they
 8   were designed to be used by people.
 9        And so I supervised, over that time, something
10   like 130 different teams.  And I would say that of
11   those teams, at least 120 involved human computer
12   interfaces.  And so I was advising the students,
13   critiquing their interfaces, evaluating their changes,
14   and participating in the evaluation of how well they
15   had done for the sponsor.
16   Q.   Sorry.  I missed it.  You might have stated it.
17   What was the interface for?  What were these interfaces
18   for?
19   A.   Oh.  There are a wide variety of systems.  Many
20   of them were -- in more recent years, they were cell
21   phone apps, which have extremely tight user interface
22   requirements because of the small size of the screen
23   and the small number of buttons that one could ever
24   show to somebody on such a screen.
25        Prior to that, they were largely for
```

14

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 14

**Atkinson-Baker, Inc.**
**www.depo.com**

1    applications for desktop systems.  And they ran the
2    whole gambit.  They had a very wide spectrum of
3    sponsors, from banks, to start-ups, to physical fitness
4    equipment manufacturers, TV manufacturers.  Samsung,
5    for example, was a sponsor.
6        Q.   And you said you reviewed these systems?  You
7    reviewed the work of the --
8        A.   No.  I advised.  All of the student teams had
9    to report to me.  They, in addition, had another
10   adviser, who was a specialist in whatever particular
11   either technology or application area that the project
12   was in.  And so I would meet with the teams regularly
13   and critique their designs.  And then at the end, I had
14   to do an evaluation of them because they had to be
15   graded.
16       Q.   Did you design any interface yourself?
17       A.   Oh.  I've designed multiple interfaces over the
18   years.  When I was a computer programmer, I was
19   designing interfaces.
20       Q.   Can you give me an example of your most recent
21   design interface?
22       A.   Okay.  So let's see.  Yes.  So I'm actually
23   working with a sponsor, now, on a sponsor for the new
24   program that I'm currently the director of.  I
25   mentioned that in 2018 -- well, I didn't mention this,

15

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 15

**Atkinson-Baker, Inc.**
**www.depo.com**

1   but from 1999 to 2018, I was director of the e-business

2   technology program.  That program ended in 2018.  And I

3   became director of the Master's program in Artificial

4   Intelligence and Innovation.  And one of our sponsors

5   is a patent search firm.  And we've developed a new

6   mechanism for patent searching that required a design

7   of an interface to a searcher, between the computer and

8   the searcher.

9        Q.   And what portions of the interface did you

10  design in this particular example?

11       A.   Oh, I just designed what the book of field

12  would be.  I didn't write the underlying code.

13            (Deposition Exhibit No. 2004 marked for

14  identification.)

15  BY MR. SINGH:

16       Q.   I'm going to hand you Exhibit 2004, as it was

17  labeled in this IPR.  Can you verify that document is

18  Exhibit 2004?

19       A.   Pretty much I can.  The reason I say, the

20  reason I say "pretty much" instead of "absolutely" is

21  this one -- this resume says it's current to October

22  20th, 2019.  I assume that that, that that was the

23  current one at the time there was the filing.

24       Q.   Can you describe --

25       A.   But this certainly -- my CV is current to

16

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 16

**Atkinson-Baker, Inc.**
**www.depo.com**

1   October 20th, 2019.

2       Q.   Can you describe what Exhibit 2004 is for the

3   record?

4       A.   I thought I just did that.  It's my CV,

5   current, to October 20th, 2019.

6       Q.   On page 3 of Exhibit 2004, you have a list of

7   patents under your name?

8       A.   Yes.

9       Q.   Do any of those patents involve designing user

10  interfaces?

11      A.   I don't think so.  Well, the patents themselves

12  I don't believe describe user interfaces.  If one

13  wanted to implement -- well, it's actually not clear

14  that any of them really require a user interface.

15      Q.   On page 2 of Exhibit 2004, you have a list of

16  courses taught at Carnegie Mellon.

17      A.   Yes.

18      Q.   Do any of those courses involve user interface

19  design?

20      A.   Yes.  E-commerce Technology 2751, the third

21  one.

22      Q.   And what type of user interface did that course

23  cover?

24      A.   Web interfaces.  It was an electronic commerce

25  course.  So they were being taught to create web bases.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 17

**Atkinson-Baker, Inc.**
www.depo.com

1   Q.   And when you say "web interfaces", what are you

2   talking about, like HTML programming?  Can you further

3   explain what you mean by "web interface"?

4   A.   Sure.  So typically a web system, the user

5   front end will be a web browser.  And the web browser

6   is presenting Web pages that have a variety of

7   capabilities.  In some cases, you can type information

8   into a box.  You can click radio buttons.  You can drag

9   things, scroll things, et cetera.  And so the ability

10  to provide a user with an interface that is convenient

11  will not motivate the user to leave the site in

12  frustration.  It's very important in closing sales on

13  the Internet.  So that's what the course content dealt

14  with.

15  Q.   Let's go back to Exhibit 2001, which is your

16  Declaration in this IPR.  That's paragraph 37.  The

17  last sentence you say "The '273 patent relates

18  specifically to electronic voting systems, not the

19  systems more broadly."

20  A.   Yes.

21  Q.   Can you explain what you mean by that?

22  A.   Sure.  There are all kinds of voting systems.

23  There are pure mechanical lever machines.  There are

24  paper-based voting systems.  There are punch card

25  voting systems.  They're not all electronic.  So I

18

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 18

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1    could have a lifetime of experience with a mechanical
 2    lever machine, but it wouldn't give me a clue as to
 3    what kind of electronic system is built.
 4         Q.   Does the '273 patent disclose a voting -- an
 5    electronic voting system or a voting machine?
 6         A.   Well, both.
 7         Q.   Can you explain what you mean by "both"?
 8         A.   Sure.  I can have a voting machine that is not
 9    electronic.  Lever machines that were widely used in
10    the United States until slightly after 2002, those did
11    not have electronic components, but they were voting
12    machines.  So they're voting machines, and their subset
13    would be electronic voting machines.
14         Q.   So voting machines is a subset of a voting
15    system?
16         A.   Yes.  Because the voting system -- well, yes,
17    it's a subset.  There are voting systems in which there
18    are no machines.  For example, pure hand-marked,
19    hand-counted paper ballots, there are no machines.
20              Then once you introduce a machine, now, you
21    have a voting system because there's the preparation of
22    the ballot.  There are all kind of steps that occur
23    before the machine is configured for the election.
24    Then there's the actual election during which people
25    interact with the machine.  Then there's a process
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 19

**Atkinson-Baker, Inc.**
**www.depo.com**

1   after the election ends of getting the votes out of the

2   machine and tabulating them and auditing them and

3   certifying.  All of that is the voting system.

4       Q.   So in your opinion, if someone has experience

5   with voting systems, that means they have experience

6   with voting machines?

7       A.   Probably.  I mean, it would, it would be an

8   unusual case for somebody to have experience purely

9   with hand-marked, hand-counted paper ballots but they

10   don't necessarily have experience with electronic

11   voting machines.

12       Q.   Does the '273 patent disclose an electronic

13   voting system?

14       A.   Yes.  It doesn't disclose the entire system,

15   from soup to nuts.

16       Q.   In your definition of a POSITA, you say that

17   the POSITA would have experience with electronic voting

18   machines?

19       A.   Yes.

20       Q.   Shouldn't that be electronic voting systems,

21   since the '273 patent discloses an electronic voting

22   system?

23       A.   Sure.  It's difficult to have experience with

24   electronic voting machines and have been completely

25   isolated from the system aspects, but I guess it's

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 20

**Atkinson-Baker, Inc.**
**www.depo.com**

1    hypothetically possible.

2       Q.    And how many years of experience would you say

3    you have with voting systems?

4       A.    Thirty-nine.

5       Q.    And the same 39 years applies to voting

6    machines?

7       A.    Yes.

8       Q.    And that's because voting machines is a subset

9    of voting systems?

10      A.    Not because of that.  It's because the --

11   starting in 1980, I started certifying voting machines.

12      Q.    How did you start certifying voting machines in

13   1980?

14      A.    You asked, so I'll tell you.

15            In 1980, the Pennsylvania legislature passed a

16   law making it legal to use electronic voting systems in

17   Pennsylvania for the first time.  They never had been

18   used before.  They were illegal.  That statute provided

19   for a certification process conducted by the Secretary

20   of the Commonwealth that required the Secretary to

21   appoint three examiners of the voting systems to ensure

22   that the systems proposed for use in Pennsylvania

23   complied with the technical requirements of the

24   Pennsylvania Election Code.

25            The state put out a call for applicants.  Would

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 21

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1    anybody like to be an examiner?  And it explained what
 2    the role of the examiner would be.  It explained what
 3    the compensation would be.  And I recall seeing this on
 4    a bulletin board on my computer at Carnegie Mellon.  I
 5    was a professor there then, and I was also in law
 6    school at the time, in 1980.  And so I looked at this
 7    and I said "this looks like the kind of a perfect
 8    interface between law and technology."  So taking a
 9    piece of technology and I'm comparing it to a law to
10    see if it meets the requirements of the law.
11         So I was a young assistant professor.  I had no
12    idea that they would ever pick me, but I sent in my
13    resume.  And low and behold, in December 1980, I got a
14    letter congratulating me on having been selected as one
15    of the three examiners of voting systems in
16    Pennsylvania.
17         So the first exam was in December 1980.  It was
18    on the CES votomatic system, which was the one that was
19    widely criticized in 2000 in Florida, but largely,
20    because of my work and that of the other examiners, it
21    was never used in Pennsylvania.  So we didn't have that
22    problem.
23         And so I got to Harrisburg, the capital of
24    Pennsylvania, to do the first examination.  And I asked
25    the, the -- actually, it was the Director of the
```

22

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 22

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1   Elections Division how many applicants did you have for
 2   these three positions?  And they said three.  And one
 3   of the others was another faculty member at Carnegie
 4   Mellon, and another was a patent attorney from York,
 5   Pennsylvania.  Well, that panel of three -- the
 6   composition of that panel did not change for many
 7   years.  More than ten years.  And so between 1980 and
 8   1996, I did every, every voting system examination of
 9   every system proposed for sale in Pennsylvania.  And I
10   did substantially the same thing for Texas.
11       Q.   So prior to this, prior to certifying voting
12   machines in 1980, did you have experience in voting
13   systems prior to that?
14       A.   The only voting system that I ever voted on
15   prior to that -- in fact, until the year 2000 -- was a
16   mechanical lever machine, which every place I happened
17   to live happened to use those.  So, personally, I had
18   never been exposed to any other kind of voting machine
19   until 1980.
20       Q.   And so when -- as an examiner, how much time
21   did you devote to examining the machines?
22       A.   Okay.  So, typically, the vendor is required,
23   in advance, to some submit the source code and user
24   documentation and internal documentation, so design
25   documents that normally the public would not see.
```

23

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 23

**Atkinson-Baker, Inc.**
**www.depo.com**

1    Those are submitted in advance so they can be reviewed

2    by the examiners, so we can prepare for our

3    examination.  Then we all assemble in Harrisburg.

4           The scenario that we developed -- and all of

5    this was videotaped.  And every one of my exams, in

6    Pennsylvania, is still available on videotape because

7    these examinations were open to the public.

8           The examiners would assemble, along with the

9    usually small number of members of the public.  It's

10   hardly ever zero, but it was never more than five, and

11   various officials of the state.  And the vendor would

12   give a demonstration.  They were allowed to say

13   whatever they wanted to say.  And after that time

14   period, the examiners were allowed to do anything they

15   wanted to do to the machine, including try to hack it,

16   break it, whatever.  And then usually we would spend a

17   day with the machine.  Then we would go back to our

18   respective offices and independently write reports to

19   the Secretary of the Commonwealth.

20          I never recall any communication among the

21   examiners after the exam.  So we didn't, like, get

22   together and decide what we were going to say.

23   Everybody had their -- said their own peace.

24          And then the Secretary, at his peril, would

25   occasionally not take our recommendation, but after a

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 24

1    while, the Secretary started following our

2    recommendations.

3        Q.   So can you give me an estimate of how many

4    hours, per year, you would spend on this panel?

5        A.   Well, so, my recollection is that I would go to

6    Harrisburg something like three times a year, and Texas

7    six times a year, and those were the primary ones.  The

8    other ones were only occasional.  So nine times a year.

9    So it was always at least a day in the state, plus a

10   day of review in advance and a day of writing.  So a

11   month, a month a year, maybe.

12       But I gave a course in electronic voting and I

13   wrote papers on electronic voting.  So it wasn't my --

14   my involvement wasn't restricted to just certification

15   exam.

16       Q.   Going back to your definition of a POSITA.  You

17   mentioned that the POSITA would have at least two years

18   experience with mechanical mechanisms of electronic

19   voting machines?

20       A.   Yes.

21       Q.   Do the claims of the '273 patent recite any

22   mechanical mechanisms?

23       A.   No.  Well, let me look.  It's always dangerous

24   to talk about patents without looking.

25       There are mechanical mechanisms, in a sense of

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 25

**Atkinson-Baker, Inc.**
**www.depo.com**

1   push button switches.  There aren't ballot transport
2   mechanisms.
3       Q.   You said there are push buttons that are
4   mechanical mechanisms in the claims of the '273 patent?
5       A.   Yes.  I'm looking at the first and second pairs
6   of push button switches, center push button switches.
7       Q.   So would someone require a bachelor's in
8   engineering to understand what a push button is?
9       A.   The -- no.  Of course not.  A member of the
10  public understands what a push button is.  But that's
11  not -- the requirement is not understanding what it is.
12  The requirement is to understand its function in the
13  machine and how to make and use one.
14      Q.   Do the claims of the '273 patent recite
15  anything about internal software?
16      A.   I don't believe that the word "software"
17  appears.  On the other hand, you have to provide a
18  display screen.  You can't drive a display without
19  software.  You have to visually present contests and
20  you have to allow scrolling among contests.  That's all
21  done with software, et cetera.
22           I mean I can go on through every limitation in
23  all of the claims, if you want.
24      Q.   But do you agree that the internal software is
25  not actually claimed in the claims of the '273 patent?

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 26

**Atkinson-Baker, Inc.**
www.depo.com

1     A.   To answer that, I'll just have to quickly

2   review the claims.

3     Q.   I'll hand you a copy of the patent.

4     A.   Okay.  I find it actually easier to search

5   this.  I have to look through it.

6          So there's no reference in Claims to internal

7   software.  There is a reference in the specifications

8   to software, however, and it's clear that the

9   embodiment, this invention is a software embodiment.

10         (Deposition Exhibit No. 1001 marked for

11   identification.)

12  BY MR. SINGH:

13    Q.   I'm going to now hand you Exhibit 1001 from the

14   IPR.  This is a copy of the '273 patent.  Can you

15   confirm that it's the copy of the '273 patent?

16    A.   Yes.

17    Q.   So at page 35 of your Declaration, you have a

18   "Claim Construction" section.

19    A.   Yes.

20    Q.   Did you construe terms in this IPR?

21    A.   Did I construe terms?  We'll see as we go

22   through.

23         For example, in Section A, paragraph 80, I'm

24   not doing any construction.  I'm just saying that I've

25   been asked to apply Petitioner's construction.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 27

**Atkinson-Baker, Inc.**
**www.depo.com**

1        Then for scrolling scrolling, Section B, I
2   critique Petitioner's proposed definition of scrolling.
3   I suppose that you could, you could interpret
4   paragraph 85 as a statement of what a POSITA would
5   understand scrolling scrolling to mean.
6        In Section C, paragraph 86, I say "in plain and
7   ordinary meaning to one of ordinary skill."
8        In Section D, paragraphs 87 to 89, I say that
9   the term "had plain and ordinary meaning" which I give
10  an elucidation of what I think a POSITA would
11  understand that plain and ordinary meaning to be.
12       Then there's a big Section E on what it means
13  for push button switches to enable.
14       And in paragraph 95, I explain what a -- how a
15  POSITA would have understand those terms.
16       Section F, in paragraph 101, I give an opinion
17  as to what a POSITA would understand that term to mean.
18       And in Section G, on the word "remote", in
19  paragraph 106, I explain how a POSITA would understand
20  that.
21       Now, that's not claim construction.  That's
22  testimony about what a POSITA would understand.
23       Claim construction itself being matter of law,
24  not for me.
25     Q.   Does your Declaration contain all of the claim

28

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 28

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1    construction positions for the '273 patent?
 2                MR. GOTTUSO:  Object to form.
 3        A.   I don't understand the question.  When you say
 4    "all of the claim construction positions".  Do you mean
 5    all of mine?  Or all that might be proposed by patent
 6    owner?  Or all that might be proposed by Petitioner?
 7    I'm not -- I don't know what you mean by "all of the
 8    claim construction positions."
 9    BY MR. SINGH:
10        Q.   All of your claim construction positions.
11        A.   Well, no.  And they don't -- it doesn't have
12    to.
13             For example, I say that I've been asked to
14    apply such construction, but I don't necessarily
15    believe it's correct.  And I may have, in my mind, a
16    vision of what the correct construction is, but that
17    doesn't matter, because I've had my say.  Other than in
18    the Declaration end, whatever you get out of me today,
19    I don't have another opportunity to say anything.
20        Q.   So does your Declaration contain all of your
21    opinions on claim construction?
22                MR. GOTTUSO:  Object to form.
23        A.   I don't understand the question.  On claim
24    construction, as the claim should be construed in this
25    IPR?  Or as might be construed later in District Court
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 29

**Atkinson-Baker, Inc.**
**www.depo.com**

1   case?

2   BY MR. SINGH:

3       Q.    In this IPR.

4       A.    Probably not.  And it doesn't have to.  I don't

5   have another opportunity to propose claim construction.

6   It's not like there's going to be a trial and you're

7   going to get surprised by my new opinions.  I don't

8   have any opportunity to offer new opinions.

9       Q.    You mentioned that you have other positions

10  that were not included in your Declaration.

11      A.    Sure.

12      Q.    Can you explain which positions those were?

13      A.    No.  Obviously, when I read claims, I have

14  understandings of meanings of the terms.  I haven't

15  formulated formal constructions yet.

16      Q.    And why are you not able to give your opinion

17  on these other positions?

18      A.    Because I just answered that question.  I

19  haven't formulated formal constructions yet.  I

20  disagree with some of the constructions of the

21  Petitioner.  I've applied them, but I haven't figured

22  out exactly what the right construction should be yet

23  because I didn't need to.

24      Q.    When you say you didn't need to, how did you

25  determine you didn't need to apply your own claim

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 30

**Atkinson-Baker, Inc.**
www.depo.com

1   construction?

2       A.   Well, there are probably 200 different words

3   that are used in the claims.  You don't construe every

4   word.  Most of the words are used in their plain and

5   ordinary meaning.

6       Q.   How do you decide which terms to construe and

7   which ones not to construe?

8       A.   Well, usually, I'm guided by counsel.  They ask

9   me:  "Would you offer your opinion as to what a POSITA

10  would have understood this term to mean?"  In some

11  cases, I dream it up myself.  It seems to me this is a

12  really important term, it may be misunderstood by the

13  Board, we better do something about this.  But in most

14  cases, it hasn't been necessary.  I don't have to.  And

15  we don't -- neither Petitioner nor patent owner

16  proposed 200 constructions.

17      Q.   So all of the terms that appear in your

18  Declaration were offered by counsel?

19      A.   I don't recall.  They might have been.  I might

20  have suggested that we really ought to construe such

21  and such.

22      Q.   Do you know which ones you suggested that --

23  strike that.

24          Do you recall which terms that you wanted to

25  have construed that were not presented by counsel?

31

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 31

**Atkinson-Baker, Inc.**
**www.depo.com**

1    A.    I don't recall.

2    Q.    Let's look at your construction for the word

3    "remote" that appears on page 48 of your Declaration.

4    A.    I'm looking.

5    Q.    Can you define your construction for the word

6    "remote"?

7    A.    I'm sorry.  I didn't hear the question.

8    Q.    I'm sorry.  Can you define the word "remote"?

9    A.    Well, paragraph 106.  "Separated by a space

10   greater than usual."

11   Q.    And how did you arrive at this construction?

12   A.    Well, if you read 104, paragraph 104, it

13   explains the motivation for "remote" as used in the

14   claims.  So let's, let's -- we'll make reference to the

15   claims, since that's the context in which we're doing

16   the construction.

17         I think it's Claim 4.  "The method of Claim 1

18   wherein said navigation device includes one or more

19   auxiliary push button switches located remote from said

20   first and second pairs of push button switches and said

21   center push button switch."  I think I read that

22   correctly.

23         So why?  Why are they -- why is there a claim

24   to remoteness?  And it has to do with the nature of

25   mechanical user interfaces.  If I have a bunch of keys

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 32

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1   over here that are push buttons that I'm manipulating,
 2   and I have a different set that perform totally
 3   different functions, you don't want them close by.
 4   Because if I'm off by one row, I'll end up
 5   inadvertently pushing a button I shouldn't be pushing.
 6   And so you move the other switches that you don't want
 7   to be confused with the first set of switches away.
 8        Now you don't put them in another room, because
 9   the voter is not going to push a few buttons in this
10   room and then go into another room to vote.  It all has
11   to be within the confines of a voting space.  And so
12   "remote" just means a greater distance than usual,
13   which is the usual spacing between the first set of
14   buttons.  And these have to be farther away than that,
15   or they could easily be confused with the first set of
16   buttons.  It all makes sense in the context of a
17   patent.
18        Q.   So what does "usual" mean?
19        A.   Usual is the usual spacing between buttons.  So
20   it differs.  For example, the buttons on a Blackberry
21   are very, very close together.  The buttons on a
22   numeric keypad, on a computer, are farther apart than
23   they would be on a Blackberry.  So if I wanted a
24   Blackberry to use in voting, then I would have to make
25   sure that these auxiliary buttons could not be confused
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 33

**Atkinson-Baker, Inc.**
**www.depo.com**

1   with the regular keyboard buttons.  So I have to move

2   them away.  But how far do I have to move them away

3   depends on what the context is.

4          If it's a Blackberry the distance is quite

5   different.  If I have these huge buttons over here that

6   are separated by this distance, then the auxiliary has

7   to be farther away than that, otherwise, they could

8   easily be confused.

9          So it's contextual.  It depends.  It's based on

10  the use of these buttons in this particular invention.

11  It's not a definition of the word "remote" totally

12  outside of the patent.

13      Q.   So other than the claims, does the word

14  "remote" appear in the '273 patent?

15      A.   No.  The word itself does not appear.

16      Q.   Going back to your Declaration.  Section 7 is a

17  summary of the '273 patent.  And at paragraph 46, you

18  use -- sorry.  I'll wait until you get there.

19      A.   Yes.

20      Q.   Paragraph 46 you use the term "discrete menu".

21  How do you define that term, "discrete menu"?

22      A.   Separate.  The menu for two different contests

23  is never presented to the voter at the same time.  That

24  causes massive confusion among voters.

25      Q.   So a discrete menu only displays one single

34

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 34

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1   contest?
 2       A.   That's right.
 3       Q.   Does the word "discrete" appear in the '273
 4   patent?
 5       A.   No.
 6       Q.   At paragraph 46, you provide citations to the
 7   '273 patent.  As Column 14, Lines 14 through 16, Column
 8   14, Lines 28 through 30, Column 38, Lines 40 to 44.
 9            Let's take a look at the first citation, just
10   Column 14, Lines 14 through 16.
11       A.   Yes.
12       Q.   Does the description there describe a discrete
13   menu?
14       A.   No.
15       Q.   Let's look at the next citation, Column 14,
16   Lines 28 through 30.  Does that portion describe a
17   discrete menu?
18       A.   It's a bit of a strange citation because
19   there's no sentence that begins on Line 28.  No.
20       Q.   Let's look at the last citation you provided.
21   It's Column 14, Lines 41 to 44.
22       A.   Yes.
23       Q.   Does that portion of the -- does that portion
24   describe a discrete menu?
25       A.   No.  I think, I think there may have some typos
```

35

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 35

**Atkinson-Baker, Inc.**
**www.depo.com**

1  associated with these citations.

2      Q.   Do you happen to know, right now, what the

3  correct citations would be?

4      A.   No.  Because I was not alerted to the error

5  until a minute ago.

6      Q.   Sitting here, can you find where, in the '273

7  patent, a discrete menu is described?

8      A.   Oh.  I probably can, but I can't

9  instantaneously go to it.  I have to review the

10  specification.  So how about this?  I'll do it during a

11  break, instead of wasting time on the record sitting

12  here?

13     Q.   I think you have an electronic version of the

14  patent open.  You can probably scroll up and then find

15  it.

16     A.   Oh, I do.  Sure.  Okay.  If you want me to find

17  it now, I'll find it now.

18          So I note -- so there are lots of figures in

19  the patents.  And so let's start out with, let's say,

20  Figure 25a.  There's one contest on there, 25c.  It's

21  the same contest.  But 25d, councilman at large, which

22  was the second contest, is presented in a separate

23  screen.

24          And, in fact, if you look at all of the

25  figures, there's never more than one contest there.  A

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 36

**Atkinson-Baker, Inc.**
**www.depo.com**

1   good design principle.

2          Then, of course, the reason that you need to be
3   able to scroll between contests is that there's never
4   more than one contest on a screen.  So to get to the
5   next contest, you have to scroll.  You wouldn't be
6   presented with both contests or more than one contest
7   on the same screen.

8          Okay.  So I refer you to Column 17, Line 28.
9   "After the voter is finished with the first race, the
10  capital N-E-X-T prompt 522 (or the right arrow key) 328
11  on sub-panel 312 is pressed to move to the next race.
12  The next race is illustrated in FIG.25d and again
13  displays the contest 530 the position 532 and the
14  candidate's area 534."  So there's no need to press
15  "next", if the same -- if the second -- if the next
16  contest is already on the screen, you don't, you don't
17  have to press "next".

18         So what this is saying is that to get from one
19  contest to another, you have to press the "next"
20  button.  So that's one.

21         So, again, in Column 17, Line 6, "the main
22  display area 518 of this screen informs the voter of
23  the contest 530, the position 532 and the candidate's
24  area of 532."  So every screen has a contest and a
25  candidate's area.  It doesn't have two contest areas.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 37

**Atkinson-Baker, Inc.**
www.depo.com

1    Q.   Does the '273 -- other than the figures, does

2    the '273 patent actually describe -- use the word

3    "discrete" in its description?

4    A.   I answered that.  I said the word "discrete"

5    does not appear in the patent.

6    Q.   In presenting one contest per screen, do you

7    consider that -- strike that.

8         Is presenting one contest per screen a novel

9    concept?

10   A.   I don't know.  I mean I can go back to

11   historical records and determine that, but it's not

12   claimed.  So I don't think it has to be.

13   Q.   So you agree that the '273 patent isn't the

14   first time someone presented a single contest in a

15   screen?

16              MR. GOTTUSO:  Object to form.

17   A.   I don't agree or disagree.  I don't know

18   because I'd have to go back and check dates.  I have a

19   lot of material on elections.  I could determine.

20   BY MR. SINGH:

21   Q.   But as someone who has multiple years of

22   experience with voting and voting machines, was the

23   '273 patent the first time you saw that there was a

24   single contest per screen presented to the voter?

25   A.   It might have been.  It might not have been.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 38

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1    Well, when you say -- to me, no.  By the time I first

 2    read this patent, I had seen voting systems that had

 3    one contest per screen, but that's not the question,

 4    right?  The question is at the time of the invention.

 5    And I'd have to, I'd just have to go back and look.

 6        Q.   So when you first read the '273 patent, then,

 7    you came across a single contest per screen, did you

 8    think that was a novel concept at the time you read the

 9    '273 patent?

10                 MR. GOTTUSO:  Object to form.

11        A.   Oh, I'm sure it wasn't at the time that I read

12    the patent.

13    BY MR. SINGH:

14        Q.   All right.  Page 38 of your Declaration, you

15    offer a construction for presenting said contests and

16    said associated options to the voter and present a

17    plurality of contests and a plurality of options

18    associated with each of the contests.

19        A.   Yes.  So I just want to correct the question.

20             I'm not really offering a construction.  What

21    I'm saying is this how a POSITA would understand the

22    term.  If that's the same as a construction, then so be

23    it.  I'm just offering my opinion as to how somebody

24    who is familiar with what he needs to be familiar with

25    would understand the term.
```

39

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 39

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1      Q.   At paragraph 89, you state, "Accordingly, in
 2   light of the '273 patent a POSITA would understand the
 3   plain and ordinary meaning of presenting said contests
 4   and said associated options to the voter to be
 5   communicating to the voter the name of each of the
 6   contests and an identifier for each of the respective
 7   options for which a vote may be cast in such contests."
 8        Is that correct?
 9      A.   Yes.
10      Q.   What is an identifier?
11      A.   Something that enables you to find the person
12   you want to vote for.  Or if -- the reason this is
13   phrased as "options" is that not every contest involves
14   human candidates.  It could be, for example, a "Yes" or
15   "No" proposition.  And so it's phrased in terms of
16   options rather than candidates.
17        But you have to be able to find the option that
18   you want to select.  And so the identifier would most
19   commonly be the name of a person.  It might not
20   necessarily be a name.  It might be a photograph of
21   people who are illiterate.  There are various different
22   ways in which you can present candidates to voters.
23      Q.   Is presenting "Yes" or "No", isn't that an
24   option to the voter?
25      A.    "Yes" or "No" is an option, yes, but I'd have
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 40

**Atkinson-Baker, Inc.**
www.depo.com

1    to be able to determine which is "Yes" and which is

2    "No".  Usually that's done with the word Y-E-S.  It

3    can't be done with nothing; otherwise, the voter

4    wouldn't know what to pick or where to make his

5    selection.

6        Q.   Does the '273 patent include the word

7    "identifier" in its description?

8        A.   I'll check.  I don't think so, but we'll see.

9    It doesn't have to.  "A person of ordinary skill in the

10   art often understands terms using other terms that are

11   not expressly listed in the patent."  It's of no

12   significance.

13       Q.   I'm not sure if you answered the question.

14   Does the '273 patent use the term "identifier"?

15       A.   Oh, I thought my first word out of my mouth was

16   no.

17              MR. SINGH:  Sorry.  I must have missed it.

18   I think this is a good spot to take a break.

19              THE WITNESS:  Okay.

20         (Whereupon, there was a recess in proceedings.)

21   BY MR. SINGH:

22       Q.   Did you discuss the substance of your testimony

23   during the break with anybody?

24       A.   No.

25       Q.   Earlier you mentioned that no screen of the

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 41

**Atkinson-Baker, Inc.**
**www.depo.com**

1    '273 patent disclosed -- or shows -- presents two

2    contests.

3         Is that correct?

4    A.   That's what I found when I looked at the

5    patent.

6    Q.   Can you take a look at Figure 25i.

7    A.   Yes.

8    Q.   Do you agree that that figure shows a screen

9    that presents two different contests?

10   A.   No.  It's a review screen that shows how you

11   voted in two different contests.  It doesn't present

12   the contest because you can't make any choices on that

13   screen.

14   Q.   So you define presenting a contest as

15   presenting the contest and options?

16   A.   The phrase that's being construed is

17   "presenting said contests and said associated options

18   to the voter," yes.

19   Q.   If you'd just focus on "presenting contests"

20   does Figure 25i not present two different contests?

21   A.   If you mean as a hypothetical, totally outside

22   the context of this patent?  The question you asked me

23   has no relationship to the term that we're talking

24   about.

25   Q.   I'm asking just "presenting contests", not the

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 42

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1   whole term.
 2       A.   There's no question that the names of more than
 3   one contests are in Figure 25i.  It's a review screen.
 4   The voter can't use it for voting.  It's just to verify
 5   his vote.  If he wants to change something, he can go
 6   back using the "previous", using the "previous" button.
 7       Q.   Did you offer an opinion on the validity of the
 8   '273 patent?
 9       A.   You mean like ever, or in this?
10       Q.   In your Declaration.
11       A.   I think -- I don't think that I have a sentence
12   that says "the '273 patent is valid."  What I've done
13   is to rebut arguments for invalidity.
14            Petitioner and Dr. Bederson opine that the
15   patent was invalid because the claims would have been
16   obvious.  And I rebut that.  Now is that an opinion of
17   validity?  It's an opinion that invalidity has not been
18   shown.
19       Q.   So in your opinion, you never offered an
20   opinion stating that the claims of the '273 patent are
21   valid?
22       A.   Not expressly.  But that's not my role.  My
23   role is to rebut the allegations of invalidity, which
24   I've done.
25       Q.   But do you believe that the claims of the '273
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 43

**Atkinson-Baker, Inc.**
**www.depo.com**

1    patent are valid?

2        A.   They're certainly valid over the prior art

3    that's been introduced in this IPR.

4        Q.   Earlier you mentioned that you didn't offer a

5    construction -- or you didn't opine on all of the terms

6    that you believe do require, in your opinion, a

7    construction?

8        A.   I don't think I said that.  I think what I said

9    was that there are -- I'm estimating 200 different

10   words used in the claims.  And nobody is suggesting

11   that every one of them requires construction.

12            I have opinions that I may hold about the

13   correctness of Petitioner's constructions, but I was

14   asked to apply Petitioner's constructions for the

15   purpose of this IPR.

16       Q.   Did you apply Petitioner's constructions to the

17   prior art in your review of the prior art?

18       A.   Yes, because Petitioner did.  And what I'm

19   supposed to do is decide whether Petitioner is correct

20   or not, and if not correct, explain why.

21       Q.   There were other terms that you deemed to

22   acquire to construction but you didn't offer any in

23   this Declaration; is that correct?

24       A.   When you say "deemed to acquire to

25   construction," they may require a construction if

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 44

**Atkinson-Baker, Inc.**
**www.depo.com**

1   there's a trial in District Court.  I don't think they

2   require construction for this IPR or they would have

3   been mentioned in my Declaration.

4       Q.   How did you make that determination, whether or

5   not the terms acquire a construction at this stage of

6   the proceeding?

7       A.   I just look.  So, for example, if we start with

8   the first words of the claim, Claim 1.  "Method of

9   voting."  I don't think "voting" requires construction.

10  "It allows a voter."  I don't think "voter" requires

11  construction.  To "navigate", I don't think "navigate"

12  requires a construction.  I don't even think "plurality

13  of contests" requires construction.  "Plurality of

14  options."  It's would the Board, without specific

15  construction or testimony, be able to understand the

16  claim terms correctly.  If they can, then there's no

17  point in construing them.

18          Sometimes Petitioner will come with

19  construction that he likes for something, and then the

20  issue is joined.  Do we live with Petitioner's

21  construction or do we rebut and propose our own?

22  That's the process.  I just explained the process.

23  That's how I do it.

24      Q.   Turn to Figure 19 of the '273 patent.

25      A.   I'm there.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 45

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1      Q.   Do the claims of the '273 patent "to acquire a
 2  navigation device comprising a center push button
 3  switch, a pair of push button switches positioned above
 4  and below said center push button switch and a second
 5  pair of push button switches positioned left and right
 6  of said center push button switch."  Is that correct?
 7      A.   Yes.
 8      Q.   In Figure 19, where do you see such a
 9  navigation device?
10      A.   Well, the center button is 328 -- I'm sorry,
11  330, the above and below are 322 and 324 and the left
12  and right are 326 and 330.
13      Q.   So would you agree that 312, of Figure 19, is
14  the navigation device?
15      A.   No.  It's not clear to me exactly what 312
16  means.  312 is pointing to a panel.  And on that panel
17  are located these devices.  I could take a look at the
18  description of 312 in the patent.  I think, I think
19  you're probably right.  Let's see what it says about
20  312.
21           Yes.  So 312, it's subject to another figure.
22  It's Figure 23.  And I think it's pretty apparent that
23  312 means not just the flat panel on which the buttons
24  are, but it includes the whole structure.  But I'm
25  checking.
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 46

**Atkinson-Baker, Inc.**
**www.depo.com**

1          Yeah.  It's referred to in the patent as

2    sub-panel 312, but it's pretty clear, from the context,

3    that it includes the buttons.

4          Q.   So would you agree that 312 is the navigation

5    device?

6          A.   In that figure, yes.

7          Q.   Which figure are you referring to?

8          A.   Nineteen.

9          Q.   Is it not -- is item 312 not a navigation

10   device in any of the other figures?

11         A.   No.  But you asked me what figure I was talking

12   about.  It's Figure 19.

13         Q.   You specified Figure 19, so I just want to make

14   sure that it applies to all of the figures.

15         A.   You specified Figure 19.  When you asked me,

16   you said "Please turn to Figure 19."  Now, if you --

17   I'm happy to answer the other question which is --

18         Q.   Should I ask it again?

19         A.   -- do I think 312 is not a navigation device in

20   any of the other figures, no.

21         Q.   Let me just ask it in a different way.  It's

22   kind of confusing with double negatives.

23              And so is 312, item 312 a navigation device in

24   the '273 patent?

25         A.   Yes.

47

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 47

**Atkinson-Baker, Inc.**
www.depo.com

```
1      Q.   Other than the "Up", "Down", "Left", "Right",
2   and the center push buttons, are there any other
3   buttons shown in the navigation device?
4      A.   Well, if we're referring to navigation device
5   312, then I think Figure 23 seems to say it all.  There
6   are 5 buttons in Figure 23, not 6.  Or not more.  Not
7   fewer.
8      Q.   So then the navigation device is fully
9   described in Figure 23?
10     A.   A navigation device.
11          MR. GOTTUSO:  Object to form.
12     A.   Not the navigation device.  There can be
13  multiple embodiments.  And, in fact, it's disclosed in
14  the patenty, you can replace sub-panel 312 with
15  something else, but it's a navigation device.
16  BY MR. SINGH:
17     Q.   As an expert in voting systems, is a voting
18  machine that has both a visual display and an audio
19  output, is that something that's novel?
20          MR. GOTTUSO:  Object to form.
21     A.   As of what time?
22  BY MR. SINGH:
23     Q.   As of the filing of the '273 patent?
24     A.   I don't think so.  There were various statutory
25  requirements for voting machines to accommodate voters
```

48

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1    with disabilities.  And the use of visual displays and
 2    headphones -- with headphones is a common way of
 3    accommodating blind voters -- was the common way of
 4    accommodating blind voters.
 5          And we used to test for that in Harrisburg.
 6    There was actually a disabled person who worked for the
 7    Department of State.  And we would invite that person
 8    in try to use the voting system to see if it met the
 9    statutory requirement.
10       Q.   So, in those machines that have both a display
11    and an audio output, is it something new to disable the
12    display when the audio is being used?
13       A.   You mean new at the time of this invention?
14       Q.   Yeah.
15       A.   I don't recall.  I mean I can probably go
16    back -- and I have a huge amount of literature.  I have
17    every document that any vendor ever supplied to the
18    Secretary of the Commonwealth, I have somewhere.  And
19    so I could do it, and I could do a timeline to
20    determine when that happened.
21       Q.   Based on your experience, would you say that it
22    would be obvious to turn off the display or adjust the
23    display in some manner when only the audio portion has
24    been used?
25       A.   I don't know.  I haven't formed an opinion
```

49

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 49

**Atkinson-Baker, Inc.**
www.depo.com

1   about that.  I'd have to go back, and as I say, look at

2   the state-of-the-art at the time to make that

3   determination.  There certainly was a time when it

4   wouldn't have been obvious.  Today it would be.

5       Q.   Why would it be obvious today?

6       A.   Because loads of machine do it.

7       Q.   What's the purpose of doing that?

8       A.   Privacy.  So that the blind voter can be

9   assured that there isn't somebody that can't see

10  watching them vote.

11      Q.   Is presenting a vertical column of options to

12  the voter, is that something you think was novel at the

13  time of the filing of the '273 patent?

14      A.   So presenting a column of options?

15      Q.   Yeah.  A single column of options to the voter.

16      A.   By "options", you mean choices that the voter

17  can make?

18      Q.   For example, the candidates' names that you're

19  supposed to pick for a particular contest?

20      A.   No.  Markson's ballots had been doing that for

21  a long time.

22          (Deposition Exhibit No. 1005 marked for

23  identification.)

24  BY MR. SINGH:

25      Q.   I'm going to hand you Exhibit 1005.  This

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 50

**Atkinson-Baker, Inc.**
**www.depo.com**

1    exhibit has been marked as Exhibit 1005 in this IPR.

2    Can you verify that that document is Exhibit 1005?

3        A.   It says it is.

4        Q.   And what is Exhibit 1005?  Can you describe it?

5        A.   A Nguyen, et al U.S. Patent 7128263.

6        Q.   And in your Declaration, you addressed two

7    limitations that you believe that Nguyen does not

8    disclose.  One appears at page 71, the other one

9    appears at page 75.

10       A.   Okay.

11       Q.   I'm referring to the headings that are

12   appearing on pages 71 and 75 in your Declaration.

13       A.   Okay.

14       Q.   Other than these two limitations that you

15   believe are not disclosed by Nguyen, do you agree that

16   Nguyen discloses all other limitations?

17                 MR. GOTTUSO:  Object to form.

18       A.   Not necessarily.

19   BY MR. SINGH:

20       Q.   When you say "not necessarily", is there a

21   reason why you didn't include those other limitations

22   in your Declaration?

23       A.   I didn't feel it was important.

24       Q.   What are those other limitations that you think

25   are not disclosed by Nguyen?

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 51

**Atkinson-Baker, Inc.**
**www.depo.com**

1      A.   I don't know.  See, what I base my reports on

2   is the report of the opposing expert.  He makes certain

3   points -- the Petitioner makes certain points, those

4   that I find eminently Rebuttal, I rebut.  You don't

5   have to address other points.

6      Q.   So do you agree Nguyen discloses a voting

7   system?

8      A.   Yes.

9      Q.   Do you agree that the Nguyen system is related

10  to a audio-based voting system?

11     A.   I'm sorry.  Is related to?

12     Q.   Or discloses.  Let me rephrase that question.

13          Do you agree that Nguyen discloses an

14  audio-based voting system?

15     A.   I don't know.  Nobody ever asked me that

16  question before.

17     Q.   Have you read Nguyen?

18     A.   Yes.

19     Q.   What is the title of Nguyen?

20     A.   System and Method for Audio Interface and

21  Navigation for Generating Paper Record.

22     Q.   Also, can you turn to paragraph 108 of your

23  Declaration.

24     A.   Yes.

25     Q.   In paragraph 108, the last sentence, you state

52

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 52

**Atkinson-Baker, Inc.**
**www.depo.com**

```
1    "To solve this problem, Nguyen proposes a simple audio
2    ballot interface which can provide voters opportunity
3    to preview the actual ballot and practice casting
4    votes."  Again, it goes on, but I want to focus on the
5    audio ballot portion.
6        A.    Yeah.
7        Q.    So do you agree that Nguyen discloses an
8    audio-based voting system?
9        A.    It certainly discloses an audio-based preview
10   system.
11       Q.    Can you describe what the difference would be
12   between a previous system and an audio-based voting
13   system?
14       A.    The idea is the voter is going to use the
15   system at home to practice, to see if they can navigate
16   through the ballot.  That's not voting.  Voting occurs
17   when they go to the polling place.
18       Q.    Are you saying that Nguyen is limited to an
19   audit preview voting system?
20       A.    Well, the quotation that I gave in
21   paragraph 108 says that Nguyen proposes a simple audio
22   ballot interface which can provide voters the
23   opportunity to preview the actual ballot and practice
24   casting votes.  It does say in the identical manner in
25   which the actual voting would be conducted.  I suppose
```

53

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 53

**Atkinson-Baker, Inc.**
**www.depo.com**

1    the implication of that is that if they used audio at

2    home, they can use audio at the polling place.

3        Q.   Can you turn to Column 1 of the Nguyen patent.

4        A.   Yes.

5        Q.   Can you read the "Field of Invention" portion

6    of Column 1.

7        A.   I've read it.

8        Q.   Based on the Field of Invention portion

9    disclosed in Nguyen, is it limited to an audio preview

10   voting system?

11       A.   Not in that sentence.

12       Q.   Would you agree that Nguyen is not limited to a

13   preview of -- an audio-based preview voting system?

14       A.   Yes.  So the reason that you're having trouble

15   getting this out of me is that I haven't met these

16   questions directly before.  So what's happening is by

17   you're pointing me to various parts of the

18   specification, you may get me to agree with you, but

19   I'm not going to do it simply based on memory.

20       Q.   But you've read the prior art in all of the

21   documents in this proceeding, correct?

22       A.   Yes, I have and I haven't memorized them.

23       Q.   Based on your experience in an audio voting

24   system, the audio system wouldn't necessarily present

25   the contest to the voter, correct?

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 54

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1              MR. GOTTUSO:  Object to the form.
 2        A.   Well, that depends on the construction of
 3    "present the contest".  Certainly, it has to present
 4    the candidates.  And that's disclosed in Nguyen, that
 5    it presents the options.
 6    BY MR. SINGH:
 7        Q.   Are you aware of any audio voting system that
 8    doesn't present contests to the voter?
 9        A.   Yeah, the one disclosed in Nguyen.
10        Q.   Other than Nguyen, are you aware of any other
11    voting systems, audio-based voting systems that don't
12    present the contests?
13        A.   I don't think so, but, again, we have to talk
14    about timeframe.  When did systems start presenting
15    contests?
16        Q.   Based on your experience, would it be required
17    to present a contest to the voter before they begin
18    voting?
19        A.   I certainly think it would be a good idea.
20        Q.   You don't think it's required to tell the
21    voters what contest they're voting for?
22        A.   Well, when you say "required", there are 50
23    states.  They have 50 different statutes, election
24    statutes.  No two of them are the same.  Some states
25    are very lax in what their requirements are.  Some
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 55

**Atkinson-Baker, Inc.**
www.depo.com

1    states are more precise.  And we have to look at what
2    the date of enactment of the statute was vis-a-vis the
3    invention.
4        Q.   But just in general, like, how would a voter
5    know what they're voting for, if the contest isn't
6    presented to them?
7        A.   Because they might know the names of the
8    candidates.  I'm not saying it's good, but Nguyen
9    doesn't disclose anything else.
10       Q.   Let's turn to Figure 1 of Nguyen.  Can you tell
11   me what item 10 corresponds to in Figure 1 of Nguyen?
12       A.   It's labeled Election Management System.  An
13   election management system is typically used to
14   configure a ballot.
15            So, for example, the computer has to know who
16   the candidates are.  And so it's different in every
17   election.  So there has to be some configuration to
18   setup.  It may even be involved in a testing process,
19   so that each party can make sure all of its candidates
20   are properly listed on the ballot in the right order.
21       Q.   You mentioned that the computer has to know who
22   the candidates are.  Does the computer also have to
23   know what the contests are?
24       A.   Yes.
25       Q.   So would you agree that the computer or the

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 56

**Atkinson-Baker, Inc.**
**www.depo.com**

1    election management system, of Nguyen, also knows what

2    the contests are?

3        A.   Yes.

4        Q.   And how does the election management system

5    know what the contests and the candidates are?

6        A.   Typically, there's a time long before the

7    election when they're typed in or entered in some way

8    into the computer system.

9        Q.   Let's take a look at Figure 2 of Nguyen.

10       A.   Yes.

11       Q.   Does Figure 2, according to Nguyen, it provides

12   an overview of the election management system?

13       A.   Yes.

14       Q.   So the election management system, as shown in

15   Figure 2, takes input data from the customer and

16   creates a dataset.  Would you agree with that?

17       A.   I'm sorry.  Creates a what?

18       Q.   A dataset.

19       A.   Yes, I agree.

20       Q.   And are audio files a part of that dataset?

21       A.   Well, it's a strange chart, this Figure 2.  So

22   there are these audio phrases to be recorded in block

23   32.  And they somehow come out of the exporting

24   functions.  Okay.  But then somebody has to go and

25   record the phrases.  So the election management system

57

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 57

**Atkinson-Baker, Inc.**
**www.depo.com**

1   software, this data setup software, in block 26, is

2   deciding all of the data that it has.  Some of that

3   stuff is going to have to be recorded for audio use.

4   And so it spits out the audio phrases to be recorded

5   and then they get recorded through an audio recorder,

6   and they get added to the election dataset as audio

7   files.  That's shown in 12B.

8       Q.   And what's -- I think you said "strange".

9   What's not normal about that?

10      A.   Well, so what's the input to the audio

11  recorder?  The input to the audio recorder is audio

12  phrases to be recorded.  It doesn't show how the

13  recording occurs.  It may be a text-to-speech system,

14  which -- in which there's no human voice or it may call

15  for a human to speak.

16      Q.   Do you agree that the audio files would contain

17  information about the contests that are being voted on?

18      A.   If Nguyen said that, I'd agree, but Nguyen

19  doesn't say that.

20      Q.   Let's take a look at Column 6, Line 54 of

21  Nguyen.

22      A.   Okay.  I've read it.  I read the paragraph that

23  begins there.

24      Q.   So this paragraph talks about information

25  provided by the customer.  The customer would be -- for

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 58

**Atkinson-Baker, Inc.**
**www.depo.com**

1   example, it gives the county government, and then does

2   that information include information about the

3   contests?

4       A.   Yes.

5       Q.   And as shown in Figure 2, that information is

6   ultimately converted into audio files; is that correct?

7       A.   It's converted into audio phrases to be

8   recorded, and then somebody goes and records audio

9   files.  So it isn't directly converted into audio

10  files.

11      Q.   So would you agree that the audio files contain

12  information about the contest?

13      A.   Not necessarily.  Nguyen doesn't say that.  It

14  doesn't -- for example, if you look at the paragraph

15  you pointed me to at Column 6, beginning at Line 54, it

16  talks about information related to counties.  You

17  wouldn't, you wouldn't speak the county to a voter.  So

18  not everything that goes into the -- not all of the

19  customer-provided information is converted into audio.

20  And there's some determination made by the setup

21  software 26 that decides on which of the audio phrases

22  to be recorded.

23      Q.   Let's take a look at Column 13, Line 11 of

24  Nguyen.  I'm sorry.  Let's look at Line 13, actually.

25      A.   Hm-mm.  I'm sorry.  Line 13, you say?

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 59

1      Q.    Yes.   Yes.   Line 13, to the end of that

2   paragraph.

3      A.    Yes.

4      Q.    Have you read it?

5      A.    Yes.

6      Q.    At Line 13, it begins, for example, the audio

7   file 12B might state you are making -- you're making

8   your selections for city council.

9           Do you see that?

10     A.    Yes.

11     Q.    So would you agree that city council is a --

12   would be a contest?

13     A.    City council is a contest.

14     Q.    So would you agree that the audio files in

15   Nguyen include information about the contests?

16     A.    They might.  So you didn't read the full

17   context of that paragraph.  Beginning at Line 7, it

18   says "Figure 8c illustrates what happens if the user

19   inputs a key that is invalid, thus creating a ballot

20   exception."  And so this only happens if the voter

21   enters a selection that's invalid or, I suppose, if

22   they ask for status.  It doesn't happen at other times.

23   And then, even assuming that that presents a contest,

24   it doesn't present the options.

25     Q.    Let's take a look at Figure 6 of Nguyen.

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 60

**Atkinson-Baker, Inc.**
**www.depo.com**

1    A.   Yes.

2    Q.   Can you describe, based on Figure 6, what the

3    control number table is?

4    A.   So it's -- the table for each row contains a

5    ballot number, a precinct number, and a party.  It

6    would be particularly useful in primary elections, for

7    example, where voters get a different ballot depending

8    on what party they're registered in.

9    Q.   And can you also describe what the ballot info

10   tables are in Figure 6?

11   A.   Yes.  The ballot info table for every -- so,

12   when it says "ballot number", that's a little

13   misleading.  What it really means is ballot style.  So

14   there -- let's say, in a particular precinct, there

15   might be five different ballot styles, depending on

16   where you live in the precinct.  For each ballot style,

17   of course, there are going to be many ballots because

18   there would be many voters.  So I'm looking at ballot

19   number as really ballot style.

20        So ballot style 10 in this -- on the left-hand

21   side, underneath "ballot info tables" lists the

22   contests that are in that ballot style.  And not all

23   contests will be in every ballot style.  In fact,

24   that's shown because ballot 30, on the right, does not

25   have contests to read.  A different ballot style.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 61

**Atkinson-Baker, Inc.**
**www.depo.com**

1     Q.   Can you describe what a ballot style is?

2     A.   Yeah.   The ballot style is the set of contests

3  and options that are available to a voter.   And not all

4  voters get the same ballot style.

5          For example, in a primary election, a

6  Republican does not get to vote -- normally does not

7  get to vote in a Democratic primary.   But the elections

8  are held in the same place at the same time on Election

9  Day, and so a Republican has to get a different ballot

10  style from a Democrat.

11     Q.   And turning to Figure 6 again, what are the

12  contests info tables?

13     A.   So the contest tables are going to list the

14  options.   If it's a contested race, then it's going to

15  list names of candidates.   If it's a referendum, it

16  would be a "Yes" or "No", something like that.

17     Q.   So the contest info tables present the

18  associated options within the contests?

19     A.   They don't present anything.   They store

20  information.

21     Q.   Would you agree that this information is then

22  later created into the dataset that we were discussing

23  in Figure 2?

24     A.   Oh.   I think it's already part of the dataset.

25  This seems, to me, to correspond to internal database

62

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 62

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1    in block 26 of Figure 2.  This is the layout of the

 2    information as stored in that database.  This is a

 3    relational database scheme that's being shown

 4    diagrammatically in Figure 6.

 5         Q.   Let's turn to Figure 7 of Nguyen.

 6         A.   Yes.

 7         Q.   What does this figure depict?

 8         A.   It's a 12 key phone keyboard.  Touchtone.  It's

 9    the keyboard of a touchtone phone.

10         Q.   And the 2, 4, 5, 6 and 8 keys are shown as --

11    depicted as being a little bit distinct.  Why is that,

12    on Figure 7?

13         A.   Because special functionality is associated

14    with them.

15         Q.   Do you know what that special functionality is?

16         A.   It's navigation, moving around in the ballot.

17         Q.   And how does a user navigate using the five

18    keys that are shown?

19         A.   Okay.  So this is describing 5 key navigation,

20    group 67.  So it says -- I'm reading from Column 12,

21    Line 27, "To facilitate its use by visually-impaired

22    persons, the system incorporates a novel and intuitive

23    five-key navigation system whereby the 4 and 6 keys are

24    used to navigate within a single level.  For example,

25    within the contest of a president, the 4 and 6 keys are
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 63

**Atkinson-Baker, Inc.**
www.depo.com

```
 1    used to scroll through all of candidates for president.
 2    The 4 key is used to go to the previous candidate, the
 3    6 key is used to go to the next candidate and the 5 key
 4    is used to select and deselect a candidate."
 5          Then it goes on to talk about the function of
 6    the 2 and 8 keys, which I don't think I need to read
 7    into the record.
 8       Q.   Can you also read Column 12, Lines 22 to 27.
 9       A.   Sorry.  Lines?
10       Q.   Twenty-two to 27.
11       A.   Okay.
12       Q.   There's a lot of twos in there.
13       A.   Yes.
14       Q.   So this portion of Nguyen describes a physical
15    ballot, and it presents contests to a voter, correct?
16       A.   It mentions it.  But what it's talking about is
17    what the five-key navigation system is designed to do.
18    And it says it's designed to give the visually-impaired
19    voter a mental image of a physical ballot.
20          Well, the five-key navigation can't talk about
21    contests or options.  What it does is -- on a ballot, a
22    paper ballot, typically contests are in order
23    vertically.  So at the top is the most important race,
24    et cetera, et cetera.  So by using the 2 and 8 keys,
25    which are above and below each other, that gives the
```

64

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 64

**Atkinson-Baker, Inc.**
www.depo.com

1    voter a mental picture of them moving up and down

2    through the ballot.  It doesn't present the ballot.

3    It's just describing what the five keys do.

4        Q.   Okay.  So that mental image would include the

5    contests laid out from top to bottom?

6        A.   Well, it includes a blank notion of what those

7    would be.  The mental images that when I -- the reason

8    they use 2 and 8, which is unusual, by the way, for an

9    user interface.  Usually "next" is right hand, not

10   above and below.  But they explain exactly why they do

11   it that way.  They do it that way so it corresponds to

12   the vertical movement within a ballot.  So the voters

13   are familiar with that.  They expect a contest to be

14   laid out this way, instead of horizontally.

15       Q.   You said it was --

16       A.   It was different in mechanical lever machines.

17   They were all -- they were -- all contests were still

18   vertical -- no.  Contests were horizontal in mechanical

19   voting machines.

20       Q.   You said it was unusual to use 2 and 8.

21   Normally would you expect voting machines to use like 4

22   and 6 to go between the contests?

23       A.   Not between contests.  For high-level

24   navigation, normally 6 means 'next' and 4 means

25   "previous".  So it's unusual but it's motivated.  I

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 65

**Atkinson-Baker, Inc.**
**www.depo.com**

1   mean it's explained in the spec why it's done.

2      Q.   How would one of ordinary skill in the art, in

3   light of the '273 patent, present the contest in audio

4   format?

5      A.   I'm sorry.  That question came out of context.

6   So we're going back?  We're going to the '273 patent

7   and we're asking in audio context?

8      Q.   Yes.

9      A.   For example, Claim 9.  Is that what we're

10  looking at?

11     Q.   Hm-mm.

12     A.   Well, a voter is wearing headphones.  And when

13  you go to a contest, it says make your selection for

14  president of the United States.  Then as you scroll --

15  as you scroll down, it says Donald Trump.  You scroll

16  down.  You go to the next candidate and the next

17  candidate and the next candidate.  And you scroll up,

18  it reads you the name of the candidate.  Some

19  instruction might just select, press this button.

20  That's how it will do it.

21     Q.   Is that any different from how other systems

22  would -- audio systems would present the contests?

23     A.   I don't know what you mean "by other audio

24  systems" or at what timeframe you're talking about.

25     Q.   Based on your experience, in voting systems,

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 66

1   how would other audio systems present contests?

2     A.   I don't know because I don't know what systems

3   you're talking about or what timeframe you're talking

4   about.  And I haven't done the historical review on

5   that, which I assure you I could do.  It will take

6   quite a bit of time because I have thousands of

7   documents that I might look through.

8     Q.   Where does the '273 patent describe presenting

9   the audio to the voter?

10     A.   You mean aside from in the claim?

11     Q.   Yes.

12     A.   I'll look.  Well, not in the abstract  Not in

13   the abstract.  So you're referring to audio; is that

14   right?

15     Q.   Yes.

16     A.   So there's some discussion at Column 16, Line

17   11.  There's a discussion of the audio prompt 514.  It

18   says "which toggles the digitized audio voting sequence

19   on and off."  And if you want audio, you can get audio

20   by making that selection, and then you get the same

21   thing in the audio that you would on the printed ballot

22   or on the touchscreen ballot.

23     Q.   Does the '273 patent, anywhere, say that the

24   contests are presented via audio?

25     A.   Yes.  In the column.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 67

1    Q.   Other than in the claims of the '273 patent?

2    A.   I don't know.  I'm going to have to dissect the

3    patent in order to determine that.  Then I would go to

4    the file history and I would look to see if Claim 9 was

5    originally presented.  I don't know.

6    Q.   So you can't find anywhere, in the '273 patent,

7    that clearly says that the contests are presented via

8    audio to the voter?

9    A.   I didn't say that.  What I said was I would

10   have to dissect the patent to determine that.  Is there

11   bunches of related disclosures that are at different

12   places in the patent.  I was not asked to make that

13   determination.

14   Q.   What's your understanding of what an embodiment

15   is?

16   A.   An embodiment is a description of a way of

17   practicing the invention.  There may be -- for example,

18   if it's an apparatus claim, there may be different

19   apparatuses that would satisfy the claim limitations

20   and various embodiments are shown.  And the claims are

21   not restricted to the disclosed embodiments.

22   Q.   Let's take a look at the Nguyen patent again at

23   Column 8, Line 21.

24   A.   Yes.  I read that paragraph.

25   Q.   Okay.  Would you agree that Nguyen is not

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 68

**Atkinson-Baker, Inc.**
**www.depo.com**

1    limited to using a telephone?

2        A.    Oh, it discloses other embodiments, but it

3    explains why the telephone embodiment is preferred,

4    because everybody has one.  If you need specialized

5    equipment, then how are all of these voters out there

6    going to get access to it?

7        Q.    Would you agree that Nguyen discloses using a

8    keypad?

9        A.    It certainly discloses using a keypad for a

10   particular purpose, yes.  It says it right there.

11       Q.    Are your opinions, regarding Nguyen, limited to

12   your proposed constructions or -- strike that.

13             So you offered certain Claim Constructions in

14   your Declaration.  Is your opinion, of Nguyen, limited

15   to those claim constructions?

16       A.    Okay.  I think for the particular limitations

17   that we've been talking about, which is presenting

18   contests and options, I think the construction that I

19   discuss in Section D, beginning on paragraph 87 and

20   going through 89, is important because it clarifies

21   that the presenting limitation, or presenting step

22   requires presenting both the contests and the options.

23       Q.    So are your opinions of Nguyen limited to that

24   particular construction?

25       A.    Being a patent attorney, I'm really nervous

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 69

**Atkinson-Baker, Inc.**
www.depo.com

```
 1    about the word "limited".  I don't like using it.  So
 2    what I would say is that my opinion is based on that
 3    construction.
 4           I agree that Nguyen discloses presenting the
 5    options.  And if that's all that's necessary, then
 6    Nguyen does that, but that's not all that's necessary.
 7    You have to present the contests and the options.
 8    Nguyen does not disclose that.
 9       Q.   Let me ask it differently.  Under the plain and
10    ordinary meaning of the terms, did you offer opinions
11    of -- strike that.
12           Did you offer opinions regarding Nguyen under
13    the plain and ordinary meaning of the terms?
14       A.   Well, I think that is the plain and ordinary
15    meaning.  That's what paragraph 89 says.  The plain and
16    ordinary mean of...is...
17                MR. SINGH:  Would now be a good time to
18    take a break.  We could probably do lunch.
19                (Luncheon recess, 11:53 o'clock a.m. until
20    12:53 o'clock p.m.)
21                    AFTERNOON SESSION
22    BY MR. SINGH:
23       Q.   We've come back from lunch.
24           Did you discuss any of your testimony during
25    lunch with anybody?
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 70

**Atkinson-Baker, Inc.**
**www.depo.com**

1    A.    No.

2           (Deposition Exhibit No. 1007 marked for

3    identification.)

4    BY MR. SINGH:

5    Q.    I'm going to hand you a document that's

6    Exhibit 1007 in this IPR.  Can you confirm that that

7    document is Exhibit 1007?

8    A.    It's what it says.

9    Q.    Can you describe what Exhibit 1007 is?

10   A.    Yes.  This is Neff at U.S. Patent Publication

11   2002/0078358.

12   Q.    Does that disclose a voting system?

13   A.    Yes.

14   Q.    Does Neff provide a display screen?

15   A.    Yes.

16   Q.    Does the Neff system visually present contests

17   and options to the voter on a display screen?

18   A.    Yes.

19   Q.    Does Neff disclose presented contests on

20   discrete screens?

21   A.    Yes.  Except it has the same kind of review

22   screen that we saw in Nguyen in which there are

23   multiple contests on the same screen, but options are

24   not presented on that screen also.  That would be

25   Figure 12.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 71

**Atkinson-Baker, Inc.**
www.depo.com

```
 1        Q.    Can you take a look at Figure 6.

 2        A.    Yes.  I'm looking at Figure 6.

 3        Q.    Does Figure 6 disclose a contests -- strike

 4   that.

 5              Does Figure 6 disclose a single contest?

 6        A.    Yes.

 7        Q.    Do you agree that that Figure 6 discloses a

 8   discrete screen disclosing a single contest?

 9        A.    Yes.

10        Q.    Does Figure 6 show the candidate options in

11   Column form?

12        A.    I'm sorry.  In what?

13        Q.    In column form.

14        A.    Oh, in column form.  Well, there are 11

15   candidates presented in 3 different columns.  So it's

16   not strictly in column form.  It's in column and row

17   form.  And, that is, they're not all in one column.

18        Q.    Would one of skill in the art know how to alter

19   a number of columns displayed on such a screen?

20        A.    Yes.

21        Q.    So a POSITA would be able to, let's say,

22   display four columns instead of three?

23        A.    Yes.

24        Q.    Could a POSITA also display one single column

25   instead of three, as shown?
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 72

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1      A.   Not clear.  And here's why I say that.  There's
 2   no -- I don't see any scrolling mechanism in Figure 6.
 3           So, for example, if you took these 11
 4   candidates and you tried to present them in one single
 5   column, it appears as though many of them would be off
 6   the screen at the bottom.
 7      Q.   So in a situation where we have fewer
 8   candidates, would be a POSITA be able to display the
 9   options in a single column?
10      A.   Yes.  For example, if we only had four
11   candidates.  Each of these columns has depth four.  So
12   if there are only four candidates, there would be one
13   or -- a feasible arrangement would be to have one
14   column.
15      Q.   Going back to the '273 patent, would the '273
16   patent be able to display more than one column on its
17   display screen?
18      A.   Well, when you say "would it be able to"?  You
19   mean could somebody of ordinary skill take an
20   embodiment that's disclosed in the patent and do that,
21   yes.  It's disclosing single columns.
22      Q.   So looking at Figure 6 in the '273 patent,
23   would something, like Figure 6, shows 2 columns, would
24   that be something that could be displayed on the '273
25   screen?
```

73

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 73

**Atkinson-Baker, Inc.**
www.depo.com

1    A.   So I have to understand what you mean by "could

2  be".  Do you mean, is it hidden lurking in the

3  disclosure of the '273 patent?  Or could what's shown

4  there be modified by a POSITA to do it?

5    Q.   What's the difference between the two?

6    A.   Well, the difference is that a disclosed

7  embodiment may have attributes that we can suck out by

8  reading the specification.  And I don't think that's

9  there.  But if you're asking if, if I handed somebody a

10  machine that was built according to the disclosed

11  embodiment, could somebody modify it, in order to, to

12  have a display as you propose, yes.

13    Q.   So you're saying --

14    A.   It's strange.  It would be strange to do it

15  because if you look at Figure 6 of Neff.  So there are

16  11 candidates.

17       Now, the disclosure in the Cummings patent is

18  that there's a mechanism for moving around within the

19  contests, from contest to contest, and there's another

20  method for moving around within, within a contest to

21  look at the different options.

22       When you offer a two-dimensional display, as we

23  see in this Figure 6, let's suppose I go -- we have

24  George Washington and John Adams.  What's the next

25  option?  Is it the one below or is it the one to the

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 74

**Atkinson-Baker, Inc.**
**www.depo.com**

```
1    right?  So there has to be semantics associated with
2    next option.  What does that mean?  And if I go all the
3    way to the right, through two successive key pushes,
4    what would the third key push take me to?  Presumably
5    Al Gore Joe Lieberman.  But there are different ways of
6    doing that.  And so this kind of display I don't think
7    is contemplated by Cummings.  Now, would it be
8    physically possible to do it, yes.
9        Q.    Just to clarify for the record.  When you say
10   "Cummings", you're referring to the '273 patent?
11       A.    Yes.
12       Q.    Can you turn to Column 14, Line 14 of the '273
13   patent.
14       A.    Column?
15       Q.    Fourteen.
16       A.    Column 14, Line 14?
17       Q.    Yes.
18       A.    Yes.  How much do you want me to read?  There's
19   one sentence remaining in that paragraph.
20       Q.    So I'm going to begin.  I'll read.  It's Column
21   14, Line 12.
22       A.    Oh.
23       Q.    It says, quote, "The terminal 300 draws in the
24   ballot.  306 scans a pre-printed code to determine
25   which form or style of ballot has been inserted.  It
```

75

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 75

1    then presents a series of menu-driven voting choices on
2    its preferably colored touchscreen 304 corresponding to
3    that particular ballot style."
4          So would you agree that Figure 6 depicts a
5    particular ballot style, Figure 6 of the '273 patent?
6    A.   It depicts one contest in a particular ballot
7    style.
8    Q.   Okay.  And based on the passage that I just
9    read from the '273 patent, would the '273 -- strike
10   that.
11         Would the '273 system be able to present that
12   particular style that's shown in Figure 6 of the '273
13   patent?
14   A.   We have to distinguish between the ballot style
15   and the display of the ballot style.  The ballot style
16   consists of the contests and options.  Once you have a
17   ballot style, there are different methods in which you
18   could display it.  You can do it visually.  You could
19   do it by audio.  How you display is a separate thing
20   from the ballot style itself.
21   Q.   So the '273 system would not be able to display
22   the ballot style shown in Figure 6?
23               MR. GOTTUSO:  I want to make a
24   clarification for the record.  He's discussing Figure 6
25   of the '273 patent, not Figure 6 of the patent.  I

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 76

**Atkinson-Baker, Inc.**
www.depo.com

1    think Dr. Shamos --

2    BY MR. SINGH:

3        Q.   Oh, yes, yes.  I mean the '273 patent.  Sorry.

4        A.   I'm looking at Figure 6.

5        Q.   Of the '273 patent.

6        A.   I'm glad you clarified that because I'm staring

7    here at Neff.

8        Q.   Oh, I didn't catch that.  Sorry.

9        A.   You want me to look at Figure 6?

10       Q.   Of the '273 patent.

11       A.   Oh, okay.  All right.  So what we're seeing

12   here is a printed ballot.  And a printed ballot -- I'm

13   not sure we see the whole thing, but that would be a

14   presentation of a ballot style, because it lists the

15   contests and the options under each contest.

16       Q.   And would the '273, the system disclosing it in

17   the '273 patent, would they be able to display that

18   particular ballot style on its screen?

19       A.   Yes.  Now, when you say "display the particular

20   ballot style", the way it would do it, it would take

21   the contests individually and present them.  It

22   wouldn't present that whole thing on the screen at the

23   same time.  That has four contests.  And this is not a

24   two-dimensional display, as in Neff, because each

25   contest is a single vertical column.  There happened to

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 77

**Atkinson-Baker, Inc.**
**www.depo.com**

1    be two columns, but no contest extends over more than

2    one column.

3        Q.   Why do you say that the '273 system would not

4    be able to display that particular ballot style, as

5    shown in Figure 6 on its display screen?

6        A.   I didn't say that.  I didn't say it wouldn't be

7    able to.  It doesn't do it that way.  It presents -- it

8    reads the ballot and it sees -- it actually doesn't

9    read the ballot.  It reads the ballot style.  There's a

10   code in the ballot that tells what the style it is.

11       I think that's up in 56a up at the top, it says

12   "Ah, I know what ballot style I'm supposed to present."

13   And then what it shows is it displays each of the

14   contests and each of the options.  It displays that

15   ballot style.  It doesn't display it in the same way

16   that it looks on the ballot, but it's exactly the same

17   contests and options.

18       Q.   Could the '273 system display the ballot as it

19   looks in Figure 6?

20       A.   I don't understand what you mean by "could" it?

21   Do you mean might it?  If somebody made an embodiment

22   of it, could they do it that way?  Sure.  But there's

23   no disclosure in the '273 patent that that's the way

24   you should do it.

25       This is not, this is not -- this is a

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 78

**Atkinson-Baker, Inc.**
**www.depo.com**

1   presentation of a ballot style.  This is not the ballot

2   style.

3        The ballot style consists of the offices and

4   options.  You have a choice of how you're going to

5   display that to the voter.  And the choice that is

6   made, when you look at how the presentation is made on

7   the screens, all of the screens have a single contest.

8    Q.   Let's look at Column 14 of the '273 patent

9   again.  The sentence at Line 14 says "It then presents

10  a series of menu-driven voting choices on its

11  preferably colored touchscreen 304 corresponding to

12  that particular ballot style."

13   A.   Yes.  You're conflating the presentation of the

14  ballot style with the ballot style.  The ballot style

15  only means what are the contests and what are the

16  options in those contests?

17        Presentation of the ballot style is a different

18  thing.  There are many ways of presenting it, as we've

19  seen.  You can present -- look, there are voting

20  machines that have what's called a full-face ballot,

21  which every contest and every option is available to

22  the voter on one sheet.  It doesn't change the ballot

23  style.  It changes the presentation of the ballot

24  style.

25   Q.   Could one of ordinary skill in the art use the

79

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 79

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1    '273 system and display the ballot style, as shown in
 2    Figure 6 with the two columns?
 3              MR. GOTTUSO:  Object to form.
 4       A.   Again, I'm asking what you mean by "could" it?
 5    BY MR. SINGH:
 6       Q.   I mean one of ordinary --
 7       A.   Could one --
 8       Q.   -- skill in the art modify the system to
 9    display the 2 columns, as shown in Figure 6 of the '273
10    patent?
11       A.   I suppose you could, but then you'd have to
12    figure out what the navigation mechanism is going to
13    look like.  What is the -- if you -- well, wait.  I'm
14    confusing it with a different question.
15              We're looking back, now, at Figure 6 of the
16    '273 patent.
17       Q.   That's correct, yes.
18       A.   Could you present it that way?
19       Q.   Yes.
20       A.   Sure.  Somebody could reprogram it so that it
21    would look that way.  Because there -- it's the
22    semantics of what it means to go from one contest to
23    the next and one option to the next is -- there's some
24    ambiguity there.
25              For example, for president, what's the next
```

80

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 80

**Atkinson-Baker, Inc.**
www.depo.com

```
 1    contest?  Is it for chairman or is it for vice
 2    president?  Do you go left or do you left right?  Or do
 3    you go "Up, Down", to get to the next one?
 4          So the person who was doing this would have to
 5    solve that problem.  You have to figure out what "next"
 6    means in the context of where there are two different
 7    directions you could go.  What's next?  But is it
 8    doable?  Sure.  It's a computer.  It could do anything.
 9    It could do anything that's doable.
10    Q.   So in your Declaration at column -- I'm sorry,
11    at paragraph 202.
12    A.   Hm-mm.
13    Q.   You argue that "the POSITA would not have
14    modified Neff to include the navigation of Nguyen."  Is
15    that correct?
16    A.   Yes.  I don't say it exactly that way but
17    that's the import.
18    Q.   Would a POSITA be able to see the layout of
19    Neff and modify the navigation keys of Nguyen to work
20    with the display layout, as shown in Neff?  Isn't that
21    something that's within the skill of a person of
22    ordinary skill in the art?
23    A.   If you're asking is it physically possible to
24    do it, yes, it's physically possible, but then it
25    requires -- so we have the concept of moving between
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 81

**Atkinson-Baker, Inc.**
**www.depo.com**

1    contests.  That's what some pair of keys do.  And then

2    we have the concept of moving within options in the

3    contest.  And we have "Up" and "Down" and "Left,

4    Right".

5            Now, it gets very confusing in this layout of

6    Figure 6 of Neff, which is on page 97 of my

7    Declaration.  You got the "Left, Right" keys, but in

8    the "Up, Down" keys are supposed to move between

9    contests.  And so how do I move down to select my

10   candidate?  How do I do that using that, using that key

11   arrangement?

12           And so a POSITA would look at that and say

13   well, that key arrangement is not suitable.  This is a

14   good system if you've got a mouse and you can directly

15   go to any one of the candidates.

16       Q.   Let's take a look at paragraph 130 of your

17   Declaration.

18       A.   Hm-mm.

19       Q.   In this paragraph you state, quote, "While Neff

20   uses the word "click" in paragraph 43 to describe how a

21   next icon is selected "-- this is very commonly used --

22   "This is a very commonly used term for describing

23   selections made on applying touchscreen."

24       A.   Hm-mm.

25       Q.   The next sentence says "A POSITA would

82

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 82

**Atkinson-Baker, Inc.**
www.depo.com

1    understand that clicking a screen with one's finger is

2    common terminology."

3        A.    Yes.  This is my whole point is if you're

4    looking at the screen of Figure 6 of Neff, and I want

5    to select a particular option.  I go to the screen, I

6    touch it.  I don't have to navigate.  I don't have to

7    click keys 10 times or 11 times to get to my candidate.

8    I just go right there and do it.  It's very fast.

9        Q.    So you've described it as touching the screen.

10   You didn't say "I click the screen".

11       A.    Well, you touch the screen or you click.

12   There's no mouse disclosed in, in Neff.  Could you

13   implement this with a mouse?  Sure.  But if you're

14   going to do everything with a mouse, why do you need a

15   touchscreen.  Also --

16       Q.    And the same could be said for the navigation

17   in '273.  If you have a touchscreen, why do you need a

18   navigation mode?  You could make the same argument for

19   '273.

20       A.    I'm not sure that the -- let's look at '273.

21   I'm looking in the Claims to see where there's a

22   touchscreen.  I don't see a touchscreen.  I see a

23   display screen.

24       Q.    I just want to focus on the argument that you

25   made it's very commonly to refer to clicking a screen

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 83

1    as -- strike that.

2        A.   Well, just read 129.  It explains it.

3        Q.   So when describing input on a touchscreen, you

4    describe it as pressing the touchscreen or clicking the

5    touchscreen?

6        A.   I don't personally use the word "click".

7    Because to me -- I grew up in a mouse world.  And to

8    me, "click" means a mouse.  But people use it in all

9    kinds of different contexts.

10           It doesn't make sense, in Neff, to mean -- to

11   understand that "click" can only mean clicking a

12   disclosed mouse because there's no mouse disclosed in

13   Neff.  And mouse -- Neff is disclosing a touchscreen as

14   the mechanism for making choices.  So when you go up

15   and you touch "back", in Neff's parlance, you've

16   "clicked on back".

17       Q.   So would you agree that clicking a screen is

18   not a very commonly used term for describing selections

19   made on a touchscreen?

20       A.   No.  I don't have any statistics on the

21   relative percentages.  I just told you that I don't

22   particularly use that word.

23       Q.   Because at paragraph 130, you say "it's very

24   commonly used."  I just want to understand.  Would you

25   say it's not -- would you agree it's not very commonly

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 84

**Atkinson-Baker, Inc.**
**www.depo.com**

1   used to describe touching a screen as -- strike that.

2       A.   Take a look at paragraph 43, down near the

3   bottom.  It says "For example, to select independent

4   candidates, George Washington and John Adams, the voter

5   selects the check box for item 601.  The voter may also

6   click the next button 621 in order to display the next

7   ballot issue."

8           Well, "selecting" and "clicking" are used

9   interchangeably here.

10      Q.   Which paragraph are you referring to?

11      A.   Forty-three of Neff.  Down at the bottom, the

12  last -- about 60 percent of the way through.  "For

13  example, to select."  First he said in the same -- two

14  sentences, first he said "selects" and then it says

15  "voter may also click."  Then in the next sentence,

16  "the voter may also select a back button."

17      Q.   So in one sentence it's "click the next button"

18  and the other it's "select the back button".

19      A.   They're using the term interchangeably there.

20  It certainly wouldn't be the case, that in order to

21  choose "next" you had to touch "next" but in order to

22  choose "back", you had to click the mouse on "back".

23  That would make no sense anyway.

24          You don't give mice to voters because they yank

25  them off.  They do terrible things to them.  You don't

85

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 85

**Atkinson-Baker, Inc.**
**www.depo.com**

1    want anything there that the voter can take away with

2    them or damage them.

3         Q.   Let's take a look at Figure 25 of the '273

4    patent.

5         A.   Yes.  Figure 25 which?

6         Q.   I'm sorry.  Figure 25a.

7         A.   Okay.  Yes.

8         Q.   Can you please read the '273 patent at Column

9    17, Lines 5 through 14 that corresponds to Figure 25.

10        A.   Silently or for the record?

11        Q.   Silently.

12        A.   I've read it.

13        Q.   So according to the '273 patent, "if a voter

14   has difficulty reading the screen, the user can touch

15   the zoom prompt to enlarge the display area."

16             Is that correct?

17        A.   Yes.

18        Q.   And the "zoom" prompt is placed between the

19   "previous" and the "next" touch prompts; is that

20   correct?

21        A.   Yes.

22        Q.   Would you agree that the "zoom" prompt is

23   sitting closer to the "previous" and "next" prompts

24   than any other item on the screen?

25        A.   Yes.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 86

**Atkinson-Baker, Inc.**
**www.depo.com**

1      Q.    For a user not using the touchscreen, how does

2  the user access the zoom prompt?

3      A.    That I'll have to look up.  So wait a second.

4          When you say the user is not using the

5  touchscreen --

6      Q.    Correct.

7      A.    -- what are they using?  Audio?  There would no

8  "zoom" prompt for --

9      Q.    They're using the navigation pad.  The

10  narrative keys of the '273 patent.

11      A.    Oh okay.  So, in the embodiment that has the

12  "zoom" prompt, that's described at Column 16, Lines 11

13  through 31 -- but I'm reading from Line 27, "the bottom

14  510 of the screen may include a "zoom" prompt 516 which

15  enlarges the touchscreen's main display area 518 as

16  well as a "previous" 520 and a "next" prompt 522," et

17  cetera.

18          So this is describing an embodiment which there

19  is a touchscreen.  Not expressly claimed, but it's an

20  embodiment with a touchscreen.  And if you have one,

21  you can include a "zoom" prompt that allows the voter

22  to increase the size of the display.  I don't think --

23  I haven't seen, yet, a disclosure of how you would

24  present the "zoom" prompt if it weren't a touchscreen.

25  So let's look.

87

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 87

1    I don't think there is such a disclosure in the

2    '273 patent.

3    Q.   So, the user using the navigation keys of the

4    '273 patent would not be able to use the "zoom" prompt?

5    A.   I didn't say that.  What I said was that

6    there's no expressed disclosure of how it would be

7    implemented.

8    Q.   So, in your opinion, how do you think it would

9    be implemented to use the navigation keys?

10   A.   Well, when you say how "it would be

11   implemented".

12   Q.   As someone skilled in the art, how you would

13   you --

14   A.   Yes.  That's what I thought you meant.

15        Okay.  So, for example, looking, again, at

16   Figure 25a.  Okay.  Figure 25a, if I navigate down with

17   the keys to "write-in", and then I go navigate down

18   again, instead of taking me back up to the top of the

19   candidates there, Richard Nixon and Spiro Agnew, it

20   could take me down to the "previous zoom" and "next"

21   row.  And you could navigate there with "left" and

22   "right".  Once I have the four directional keys, I can

23   get anywhere on the screen that I want.

24   Q.   So you can get to the "zoom" prompt using the

25   left and right keys?

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 88

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1      A.    No.   I would use the "down" key for "write-in".
 2   The "down" key would take me to either -- probably
 3   either "previous" or "zoom".   And then I would move
 4   right and left between among "previous", "zoom", and
 5   "next".
 6      Q.    Let's take a look at Figure 25G of the '273
 7   patent.
 8      A.    Yes.
 9      Q.    Can you please also read Column 17, Line 42 to
10   Line 47 of the '273 patent.
11      A.    Yes.
12      Q.    So if using a touchscreen, the user can select
13   the letters to write-in a candidate's name; is that
14   correct?
15      A.    Yes.  By touching them.
16      Q.    And how would a user, using the navigation
17   keys, input the name of a candidate?
18      A.    Well --
19      Q.    For the write-in candidate.
20      A.    So beginning at Column 17, Line 42, it says, in
21   the case of sub-panel navigation, the "up" 322 and
22   "down" 324 key buttons navigate the voter through the
23   displayed touchscreen (display) or audio (headphones)
24   alphabet until the desired letter is highlighted,
25   (display) or heard (headphones) and then the "select
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 89

**Atkinson-Baker, Inc.**
www.depo.com

1   enter" key is pressed until the name is completed.

2   It's straightforward.

3       Q.   So the user is going to use the "up" and "down"

4   keys on the navigation panel to type in the name of the

5   write-in candidate?

6       A.   Well, technically to select --

7       Q.   To select?

8       A.   -- the letters that are then going to say

9   "enter", to add to the name of the candidate, yes.

10      Q.   Okay.  So for -- let's do a hypothetical.  So I

11  want to spell the name Tom Smith.

12      A.   Yes.

13      Q.   Currently, I have -- I've selected -- the user

14  is at "T".  And then the next letter the user wants to

15  select is "O".  How does the user go from the letter

16  "T" to the letter "O"?

17      A.   Press the right button four times.  It goes

18  from "T" to "Y" to "U" to "I" to "O".

19      Q.   Didn't the '273 patent in Column 17, Line 42

20  state in the case of the sub-panel navigation the "up"

21  and "down" key buttons navigate the letter through the

22  display?

23      A.   That's fine.  Use the "up" and "down" keys.

24  It's a design choice.

25      Q.   For a user not using the screen -- for a user

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 90

**Atkinson-Baker, Inc.**
www.depo.com

1   that's visually impaired and they're listening to via

2   headphones to the options, how do the user -- strike

3   that.

4           So for a user using the headphones, the user

5   presses the "up" and "down" keys to scroll among the

6   options.  And the 273 system audibly announces which

7   letter they're on; is that correct?

8       A.   Yes.

9       Q.   So if the user is, for example, say, at letter

10  "Q", and they're using the system audibly, how do they

11  know the letter "B" is coming up?  Or when is the

12  letter "B" going to come up?

13      A.   Well, as they navigate through the keyboard,

14  each time they press one of the keys, they will hear

15  the letter that is now highlighted.  So they'll keep

16  doing that until they get to the letter "B".  It will

17  announce "B" probably after "V".

18      Q.   Would you agree that's not very logical, for a

19  person listening to the letters being announced from

20  "Q", to arrive at letter "B", you're going to go

21  through letter -- numerous other letters without

22  knowing when letter "B" is going to be announced?

23      A.   It would be very cumbersome and confusing to a

24  voter.  So what I think you would do is if the

25  headphones were installed, it would present a different

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 91

**Atkinson-Baker, Inc.**
www.depo.com

1  display here.  You would put the letters in
2  alphabetical order, instead of in KWERTY order.
3      Q.   Is there support for that in the '273 patent?
4      A.   Sure.
5      Q.   Where do you see support for laying out the
6  keyboard in alphabetical order for using that?
7      A.   Well, support for.  Here's the support.  Line
8  42, "in the case of sub-panel navigation, the "up" 322
9  and "down" 324 key buttons navigate the voter through
10  the displayed (touchscreen display) or audio
11  (headphones) alphabet until the desired letter is
12  highlighted.
13         Now, this is just showing one possible
14  arrangement of how you might display the letters.  You
15  can display the letters in alphabetical order.  You can
16  display them in random order, reverse alphabetical
17  order, any way you want.
18      Q.   Would you agree there's no actual support for
19  that in the '273 patent?
20      A.   There's support.  It says "the displayed
21  alphabet".  And it shows one way of displaying an
22  alphabet.
23      Q.   Earlier this morning you mentioned that no
24  screen of the '273 patent presents multiple contests on
25  the screen; is that correct?

92

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 92

1   A.   With associated options.  There are screens, as

2   we discussed, that show the name of more than one

3   contest, which is common in a review screen.  You don't

4   want to have a voter waste a lot of time going through

5   lots and lots of screens.  It is not confusing anymore

6   because each contest is highlighted and the name of the

7   person they chose is printed there.

8   Q.   Looking at Figure 25 of the '273 patent.

9   A.   Which Figure 25?

10   Q.   I'm sorry.  Figure 25f.

11   A.   Yes.

12   Q.   Can you describe what that figure shows, Figure

13   25f?

14   A.   Yeah.  It shows a screen denominated write-in

15   editor.  And it shows a standard KWERTY keyboard in

16   uppercase and a space bar and a "done" button, in

17   addition to the "previous", "zoom", and "next".  It's a

18   typical way in which a voter would enter the name of a

19   candidate on a touchscreen.

20   Q.   Does the screen, shown in Figure 25f, does that

21   list the name of the contest for which the voter would

22   be voting?

23   A.   No.  He got there from the contest screen.

24   Q.   Let's take a look at Figure 25i.  According to

25   the '273 patent, this screen summarizes the voter's

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 93

**Atkinson-Baker, Inc.**
**www.depo.com**

```
 1    selections and prompts the voter to either a race to
 2    edit or to mark the ballot.  Is that correct?
 3        A.   Yes.
 4        Q.   Using the navigation keys, how does the user
 5    edit the second race shown, item 548?
 6        A.   I don't know.  There are a number of options.
 7    One of the options you can use the two 8 keys to move
 8    around.
 9        Q.   Is that in the 2 and 8?
10        A.   2 and 8 keys, as if you were navigating through
11    the alphabet.
12        Q.   So that the 2 and 8 keys correspond to the "up"
13    and "down" keys; is that correct?
14        A.   Yes.
15        Q.   So you're saying that the user uses the "up"
16    and "down" keys to move right and left?
17        A.   Well, that's what the patent said with respect
18    to the keyboard.  You use the "up" and "down" keys to
19    move through the keyboard.  As I say, it's a design
20    choice.
21             MR. SINGH:  Can you mark that as 1.
22             (Deposition Exhibit No. 1 marked for
23    identification.)
24    BY MR. SINGH:
25        Q.   I'm going to hand you a document that's been
```

94

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 94

**Atkinson-Baker, Inc.**
**www.depo.com**

1   marked Exhibit 1.  Can you please read the title of

2   this document.

3       A.   Patent Owner's Contingent Motion to Amend Under

4   37 C.F.R. Section 42.121.

5       Q.   Do you agree that Exhibit 1 is a copy of an

6   Owner's Contingent Motion to Amend?

7       A.   I think so.  I haven't had a chance to collate

8   it with the copy that I have on my system, but it

9   appears to be complete.

10      Q.   Can you turn to page 3 of Exhibit 1.

11      A.   Yes.

12      Q.   Do you agree that the written support --

13  Written Description Support for the Substitute Claims

14  appears on pages -- it starts at page 3 and ends at

15  page 12 of Exhibit 1?

16      A.   I'm sorry.  I had trouble following your

17  question.  Can you repeat it?

18      Q.   Sure.  Do you agree that the Written

19  Description Support for the Substitute Claims starts at

20  page 3?

21      A.   Yes.

22      Q.   Do you agree that the Written Description

23  Support for Substitute Claims ends at page 12 of

24  Exhibit 1?

25      A.   I will agree that a Section 6 labeled Written

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 95

**Atkinson-Baker, Inc.**
**www.depo.com**

1  Description Support begins at page 3 and ends at page

2  12.

3      Q.    Let's turn to your Declaration.

4      A.    Yes.

5      Q.    Turn to paragraph 246 of your Declaration.

6      A.    Yes.

7      Q.    Do you agree that the Written Description

8  Support for the Substitute Claims appears in your

9  Declaration at paragraph 246?

10      A.    I agree that support is found at least in those

11  citations.  It may be found in other places in the

12  patent -- or in the application, I mean.

13      Q.    Can you please take a look at element 20 [C] --

14      A.    Yes.

15      Q.    -- of paragraph 246 in your Declaration.

16      A.    Yes.

17      Q.    Can you also look at pages 4 and 5 of

18  Exhibit 1, which is the Contingent Motion to Amend.

19      A.    Which page?

20      Q.    Four to five.

21      A.    Yes.  I'm looking at them.

22      Q.    Okay.  Isn't the List of Citations in your

23  Declaration for element 20 [C] more extensive than the

24  List of Citations in the Exhibit 1.

25      A.    Yes.  Possibly I did a more thorough job than

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 96

**Atkinson-Baker, Inc.**
www.depo.com

1    counsel.  Maybe not.

2        Q.   Which citations would you say are correct?

3             MR. GOTTUSO:  Object to form.

4        A.   I think they're all correct because neither of

5    us -- neither counsel nor myself attempted to provide

6    an exhaustive list of all places in which support might

7    be found.  They found support in fewer places than I

8    found support.  At least they were willing to express

9    or list fewer places.  It doesn't mean that one of them

10   is right and one is wrong.  They're both right.

11   BY MR. SINGH:

12       Q.   So would you say the Motion to Amend, Exhibit

13   1, does that provide a complete written description of

14   support for the Substitute Claims?

15       A.   I think so.  I don't know.  I didn't go through

16   the exercise of looking at their support.

17       Q.   How is the touchscreen different from a

18   non-touchscreen display?

19       A.   Well, it certainly functionally it's easy to

20   describe the difference.  I have a laptop sitting in

21   front of me here.  It's a Lenovo 2470S.  It does not

22   have a touchscreen.  So when I touch the screen,

23   nothing happens, except the screen bounces around under

24   hand my finger.

25            If I had a touchscreen, then activity would

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 97

**Atkinson-Baker, Inc.**
**www.depo.com**

1    occur when I touched a particular place on the screen,

2    it would be recognized as a touch.  And whatever the

3    software was expecting to do, if a touch were to sense

4    that a particular XY coordinate, it would do that.

5        Q.   So both the touchscreen display and the

6    non-touchscreen display, both present information to

7    the user in similar fashion?

8        A.   Yes.  I would say -- so there are two different

9    directions.  They're sending the information to the

10   user and then it's collecting information from the

11   user.  Both screens display information to the user,

12   but a screen that's not a touchscreen or equivalent

13   does not enable the voter to send in any input through

14   touching.  They would have to use some other mechanism,

15   in this case, my mouse and my keyboard.

16       Q.   So the only difference between the two would be

17   the way the user interfaces with the screen?

18       A.   At the functional level.  Of course, there are

19   physical differences and electrical differences and all

20   of that.  But at the functional level, the difference

21   is if it's not a touchscreen, then touching doesn't

22   produce any inputs.

23       Q.   With regards to the claims, the Substitute

24   Claims, do you agree that the touch interface aspect of

25   the touchscreen is not being used in the claims method

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 98

**Atkinson-Baker, Inc.**
**www.depo.com**

1    or the system claims?

2        A.    Okay.   So repeat the question.   We're talking

3    about the Substitute Claims and what are they supposed

4    to have or not have?

5        Q.    Do you agree that the touch interface aspect of

6    the touchscreen is not being used in the claims method

7    or the voting terminal?

8        A.    The question confuses me because there's an

9    Appendix A to the Patent owner's Contingent Motion to

10   Amend.   On page 2 of that, the first limitation is

11   providing a touchscreen display.

12       Q.    Do you agree that beyond providing a

13   touchscreen display, the claim does not actually use

14   the touchscreen aspects of the display in the body of

15   the rest of the claim?

16       A.    Well, let me read the claim.   I'm looking at

17   Claim 20.   I don't see, in Claim 20, where accepting a

18   touch input is called out as part of the claim.   It

19   doesn't preclude accepting touch inputs but it's not

20   claimed.

21       Q.    Can you review Claim 23 as well and see if that

22   claim -- and see if that claim uses aspects of the

23   touch interface in the claim?

24       A.    I think it's the same answer.   It recites

25   providing a touchscreen display configured to visually

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 99

**Atkinson-Baker, Inc.**
**www.depo.com**

1  present said contests and said associated options to

2  the voter.  And then touches are not called out in the

3  remainder of the claim.

4        So I think it's important to understand the

5  context here.  Ordinary touchscreen displays are not

6  useable by blind people.  So this is an added

7  attraction to a touchscreen display.  Now we're

8  adding -- along with it, we're adding headphone

9  capability.  So this is designed to be used in

10  conjunction with a touchscreen.

11  Q.   With regards to these claims, these claims --

12  they claim a navigation device.  So why would you have

13  need to introduce a touchscreen if the claims -- when

14  only the navigation device is actually being used in

15  claims?

16  A.   I just answered that.  So it's not that you

17  need a navigation device.  You need the navigation

18  device for blind people.  You don't need the navigation

19  for sighted people who are capable of locating the

20  right place on the touchscreen to touch.

21        You don't want to give a blind person access to

22  a touchscreen, in general, because they can't see what

23  they're touching.  It's not universally true, by the

24  way.  There are systems which announce to you what

25  you're touching.  But, in general, blind people don't

100

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 100

**Atkinson-Baker, Inc.**
**www.depo.com**

1    like using touch scenes.  They can't feel them.

2        Q.   Let's look at Element 23 [B] of Substitute

3    Claims.  It's on page 3 of the appendix --

4        A.   Yes.

5        Q.   23 [B] recites "providing a touchscreen display

6    configured to visually present said contests and said

7    associated options to the voter."  Is that correct?

8        A.   Yes.

9        Q.   Where is the disclosure that defines what

10   "touchscreens displayed configured to visually present"

11   means?

12       A.   Where is the support in the original

13   application?

14       Q.   Correct.

15       A.   Well, I'll have to go to the original

16   application.  So which exhibit is that?  I'm sorry.  I

17   got it backwards.  It's in the other IPR.  Where is it?

18   It's Exhibit 2003.  I have it.

19       Q.   Let's get it on the record.  So I'm going to

20   hand you Exhibit 2003.

21           (Deposition Exhibit No. 2003 marked for

22   identification.)

23       A.   Yes.

24   BY MR. SINGH:

25       Q.   Can you describe what Exhibit 2003 is?

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 101

**Atkinson-Baker, Inc.**
**www.depo.com**

```
1        A.    Well, I think I can.  I think I can.

2              It's the original application from -- yeah.

3    It's U.S. Patent Application 10/454345, which is the

4    application that matured into the '273 patent.

5        Q.    Based on Exhibit 2003, can you point me to the

6    disclosure that defines touchscreen display configured

7    to visually present?

8        A.    So we're looking at 23.  Which is it?

9        Q.    Twenty-three, Element B.

10       A.    Okay.  There's a whole bunch of support for

11   that on page 115 of my Declaration.  In fact, I have

12   more support for that than for any other limitation in

13   the Substitute Claims.  We can go through every

14   paragraph of it, if you want.

15       Q.    Can you go to the first one.

16       A.    Yes.  Three, 18 to 23.  Okay.  You want me to

17   read it and talk about it?

18       Q.    Let me get there.  Just a moment.  What page

19   are you on again?

20       A.    Page 3.  It's the first citation.  It's, 3, 18

21   to 23.  We're talking about the application.

22       Q.    Yeah.  Go ahead.

23       A.    Do you want me to read it into the record?

24       Q.    Yes, please.

25       A.    "It is a more specific object of the invention
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 102

**Atkinson-Baker, Inc.**
**www.depo.com**

```
1   to provide an improved voting system which utilizes a
2   voteable readable and machine readable physical ballot
3   which can be either hand marked in a voting booth or
4   electronically marked at an electronic voting station
5   by means of a touchscreen voting terminal and
6   associated marking device."
7           Well, what's the touchscreen going to show?  It
8   has to show the contests and the offices, or the
9   choices.
10      Q.   Isn't every display or touchscreen configured
11  to visually present?
12      A.   If you cut it off there, then, yes.  Yeah,
13  every display screen visually presents something or
14  that's configured to.  That's not the whole phrase
15  that's used in the claim.
16      Q.   Looking at Substitute Claim Element [C].
17      A.   23 [C].
18      Q.   20 [C].
19      A.   Oh.  20 [C]  Okay.
20      Q.   The limitation talks about a discrete
21  presentation screen.
22      A.   Yes.
23      Q.   Can you identify where a discrete presentation
24  screen is mentioned in the specification?
25      A.   Well, we've already talked about that.  So
```

103

**Atkinson-Baker, Inc.**
**www.depo.com**

1   that's in Figure 25a.  Figure 25b.  Figure 25c.  Figure
2   25d and Figure 25e.  Figure 25h.  Figure 25j, for
3   example.
4       Q.   Other than in the figures that there's --
5   there's a specification described, define the word
6   "discrete"?
7       A.   We've already talked about this.  The word
8   "discrete" D-I-S-C-R-E-T-E, does not appear in the
9   application or the specification of the patent as
10  issued.
11      Q.   How do you define the word "discrete" as a
12  person skilled in the art?
13      A.   Separate, as used in these claims.
14              MR. SINGH:  Let's take a break for ten
15  minutes.
16              (Whereupon, there was a recess in
17  proceedings.)
18  BY MR. SINGH:
19      Q.   Can you take a look at Figures 25f and 25g for
20  the 273 patent.
21      A.   Yes.
22      Q.   Are these screens displayed any time that the
23  user selects to have a write-in candidate for any of
24  the contests?
25      A.   I think so.  Well, they're certainly

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 104

**Atkinson-Baker, Inc.**
**www.depo.com**

1    displayed -- well, unless for privacy reasons, a

2    headphone user has elected to turn off the display, but

3    other than that, they would be displayed because

4    otherwise there's no other way to enter the write-in.

5       Q.    Substitute Claim 20, Limitation [E] begins when

6    presenting said contests comprising communicating the

7    name," it goes on.  How do you define communicating as

8    a person of skill in the art?

9       A.    The information is known to the computer.  It

10   has to become known to the voter, so it could be

11   communicated visually.  It could be communicated

12   through the headphones, and any other of the set of

13   human computer interface devices.

14      Q.    In Substitute Claim 20, presenting contests is

15   further defined as communicating a name of the contest

16   as the voter scrolls through the contest.

17      A.    I'm sorry.  Which limitations are you looking

18   at?

19      Q.    I'm looking at 20[E].

20      A.    Yes.

21      Q.    So in 20 [E] presenting the contest is further

22   defined as communicating a name of the contest as the

23   voter scrolls through the contest.  Is that right?

24      A.    Yes.

25      Q.    And presenting an option is further defined as

105

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 105

**Atkinson-Baker, Inc.**
**www.depo.com**

1   communicating a name of the contest as the voter

2   scrolls through the option.  Is that correct?

3       A.   I don't think so.  I don't think you were read

4   literally from anything there, or were you?

5       Q.   I wasn't reading the clean language.  I was

6   kind of generalizing.

7       A.   I think the last characterization was not

8   correct.  I think you may have mixed up options and

9   contests.

10      Q.   Let me reask that question.

11      A.   Okay.

12      Q.   Claim 20 [E] "Presenting an option is further

13  defined as wherein presenting said associated options

14  comprises communicating the name for the option after

15  the voter scrolls through the option."  Is that

16  correct?

17      A.   Yes.

18      Q.   Earlier in your Declaration, at paragraph 89,

19  you state that "presenting said contests and said

20  associated options to the voter means communicating to

21  the voter the name of each of the contests and an

22  identifier for each of their respective options for

23  which a vote may be cast in such contest."

24           Is that right?

25      A.   Yes.

106

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 106

**Atkinson-Baker, Inc.**
**www.depo.com**

1      Q.   Why is there a difference between the two, for

2    example, in regards to the options, you refer to an

3    identifier for each of those respective options, yet,

4    in Claim 20[E] it states that "presenting is

5    communicating the name for the option for which --

6    strike that.

7          In 20[E], it states "that presenting the option

8    is communicating the name for the option."

9      A.   Yeah.  It's a further limitation.

10   Communicating an identifier is more general than

11   communicating the name for the option.  As I said it --

12   maybe it was yesterday.  You can display a face, which

13   isn't the name, but it's still an identifier.

14     Q.   Looking at Substitute Claim 23, Limitation [D].

15   "In audibly presenting said contests and said

16   associated options to the voter via set of headphones

17   after the voter elects to have said contests and said

18   associated options presented audibly."

19         How do you define "elects"?

20     A.   Chooses.  Takes some action to indicate.

21         So, for example, if I'm an ordinary sighted

22   voter, when I go up to the voting machine, I don't want

23   it to talk to me.  Whereas, if I'm a blind voter, I do

24   want it to talk to me.  So that has to be indicated in

25   some way.  There are any number of ways of doing that.

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 107

**Atkinson-Baker, Inc.**
**www.depo.com**

1    One is you can tell the poll worker that I need

2    audibility.  And the poll worker will do something.  Or

3    there could be some manner of -- for example, plugging

4    in the headphones might be an action to elect to hear

5    the contest audibly.  Something has -- there has to be

6    some indication because we don't always present the

7    information audibly.

8        Q.   Did you interpret "elects" to be the active,

9    plugging in the headphones into the device?

10       A.   That's a way of electing.  There are any number

11   of ways of electing.

12       Q.   Are there any disclosures in the specification

13   of the '273 patent that describe other ways to elect?

14       A.   Well, let's look at the support.  We're looking

15   at 23[D].  There's lots of support there.

16           I'm going to simply things a bit.  Well,

17   there's -- I'm looking at the disclosure at page 23 10.

18   Is that listed there?  Yes.  34 10 to 11.

19           Although the headphones may be used in

20   conjunction with the touchscreen display, the display

21   preferably shuts down (turns black) when the jack 316

22   is inserted into plug 318 in order to preserve the

23   voter's privacy, et cetera.

24           So inserting the jack into the plug, I think it

25   really should read inserting the plug into the jack,

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 108

**Atkinson-Baker, Inc.**
**www.depo.com**

```
1    but it may be a typo.
2          But you insert one into the other.  And that --
3    since it causes the display to shutdown, now the
4    machine knows that we want to use headphones, because
5    without the display and without the headphones, nobody
6    is voting.
7    Q.   Claim 23 [G] it talks about adjusting the
8    touchscreen display after the voter elects to have the
9    contests and said options presented audibly.
10         Are there other ways to adjust the screen?  I
11   mean could someone, like, turn the brightness of the
12   screen, and that's the way to adjust the screen?
13   A.   Of course, there are other ways to adjust the
14   screen.  But this is a particular one, which is you're
15   adjusting the touchscreen so that the options are not
16   visually presented on the touchscreen display.
17   Q.   Could adjusting the screen -- could you get rid
18   of the -- maybe put up a blank screen, would that be
19   adjusting the touchscreen there?
20   A.   Any method such that the contests and options
21   are not visually presented.  So you could have a blank
22   screen.  You could put up a picture of a Caribbean
23   island.  You could put up quotes from the Constitution
24   of the United States, patriotic symbols, as long as
25   you're not visually presenting the contests and said
```

109

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 109

```
 1    options.
 2       Q.   And the objective of that is to -- for privacy;
 3    is that correct?
 4       A.   That's the stated objective in the patent
 5    application, yes.  I just read that into the record
 6    earlier.
 7                  MR. SINGH:  I have no further questions.
 8                  MR. GOTTUSO:  We will review and sign.
 9
10                  (Deposition concluded at 2:28
11           o'clock p.m.
12                  (Signature not waived.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 110

```
1    SMARTMATIC USA CORPORATION

2

3        vs

4    ELECTION SYSTEMS AND SOFTWARE, LLC

5                        - - - -

6                     CERTIFICATE

7

8           I, MICHAEL I. SHAMOS, PH.D., J.D., do hereby
     certify that I have read the foregoing transcript of my
9    deposition, and it is a true and correct copy of my
     testimony, except for the changes, if any, made by me
10   on the attached Deposition Correction Sheet.

11

12                         _____

13                         MICHAEL I. SHAMOS, PH.D

14

15                         _____

16                         (Date)

17

18   _____

19   Notary Public

20

21   _____

22   (Date)

23                                                    ls

24

25
```

111

Michael I. Shamos, Ph.D, J.D.
December 20, 2019

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 111

1    COMMONWEALTH OF PENNSYLVANIA )

2    COUNTY OF ALLEGHENY              )

3

4              I, Lois Sikoski, a Court Reporter and
     a notary public in and for the Commonwealth of
5    Pennsylvania, do hereby certify that the witness
     MICHAEL I. SHAMOS, PH.D., J.D., was by me first duly
6    sworn to testify to the truth, the whole truth, and
     nothing but the truth; that the foregoing deposition
7    was taken at the time and place stated herein; and that
     the said deposition was recorded stenographically by me
8    and then reduced to typewriting under my direction, and
     constitutes a true record of the testimony given by
9    said witness, all to the best of my skill and ability.

10             I further certify that the inspection,
     reading and signing of said deposition were not waived
11   by counsel for the respective parties and by the
     witness.

12

13             I further certify that I am not a relative,
     or employee of either counsel, and that I am in no way
     interested, directly or indirectly, in this action.

14

15             IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office this
     26TH day of December, 2019.

16

17

                                _____
18                              Lois Sikoski
                                Notary Public
19

20   My Commission Expires August 2, 2020.

21

22

23

24

25

                                                            112

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 112

**Atkinson-Baker, Inc.**
**www.depo.com**

## A

**a.m** 2:19 70:19
**ability** 18:9 112:9
**able** 10:15,15 11:2 12:4
12:5 30:16 37:3 40:17
41:1 45:15 72:21 73:8
73:16,18 76:11,21
77:17 78:4,7 81:18
88:4
**absolutely** 16:20
**abstract** 67:12,13
**accepting** 99:17,19
**access** 11:23 69:6 87:2
100:21
**accommodate** 48:25
**accommodating** 49:3,4
**accurate** 6:6
**accurately** 6:19
**acquire** 44:22,24 45:5
46:1
**action** 107:20 108:4
112:13
**active** 108:8
**activity** 97:25
**actual** 19:24 53:3,23,25
92:18
**AD0C56D** 1:21
**Adams** 74:24 85:4
**add** 90:9
**added** 58:6 100:6
**adding** 100:8,8
**addition** 15:9 93:17
**address** 52:5
**addressed** 51:6
**adjust** 49:22 109:10,12
109:13
**adjusting** 109:7,15,17
109:19
**advance** 23:23 24:1
25:10
**advantages** 13:3
**advised** 15:8
**adviser** 15:10
**advising** 14:12
**affixed** 112:15
**AFTERNOON** 70:21
**Agnew** 88:19
**ago** 6:24 36:5
**agree** 10:25 26:24 38:13
38:17 42:8 46:13 47:4
51:15 52:6,9,13 53:7
54:12,18 56:25 57:16
57:19 58:16,18 59:11
60:11,14 62:21 68:25
69:7 70:4 72:7 76:4
84:17,25 86:22 91:18
92:18 95:5,12,18,22
95:25 96:7,10 98:24
99:5,12
**Ah** 78:12
**ahead** 102:22
**al** 4:9 51:5 75:5
**alerted** 36:4
**allegations** 43:23
**ALLEGHENY** 112:2
**allow** 26:20
**allowed** 24:12,14
**allows** 45:10 87:21

**alphabet** 89:24 92:11,21
92:22 94:11
**alphabetical** 92:2,6,15
92:16
**alter** 72:18
**ambiguity** 80:24
**Amend** 4:20 95:3,6
96:18 97:12 99:10
**amount** 49:16
**announce** 91:17 100:24
**announced** 91:19,22
**announces** 91:6
**answer** 6:8,10,11,14
12:19,20 27:1 47:17
99:24
**answered** 30:18 38:4
41:13 100:16
**anybody** 22:1 41:23
70:25
**anymore** 93:5
**anyway** 85:23
**apart** 33:22
**apparatus** 68:18
**apparatuses** 68:19
**apparent** 46:22
**APPEAL** 1:2 2:2
**appear** 31:17 34:14,15
35:3 38:5 104:8
**appearing** 51:12
**appears** 26:17 32:3 51:8
51:9 73:5 95:9,14 96:8
**appendices** 8:6
**appendix** 99:9 101:3
**applicants** 21:25 23:1
**application** 4:11,15
15:11 96:12 101:13,16
102:3,4,21 104:9
110:5
**applications** 15:1
**applied** 30:21
**applies** 21:5 47:14
**apply** 27:25 29:14 30:25
44:14,16
**applying** 82:23
**appoint** 21:21
**appreciate** 13:14
**apps** 14:21
**Arch** 3:6
**area** 15:11 37:14,22,24
37:25 86:15 87:15
**areas** 37:25
**argue** 81:13
**argument** 83:18,24
**arguments** 43:13
**arrangement** 73:13
82:11,13 92:14
**arrive** 32:11 91:20
**arrow** 37:10
**art** 9:10 41:10 44:2,17,17
54:20 66:2 72:18
79:25 80:8 81:22
88:12 104:12 105:8
**Artificial** 16:3
**aside** 67:10
**asked** 12:22 21:14 22:24
27:25 29:13 42:22
44:14 47:11,15 52:15
68:12

**asking** 42:25 66:7 74:9
80:4 81:23
**aspect** 98:24 99:5
**aspects** 20:25 99:14,22
**assemble** 24:3,8
**assistant** 22:11
**associated** 36:1 39:16
39:18 40:4 42:17
62:18 63:13 75:1 93:1
100:1 101:7 103:6
106:13,20 107:16,18
**assume** 6:12 11:21
16:22
**assuming** 60:23
**assure** 67:5
**assured** 50:9
**ATKINSON-BAKER** 1:19
**attached** 111:10
**attempted** 97:5
**attorney** 23:4 69:25
**attraction** 100:7
**attributes** 74:7
**audibility** 108:2
**audibly** 91:6,10 107:15
107:18 108:5,7 109:9
**audio** 48:18 49:11,12,23
52:20 53:1,5,21 54:1,2
54:9,23,24 55:7 57:20
57:22 58:3,4,5,6,10,11
58:11,16 59:6,7,8,9,11
59:19,21 60:6,14 66:3
66:7,22,23 67:1,9,13
67:17,18,19,19,21,24
68:8 76:19 87:7 89:23
92:10
**audio-based** 52:10,14
53:8,9,12 54:13 55:11
**audit** 53:19
**auditing** 20:2
**August** 112:20
**auxiliary** 32:19 33:25
34:6
**available** 24:6 62:3
79:21
**aware** 55:7,10

## B

**B** 28:1 91:11,12,16,17,20
91:22 101:2,5 102:9
**bachelor's** 105:7 26:7
**back** 18:15 24:17 25:16
34:16 38:10,18 39:5
43:6 49:16 50:1 66:6
70:23 73:15 80:15
84:15,16 85:16,18,22
85:22 88:18
**backwards** 101:17
**ballot** 10:23 11:4,5,8
19:22 26:1 53:2,3,5,16
53:22,23 56:14,20
60:19 61:5,7,9,11,12
61:13,15,16,18,19,20
61:21,22,23,24,25
62:1,2,4,9 63:16 64:15
64:19,21,22 65:2,2,12
67:21,22 75:24,25
76:3,5,6,14,15,15,17
76:20,22 77:12,12,14

77:18,20 78:4,8,9,9,10
78:12,15,16,18 79:1,1
79:3,12,14,14,14,17
79:20,22,23 80:1 85:7
94:2 103:2
**ballots** 19:19 20:9 50:20
61:17
**banks** 15:3
**bar** 93:16
**base** 52:1
**based** 34:9 49:21 54:8
54:19,23 55:16 61:2
66:25 70:2 76:8 102:5
**bases** 17:25
**basis** 10:18
**Bederson** 9:20 10:21
43:14
**beginning** 59:15 60:17
69:19 89:20
**begins** 35:19 58:23 60:6
96:1 105:5
**behalf** 2:15 3:3,9
**behold** 22:13
**believe** 17:12 26:16
29:15 43:25 44:6 51:7
51:15
**benefits** 13:5
**best** 112:9
**better** 31:13
**beyond** 99:12
**Bifano** 3:4 5:12
**big** 28:12
**bit** 35:18 63:11 67:6
108:16
**black** 108:21
**Blackberry** 33:20,23,24
34:4
**blank** 65:6 109:18,21
**blind** 49:3,4 50:8 100:6
100:18,21,25 107:23
**block** 57:22 58:1 63:1
45:14
**body** 99:14
**bones** 112:9
**book** 13:12 16:11
**booth** 103:3
**Boston** 3:6
**bottom** 65:5 73:6 85:3
85:11 87:13
**Boulevard** 3:11
**bounces** 97:23
**box** 18:8 85:5
**break** 6:16,17 24:16
36:11 41:18,23 70:18
104:14
**brightness** 109:11
**broadly** 18:19
**browser** 18:5,5
**built** 19:3 74:10
**bulletin** 22:4
**bunch** 32:25 102:10
**bunches** 68:11
**button** 26:1,6,6,8,10
28:13 32:19,20,21
33:5 37:20 43:6 46:2,3
46:4,5,6,10 66:19 85:6
85:16,17,18 90:17

93:16
**buttons** 11:17 14:23
18:8 26:3 33:1,9,14,16
33:19,20,21,25 34:1,5
34:10 46:23 47:3 48:2
48:3,6 89:22 90:21
92:9

## C

**C** 3:1 5:1 28:6 96:13,23
103:16,17,18,19
**C.F.R** 4:20 95:4
**call** 21:25 58:14
**called** 79:20 99:18 100:2
**candidate** 64:2,3,4 66:16
66:17,17,18 72:10
82:10 83:7 89:17,19
90:5,9 93:19 104:23
**candidate's** 37:14,23,25
89:13
**candidates** 40:14,16,22
55:4 56:8,16,19,22
57:5 62:15 64:1 72:15
73:4,8,11,12 74:16
82:15 85:4 88:19
**candidates'** 50:18
**capabilities** 18:7
**capability** 100:9
**capable** 100:19
**capital** 22:23 37:10
**card** 18:24
**Caribbean** 109:22
**Carnegie** 13:24 17:16
22:4 23:3
**case** 1:9 2:9 20:8 30:1
85:20 89:21 90:20
92:8 98:15
**cases** 18:7 31:11,14
**cast** 40:7 106:23
**casting** 53:3,24
**catch** 77:8
**causes** 34:24 109:3
**cell** 14:20
**center** 26:6 32:21 46:2,4
46:6,10 48:2
**Centre** 2:17
**certain** 52:2,3 69:13
**certainly** 10:25 13:1
16:25 44:2 50:3 53:9
55:3,19 69:9 85:20
97:19 104:25
**CERTIFICATE** 111:6
**certification** 21:19 25:14
**certify** 111:8 112:5,10,12
**certifying** 20:3 21:11,12
23:11
**CES** 22:18
**cetera** 18:9 26:21 64:24
64:24 87:17 108:23
**chairman** 81:1
**chance** 95:7
**change** 23:6 43:5 79:22
**changes** 14:13 79:23
111:9
**characterization** 10:20
106:7
**chart** 57:21
**check** 38:18 41:8 85:5

**Atkinson-Baker, Inc.**
**www.depo.com**

**checking** 46:25
**choice** 79:4,5 90:24 94:20
**choices** 42:12 50:16 76:1 79:10 84:14 103:9
**choose** 85:21,22
**Chooses** 107:20
**chose** 93:7
**citation** 35:9,15,18,20 102:20
**citations** 35:6 36:1,3 96:11,22,24 97:2
**city** 60:8,11,13
**Civil** 2:16
**claim** 27:18 28:21,23,25 29:4,8,10,21,23,24 30:5,25 32:17,17,23 45:8,8,16 66:9 67:10 68:4,18,19 69:13,15 99:13,15,16,17,17,18 99:21,22,22,23 100:3 100:12 103:15,16 105:5,14 106:12 107:4 107:14 109:7
**claimed** 11:5 26:25 38:12 87:19 99:20
**claims** 10:18 11:8 25:21 26:4,14,23,25 27:2,6 30:13 31:3 32:14,15 34:13 43:15,20,25 44:10 46:1 68:1,20 83:21 95:13,19,23 96:8 97:14 98:23,24 98:25 99:1,3,6 100:11 100:11,13,15 101:3 102:13 104:13
**clarification** 76:24
**clarified** 12:20 77:6
**clarifies** 69:20
**clarify** 75:9
**Clark** 2:17
**clean** 106:5
**clear** 9:13 17:13 27:8 46:15 47:2 73:1
**clearly** 68:7
**click** 18:8 82:20 83:7,10 83:11 84:6,8,11 85:6 85:15,17,22
**clicked** 84:16
**clicking** 83:1,25 84:4,11 84:17 85:8
**close** 33:3,21
**closer** 86:23
**closing** 18:12
**clue** 19:2
**code** 16:12 21:24 23:23 75:24 78:10
**collaborative** 8:14
**collate** 95:7
**colleagues** 5:12
**collecting** 98:10
**colored** 76:2 79:11
**column** 35:7,7,8,10,15 35:21 37:8,21 50:11 50:14,15 54:3,6 58:20 59:15,23 63:20 64:8 67:16,25 68:23 72:11

72:13,14,16,16,17,24 73:5,9,14,16 75:12,14 75:16,20 77:25 78:2 79:8 81:10 86:8 87:12 89:9,20 90:19
**columns** 72:15,19,22 73:11,21,23 78:1 80:2 80:9
**come** 9:8 10:12 45:18 57:23 70:23 91:12
**coming** 91:11
**commerce** 17:24
**commercial** 14:4
**Commission** 112:20
**commit** 13:7
**common** 49:2,3 83:2 93:3
**commonly** 40:19 82:21 82:22 83:25 84:18,24 84:25
**Commonwealth** 2:21 21:20 24:19 49:18 112:1,4
**communicated** 105:11 105:11
**communicating** 40:5 105:6,7,15,22 106:1 106:14,20 107:5,8,10 107:11
**communication** 7:8 24:20
**comparing** 22:9
**compensation** 22:3
**complete** 95:9 97:13
**completed** 90:1
**completely** 20:24
**complied** 21:23
**component** 13:18
**components** 19:11
**composition** 23:6
**comprises** 106:14
**comprising** 46:2 105:6
**computer** 10:6 11:14,16 14:11 15:18 16:7 22:4 33:22 56:15,21,22,25 57:8 81:8 105:9,13
**concept** 38:9 39:8 81:25 82:2
**concluded** 110:10
**conditions** 6:18
**conducted** 21:19 53:25
**configuration** 56:17
**configure** 56:14
**configured** 19:23 99:25 101:6,10 102:6 103:10 103:14
**confined** 10:23
**confines** 33:11
**confirm** 8:3 27:15 71:6
**conflating** 79:13
**confused** 33:7,15,25 34:8
**confuses** 99:8
**confusing** 47:22 80:14 82:5 91:23 93:5
**confusion** 34:24
**congratulating** 22:14
**conjunction** 100:10

108:20
**consider** 38:7
**consists** 76:16 79:3
**constitutes** 112:8
**Constitution** 109:23
**construction** 27:18,24 27:25 28:21,23 29:1,4 29:8,10,14,16,21,24 30:5,22 31:1 32:2,5,11 32:16 39:15,20,22 44:5,7,11,22,25,25 45:2,5,9,11,12,13,15 45:19,21 55:2 69:18 69:24 70:3
**constructions** 30:15,19 30:20 31:16 44:13,14 44:16 69:12,13,15
**construe** 27:20,21 31:3 31:6,7,20
**construed** 29:24,25 31:25 42:16
**construing** 45:17
**contain** 28:25 29:20 58:16 59:11
**contains** 61:4
**contemplated** 75:7
**content** 18:13
**contest** 35:1 36:20,21,22 36:25 37:4,5,6,13,16 37:19,23,24,25 38:6,8 38:14,24 39:3,7 40:13 42:12,14,15 50:19 54:25 55:3,17,21 56:5 59:12 60:12,13,23 62:13,17 63:25 65:13 66:3,13 72:5,8 74:19 74:19,20 76:6 77:15 77:25 78:1 79:7,21 80:22 81:1 82:3 93:3,6 93:21,23 105:15,16,21 105:22,23 106:1,23 108:5
**contested** 62:14
**contests** 26:19,20 34:22 37:3,6 39:15,17,18 40:3,6,7 42:2,9,11,17 42:19,20,25 43:3 45:13 55:8,12,15 56:23 57:2,5 58:17 59:3 60:15 61:22,23 61:25 62:2,12,18 64:15,21,22 65:5,17 65:18,22,23 66:22 67:1,24 68:7 69:18,22 70:7 71:16,19,23 72:3 74:19 76:16 77:15,21 77:23 78:14,17 79:15 79:16 82:1,9 92:24 100:1 101:6 103:8 104:24 105:6,14 106:9 106:19,21 107:15,17 109:9,20,25
**context** 9:13 32:15 33:16 34:3 42:22 47:2 60:17 66:5,7 81:6 100:5
**contexts** 84:9
**contextual** 34:9
**Contingent** 4:19 95:3,6

96:18 99:9
**control** 61:3
**convenient** 18:10
**conversation** 7:11
**conversations** 7:10
**converted** 59:6,7,9,19
**coordinate** 98:4
**copy** 8:3,5 27:3,14,15 95:5,8 111:9
**CORPORATION** 1:4 2:4 111:1
**correct** 10:10 29:15,16 36:3 39:19 40:8 42:3 44:19,20,23 46:6 54:21,25 59:6 64:15 80:17 81:15 86:16,20 87:6 89:14 91:7 92:25 94:2,13 97:2,4 101:7 101:14 106:2,8,16 110:3 111:9
**correction** 9:4 111:10
**correctly** 32:22 45:16
**correctness** 44:13
**correspond** 62:25 94:12
**corresponding** 76:2 79:11
**corresponds** 56:11 65:11 86:9
**council** 60:8,11,13
**councilman** 36:21
**counsel** 5:21 6:13,24 7:2 7:3,5,9 31:8,18,25 97:1,5 112:11,13
**counties** 59:16
**county** 59:1,17 112:2
**course** 17:22,25 18:13 25:12 26:9 37:2 61:17 98:18 109:13
**courses** 17:16,18
**court** 2:20 6:5,7 29:25 45:1 112:4
**cover** 17:23
**covering** 7:7
**create** 13:13 14:2 17:25
**created** 62:22
**creates** 57:16,17
**creating** 11:24 60:19
**criticized** 22:19
**critique** 15:13 28:2
**critiquing** 14:13
**CROSS-EXAMINATION** 5:5
**cumbersome** 91:23
**Cummings** 4:8 74:17 75:7,10
**current** 16:21,23,25 17:5
**currently** 15:24 90:13
**customer** 57:15 58:25 58:25
**customer-provided** 59:19
**cut** 103:12
**CV** 16:25 17:4

— **D** —

**D** 4:1 5:1 28:8 69:19 107:14
**D-I-S-C-R-E-T-E** 104:8

**damage** 86:2
**dangerous** 25:23
**data** 57:15 58:1,2
**database** 62:25 63:2,3
**dataset** 57:16,18,20 58:6 62:22,24
**date** 56:2 111:16,22
**dates** 38:18
**day** 24:17 25:9,10,10 62:9 112:15
**days** 6:24
**dealing** 11:20
**dealt** 18:13
**December** 1:15 2:18 22:13,17 112:15
**decide** 10:18 24:22 31:6 44:19
**decides** 59:21
**deciding** 58:2
**Declaration** 4:13 5:15 7:21,25 8:4,5,8,20,24 9:1,16,21 10:1 18:16 27:17 28:21 28:25 29:18,20 30:10 31:18 32:3 34:16 39:14 43:10 44:23 45:3 51:6,12,22 52:23 69:14 81:10 82:7,17 96:3,5,9,15,23 102:11 106:18
**deemed** 44:21,24
**Defendant** 3:9
**define** 11:11 32:5,8 34:21 42:14 104:5,11 105:7 107:19
**defined** 105:15,22,25 106:13
**defines** 101:9 102:6
**definition** 10:12 11:10 12:1 20:16 25:16 28:2 34:11
**degree** 10:5 13:12
**Democrat** 62:10
**Democratic** 62:7
**demonstration** 24:12
**denominated** 93:14
**Department** 49:7
**depending** 61:7,15
**depends** 34:3,9 55:2
**depict** 63:7
**depicted** 63:11
**depicts** 76:4,6
**depo** 6:7 7:10,11,13,17
**deposed** 5:14
**deposition** 1:13 2:14 6:22 7:18 16:13 27:10 50:22 71:2 94:22 101:21 110:10 111:9 111:10 112:6,7,10
**depth** 73:11
**describe** 16:24 17:2,12 35:12,16,24 38:2 51:4 53:11 61:2,9 62:1 67:8 71:9 82:20 84:4 85:1 93:12 97:20 101:25 108:13
**described** 36:7 48:9 83:9 87:12 104:5
**describes** 11:6 64:14

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 114

Atkinson-Baker, Inc.
www.depo.com

describing 63:19 65:3
82:22 84:3,18 87:18
description 35:12 38:3
41:7 46:18 68:16
95:13,19,22 96:1,7
97:13
deselect 64:4
design 11:20 12:4 13:18
15:16,21 16:6,10
17:19 23:24 37:1
90:24 94:19
designed 13:23 14:8
15:17 16:11 64:17,18
100:9
designing 13:8,11,17,20
15:19 17:9
designs 15:13
desired 89:24 92:11
desktop 15:1
detailed 8:16
determination 45:4 50:3
59:20 68:13
determine 30:25 38:11
38:19 41:1 49:20 68:3
68:10 75:24
developed 16:5 24:4
device 32:18 46:2,9,14
47:5,10,19,23 48:3,4,8
48:10,12,15 100:12,14
100:17,18 103:6 108:9
devices 46:17 105:13
devote 23:21
diagrammatically 63:4
difference 53:11 74:5,6
97:20 98:16,20 107:1
differences 98:19,19
different 11:1 14:10 31:2
33:2,3 34:5,22 40:21
42:9,11,20 44:9 47:21
55:23 56:16 61:7,15
61:25 62:9 65:16
66:21 68:11,18 72:15
74:21 75:5 76:17
79:17 80:14 81:6 84:9
91:25 97:17 98:8
differently 70:9
differs 33:20
difficult 20:23
difficulties 13:5
difficulty 86:14
digitized 67:18
direction 112:8
directional 88:22
directions 81:7 98:9
directly 54:16 59:9 82:14
112:13
director 15:24 16:1,3
22:25
disabilities 49:1
disable 49:11
disabled 49:6
disadvantages 13:3
disagree 30:20 38:17
disclose 19:4 20:12,14
51:8 56:9 70:8 71:12
71:19 72:3,5
disclosed 42:1 48:13
51:15,25 54:9 55:4,9

68:21 73:20 74:6,10
83:12 84:12,12
discloses 20:21 51:16
52:6,12,13 53:7,9 69:2
69:7,9 70:4 72:7
disclosing 72:8 73:21
77:16 84:13
disclosure 74:3,17
78:23 87:23 88:1,6
101:9 102:6 108:17
disclosures 68:11
108:12
discrete 34:20,21,25
35:3,12,17,24 36:7
38:3,4 71:20 72:8
103:20,23 104:6,8,11
discuss 41:22 69:19
70:24
discussed 93:2
discussing 62:22 76:24
discussion 67:16,17
display 26:18,18 37:22
48:18 49:10,12,22,23
71:14,17 72:22,24
73:8,16,17 74:12,22
75:6 76:15,18,19,21
77:17,19,24 78:4,5,15
78:18 79:5 80:1,9
81:20 83:23 85:6
86:15 87:15,22 89:23
89:25 90:22 92:1,10
92:14,15,16 97:18
98:5,6,11 99:11,13,14
99:25 100:7 101:5
102:6 103:10,13 105:2
107:12 108:20,20
109:3,5,8,16
displayed 72:19 73:24
89:23 92:10,20 101:10
104:22 105:1,3
displaying 92:21
displays 34:25 37:13
49:1 78:13,14 100:5
dissect 68:2,10
distance 33:12 34:4,6
distinct 63:11
distinguish 76:14
District 29:25 45:1
divided 8:13
Division 23:1
DLA 3:5 5:11
doable 81:8,9
document 9:22 16:17
49:17 51:2 71:5,7
94:25 95:2
documentation 23:24,24
documents 7:12,14 9:18
9:19,23 23:25 54:21
67:7
doing 27:24 32:15 50:7
50:20 75:6 81:4 91:16
107:25
Donald 66:15
double 47:22
Dr 5:10 10:21 43:14 77:1
draft 8:7,11
drafted 8:11
drafting 8:14 9:16

drag 18:8
draws 75:23
dream 31:11
drive 26:18
duly 5:3 112:5

---E---

E 3:1,1 4:1 5:1,1 28:12
105:5,21 106:12
e-business 13:25 14:2
16:1
E-commerce 17:20
earlier 41:25 44:4 92:23
106:18 110:6
easier 27:4
easily 33:15 34:8
easy 97:19
edit 94:2,5
editor 93:15
education 11:1,22
effect 6:5
either 15:11 89:2,3 94:1
103:3 112:13
elect 108:4,13
elected 105:2
electing 108:10,11
election 1:6 2:6 19:23,24
20:1 21:24 55:23
56:12,13,17 57:1,4,7
57:12,14,25 58:6 62:5
62:8 111:4
elections 23:1 38:19
61:6 62:7
electrical 10:5 12:12
98:19
electronic 10:8,23 12:13
17:24 18:18,25 19:3,5
19:9,11,13 20:10,12
20:17,20,21,24 21:16
25:12,13,18 36:13
103:4
electronically 103:4
elects 107:17,19 108:8
109:8
element 96:13,23 101:2
102:9 103:16
elucidation 28:10
embodiment 27:9,9
68:14,16 69:3 73:20
74:7,11 78:21 87:11
87:18,20
embodiments 48:13
68:20,21 69:2
eminently 52:4
employee 112:13
enable 28:13 98:13
enables 40:11
enactment 56:2
ended 16:2
ends 20:1 95:14,23 96:1
engineering 10:6 26:8
enlarge 86:15
enlarges 87:15
ensure 21:21
enter 90:1,9 93:18 105:4
entered 57:7
enters 60:21
entire 11:21 20:14

equal 11:23
equipment 15:4 69:5
equivalent 98:12
error 9:3,5,7 36:4
errors 13:6
ES&S 5:25 6:1
Esquire 3:4,4,5,10,10
estimate 25:3
estimating 8:21 44:9
et 4:9 18:9 26:21 51:5
64:24,24 87:16 108:23
evaluating 14:13
evaluation 14:14 15:14
Evans 3:10 6:1,1 7:4
everybody 11:23 24:23
69:4
exactly 30:22 46:15
65:10 78:16 81:16
exam 22:17 24:21 25:15
examination 4:2 22:24
23:8 24:3
examinations 24:7
examined 5:3
examiner 22:1,2 23:20
examiners 21:21 22:15
22:20 24:2,8,14,21
examining 23:21
example 12:6 15:5,20
16:10 19:18 27:23
29:13 33:20 40:14
45:7 50:18 56:15 59:1
59:14 60:6 61:7 62:5
63:24 66:9 68:17 73:3
73:10 80:25 85:3,13
88:15 91:9 104:3
107:2,21 108:3
examples 13:22
exams 24:5
exception 60:20
exercise 97:16
exhaustive 97:6
exhibit 7:18,22,23 8:1,3
16:13,16,18 17:2,6,15
18:15 27:10,13 50:22
50:25 51:1,1,2,4 71:2
71:6,7,9 94:22 95:1,5
95:10,15,24 96:18,24
97:12 101:16,18,20,21
101:25 102:5
exhibits 4:7 8:6
expect 65:13,21
expecting 98:3
experience 10:7,22 11:2
11:11 12:6,8,9,10,14
12:15,16,18,23 13:8
13:17,18,20 19:1 20:4
20:5,8,10,17,23 21:2
23:12 25:18 38:22
49:21 54:23 55:16
66:25
experimentation 10:17
expert 48:17 52:2
expertise 10:19
Expires 112:20
explain 13:22 18:3,21
19:7 28:14,19 30:12
44:20 65:10
explained 22:1,2 45:22

66:1
explains 32:13 69:3 84:2
exporting 57:23
exposed 12:17 23:18
exposure 13:12
express 97:8
expressed 88:6
expressly 41:11 43:22
87:19
extends 78:1
extensive 96:23
extremely 14:21

---F---

F 28:16
face 107:12
facilitate 63:21
fact 23:15 36:24 48:13
61:23 102:11
faculty 23:3
familiar 13:1 39:24,24
65:13
far 34:2
farther 33:14,22 34:7
fashion 98:7
fast 83:8
feasible 73:13
feel 51:23 101:1
fewer 48:7 73:7 97:7,9
field 16:11 54:5,8
FIG.25d 37:12
figure 36:20 42:6,8,20
43:3 45:24 46:8,13,21
46:22 47:6,7,11,12,13
47:15,16 48:5,6,9
56:10,11 57:9,11,15
57:21 59:5 60:18,25
61:2,10 62:11,23 63:1
63:4,5,7,12 71:25 72:1
72:2,3,5,7,10 73:2,22
73:23 74:15,23 76:4,5
76:12,22,24,25 77:4,9
78:5,19 80:2,9,12,15
81:5 82:6 83:4 86:3,5
86:6,9 88:16,16 89:6
93:8,9,10,12,12,20,24
104:1,1,1,1,2,2,2
figured 30:21
figures 36:18,25 38:1
47:10,14,20 104:4,19
file 1:21 60:7 68:4
filed 6:25 7:14,15,22
9:19
files 57:20 58:7,16 59:6
59:9,10,11 60:14
filing 16:23 48:23 50:13
find 10:24 13:5 27:4 36:6
36:14,16,17 40:11,17
52:4 68:6
fine 90:23
finger 83:1 97:24
finish 6:9
finished 37:9
firm 16:5
first 4:13 5:3 21:17 22:17
22:24 26:5 32:20 33:7
33:13,15 35:9 37:9
38:14,23 39:1,6 41:15

Atkinson-Baker, Inc.
www.depo.com

45:8 85:13,14 99:10
102:15,20 112:5
**fitness** 15:3
**five** 24:10 61:15 63:17
65:3 96:20
**five-key** 63:23 64:17,20
**flat** 46:23
**flesh** 8:17,20
**Floor** 2:17 3:6
**Florida** 22:19
**focus** 42:19 53:4 83:24
**following** 25:1 95:16
**follows** 5:4
**foregoing** 111:8 112:6
**form** 29:2,22 38:16
39:10 48:11,20 51:17
55:1 72:11,13,14,16
72:17 75:25 80:3 97:3
**formal** 30:15,19
**format** 66:4
**formed** 49:25
**forms** 11:15
**formulated** 30:15,19
**Forsyth** 3:11
**Forty-three** 85:11
**found** 10:20 42:4 96:10
96:11 97:7,7,8
**four** 72:22 73:10,11,12
77:23 88:22 90:17
96:20
**Fourteen** 75:15
**Friday** 2:18
**front** 8:22 18:5 97:21
**frustration** 18:12
**full** 6:6 60:16
**full-face** 79:20
**fully** 48:8
**function** 26:12 64:5
**functional** 98:18,20
**functionality** 63:13,15
**functionally** 97:19
**functions** 33:3 57:24
**further** 18:2 105:15,21
105:25 106:12 107:9
110:7 112:10,12

**G**

**G** 3:10 5:1 28:18 109:7
**gambit** 15:2
**general** 12:2,4 56:4
100:22,25 107:10
**generalizing** 106:6
**Generating** 52:21
**George** 74:24 85:4
**getting** 20:1 54:15
**give** 6:6 12:11 13:22
15:20 19:2 24:12 25:3
28:9,16 30:16 64:18
85:24 100:21
**given** 10:20 112:8
**gives** 59:1 64:25
**glad** 77:6
**go** 18:15 24:17 25:5
26:22 27:21 33:10
36:9 38:10,18 39:5
43:5 49:15 50:1 53:17
57:24 64:2,3 65:22
66:13,16 68:3 74:23

**goes** 53:4 59:8,18 64:5
90:17 105:7
**going** 7:21,25 12:5 16:16
24:22 25:16 27:13
30:6,7 33:9 34:16
50:25 53:14 54:19
58:3 61:17 62:13,14
66:6,6 68:2 69:6,20
71:5 73:15 75:20 79:4
80:12 83:14 90:3,8
91:12,20,22 93:4
94:25 101:19 103:7
108:16
**good** 5:10 37:1 41:18
55:19 56:8 70:17
82:14
**Gore** 75:5
**Gottuso** 3:10 5:24,24 7:4
29:2,22 38:16 39:10
48:11,20 51:17 55:1
76:23 80:3 97:3 110:8
**government** 59:1
**graded** 15:15
**greater** 32:10 33:12
**grew** 84:7
**group** 63:20
**guess** 20:25
**guide** 9:22
**guided** 31:8

**H**

**hack** 24:15
**hand** 7:21 16:16 26:17
27:3,13 50:25 65:9
71:5 94:25 97:24
101:20 103:3 112:15
**hand-counted** 19:19
20:9
**hand-marked** 19:18 20:9
**handed** 74:9
**Handel** 3:5 5:13
**handling** 10:24 11:4,5,8
**happen** 36:2 60:22
**happened** 23:16,17
49:20 77:25
**happening** 54:16
**happens** 60:18,20 97:23
**happy** 47:17
**Harpreet** 3:4 5:10
**Harrisburg** 22:23 24:3
25:6 49:5
**headings** 51:11
**headphone** 100:8 105:2
**headphones** 49:2,2
66:12 89:23,25 91:2,4
91:25 92:11 105:12
107:16 108:4,9,19
109:4,5
**hear** 32:7 91:14 108:4
**heard** 89:25
**heavy** 11:24
**held** 62:8
**hereunto** 112:14

**hidden** 74:2
**high-level** 65:23
**highlighted** 89:24 91:15
92:12 93:6
**Hill** 2:17
**historical** 38:11 67:4
**history** 68:4
**Hm-mm** 59:25 66:11
81:12 82:18,24
**hold** 44:12
**home** 53:15 54:2
**horizontal** 65:18
**horizontally** 65:14
**hour** 6:17
**hours** 7:6,9 8:23 25:4
**HTML** 18:2
**huge** 34:5 49:16
**human** 11:13 14:7,11
40:14 58:14,15 105:13
**hypothetical** 42:21
90:10
**hypothetically** 21:1

**I**

**I-A-N** 5:9
**Ian** 5:9
**icon** 82:21
**idea** 22:12 53:14 55:19
**identical** 53:24
**identification** 4:7 7:19
16:14 27:11 50:23
71:3 94:23 101:22
**identifier** 40:6,10,18
41:7,14 106:22 107:3
107:10,13
**identify** 103:23
**illegal** 21:18
**illiterate** 40:21
**illustrated** 37:12
**illustrates** 60:18
**image** 64:19 65:4
**images** 65:7
**impair** 6:19
**impaired** 91:1
**implement** 17:13 83:13
**implemented** 88:7,9,11
**implication** 54:1
**import** 81:17
**important** 11:20 18:12
31:12 51:23 64:23
69:20 100:4
**improved** 103:1
**inadvertently** 33:5
**include** 13:8 41:6 51:21
59:2 60:15 65:4 81:14
87:14,21
**included** 30:10
**includes** 32:18 46:24
47:3 65:6
**including** 24:15
**incorporates** 63:22
**incorrect** 9:12
**increase** 87:22
**independent** 85:3
**independently** 24:18
**indicate** 107:20
**indicated** 107:24
**indication** 108:6

**indirectly** 112:13
**individually** 77:21
**info** 61:9,11,21 62:12,17
**information** 18:7 58:17
58:24 59:2,2,5,12,16
59:19 60:15 62:20,21
63:2 98:6,9,10,11
105:9 108:7
**informs** 37:22
**Innovation** 16:4
**input** 57:15 58:10,11
84:3 89:17 98:13
99:18
**inputs** 60:19 98:22 99:19
**insert** 109:2
**inserted** 75:25 108:22
**inserting** 108:24,25
**inspection** 112:10
**installed** 91:25
**instantaneously** 36:9
**instructed** 6:14
**instruction** 66:19
**insufficient** 10:21
**Intelligence** 16:4
**interact** 19:25
**interacts** 11:14
**interchangeably** 85:9,19
**interested** 112:13
**interface** 11:12,14 12:4
13:7,23 14:17,21
15:16,21 16:7,9 17:14
17:18,22 18:3,10 22:8
52:20 53:2,22 65:9
98:24 99:5,23 105:13
**interfaces** 10:7 11:11,18
11:25 12:8,23 13:2,6,9
13:9,10,11,13,17,19
13:20,23 14:7,12,13
14:17 15:17,19 17:10
17:12,24 18:1 32:25
98:17
**internal** 10:7 12:12
23:24 26:15,24 27:6
62:25
**Internet** 18:13
**interpret** 28:3 108:8
**introduce** 5:21 19:20
100:13
**introduced** 44:3
**intuitive** 63:22
**invalid** 43:15 60:19,21
**invalidity** 43:13,17,23
**invention** 16:10 27:9
34:10 39:4 49:13 54:5
54:8 56:3 68:17
102:25
**invite** 49:7
**involve** 17:9,18
**involved** 14:11 56:18
**involvement** 25:14
**involves** 5:16 40:13
**IPR** 5:15 7:1,14,16,22
9:19,24 16:17 18:16
27:14,20 29:25 30:3
44:3,15 45:2 51:1 71:6
101:17
**IPR2019-00527** 2:9
**IPR2019-00531** 1:9

**island** 109:23
**isolated** 20:25
**issue** 45:20 85:7
**issued** 104:10
**issues** 11:20 13:15
**item** 47:9,23 56:11 85:5
86:24 94:5

**J**

**J.D** 1:14 2:15 5:2 111:8
112:5
**jack** 108:21,24,25
**job** 96:25
**Joe** 75:5
**John** 74:24 85:4
**joined** 45:20
**Jr** 3:10

**K**

**keep** 91:15
**key** 37:10 60:19 63:8,19
64:2,3,3 75:3,4 82:10
82:13 89:1,2,22 90:1
90:21 92:9
**keyboard** 34:1 63:8,9
91:13 92:6 93:15
94:18,19 98:15
**keypad** 33:22 69:8,9
**keys** 32:25 63:10,18,23
63:25 64:6,24 65:3
81:19 82:1,7,8 83:7
87:10 88:3,9,17,22,25
89:17 90:4,23 91:5,14
94:4,7,10,12,13,16,18
**kind** 10:19 19:3,22 22:7
23:18 47:22 71:21
75:6 106:6
**kinds** 11:17 18:22 84:9
**know** 6:11,16 29:7 31:22
36:2 38:10,17 41:4
49:25 52:1,15 56:5,7
56:15,21,23 57:5
63:15 66:23 67:2,2
68:2,5 72:18 78:12
91:11 94:6 97:15
**knowing** 13:9 91:22
**knowledge** 13:12
**known** 105:9,10
**knows** 57:1 109:4
**KWERTY** 92:2 93:15
**Kyle** 3:10 5:24

**L**

**L** 4:14
**labeled** 7:23 16:17 56:12
95:25
**laid** 65:5,14
**language** 106:5
**laptop** 97:20
**large** 36:21
**largely** 14:25 22:19
**larger** 9:25
**Larissa** 3:4 5:12
**law** 2:16 21:16 22:5,8,9
22:10 28:23
**lax** 55:25
**laying** 92:5

Michael I. Shamos, Ph.D., J.D.
December 20, 2019

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 116

**Atkinson-Baker, Inc.**
**www.depo.com**

layout 63:1 81:18,20 82:5
leave 18:11
left 46:5,11 48:1 81:2,2 82:3,7 88:21,25 89:4 94:16
left-hand 61:20
legal 21:16
legislature 21:15
Lenovo 97:21
let's 6:8 10:1 15:22 18:15 32:2,14,14 35:9 35:15,20 36:19,19 46:19 56:10 57:9 58:20 59:23,24 60:25 61:14 63:5 68:22 72:21 74:23 79:8 82:16 83:20 86:3 87:25 89:6 90:10 93:24 96:3 101:2,19 104:14 108:14
letter 22:14 89:24 90:14 90:15,16,21 91:7,9,11 91:12,15,16,20,21,22 92:11
letters 89:13 90:8 91:19 91:21 92:1,14,15
level 10:25 11:21 63:24 98:18,20
lever 18:23 19:2,9 23:16 65:16
Lieberman 75:5
lifetime 19:1
light 40:2 66:3
likes 45:19
limitation 26:22 69:21 99:10 102:12 103:20 105:5 107:9,14
limitations 51:7,14,16 51:21,24 68:19 69:16 105:17
limited 53:18 54:9,12 69:1,11,14,23 70:1
Line 35:19 37:8,21 58:20 59:15,23,24,25 60:1,6 60:17 63:21 67:16 68:23 75:12,16,21 79:9 87:13 89:9,10,20 90:19 92:7
Lines 35:7,8,8,10,16,21 64:8,9 86:9 87:12
list 12:11 17:6,15 62:13 62:15 93:21 96:22,24 97:6,9
listed 41:11 56:20 108:18
listening 91:1,19
lists 61:21 77:14
literally 106:4
literature 49:16
little 61:12 63:11
live 23:17 45:20 61:16
LLC 1:6 2:6 111:4
LLP 3:5,11
loads 50:6
located 32:19 46:17
locating 100:19
logical 91:18

Lois 1:20 2:19 112:4,18
long 7:5 50:21 57:6 109:24
look 25:23 27:5 32:2 35:9,15,20 36:24 39:5 42:6 45:7 46:17 50:1 56:1 57:9 58:20 59:14 59:23,24 60:25 67:7 67:12 68:4,22 72:1 74:15,21 77:9 79:6,8 79:19 80:13,21 82:12 82:16 83:20 85:2 86:3 87:3,25 89:6 93:24 96:13,17 101:2 104:19 108:14
looked 10:18 22:6 42:4
looking 25:24 26:5 32:4 61:18 66:10 72:2 73:22 77:4 80:15 83:4 83:21 88:15 93:8 96:21 97:16 99:16 102:8 103:16 105:17 105:19 107:14 108:14 108:17
looks 22:7 78:16,19
lot 38:19 64:12 93:4
lots 36:18 93:5,5 108:15
Louis 3:12
low 22:13
ls 111:23
lunch 70:18,23,25
Luncheon 70:19
lurking 74:2

**M**

M 3:10
MA 3:6
machine 19:2,5,8,20,23 19:25 20:2 23:16,18 24:15,17 26:13 48:18 50:6 74:10 103:2 107:22 109:4
machines 10:9 12:13 18:23 19:9,12,12,13 19:14,18,19 20:6,11 20:18,24 21:6,8,11,12 23:12,21 25:19 38:22 48:25 49:10 65:16,19 65:21 79:20
main 37:21 87:15
making 21:16 60:7,7 67:20 84:14
management 56:12,13 57:1,4,12,14,25
manipulating 33:1
manner 49:23 53:24 108:3
manufacturers 15:4,4
mark 94:2,21
marked 4:6 7:18 16:13 27:10 50:22 51:1 71:2 94:22 95:1 101:21 103:3,4
marking 103:6
Markson's 50:20
massive 34:24
Master's 14:1 16:3
material 38:19

materials 6:25 9:15
matter 28:23 29:17
matured 102:4
mean 8:9,11 12:22 18:3 18:21 19:7 20:7 26:22 28:5,17 29:4,7 31:10 33:18 38:10 42:21 43:9 49:13,15 50:16 66:1,23 67:10 70:16 73:19 74:1,2 75:2 77:3 78:20,21 80:4,6 84:10 84:11 96:12 97:9 109:11
meaning 28:7,9,11 31:5 40:3 70:10,13,15
meanings 30:14
means 20:5 28:12 33:12 46:16,23 61:13 65:24 65:24 79:15 80:22 81:6 84:8 101:11 103:5 106:20
meant 88:14
mechanical 10:8 12:12 18:23 19:1 23:16 25:18,22,25 26:4 32:25 65:16,18
mechanism 11:13 16:6 73:2 74:18 80:12 84:14 98:14
mechanisms 10:8 12:13 13:4 25:18,22,25 26:2 26:4
medical 6:18
meet 7:2,5 15:12
meeting 7:9
meets 22:10
Mellon 13:24 17:16 22:4 23:4
member 23:3 26:9
members 24:9
memorized 54:22
memory 54:19
mental 64:19 65:1,4,7
mention 11:8 15:25
mentioned 11:4,10 12:7 15:25 25:17 30:9 41:25 44:4 45:3 56:21 92:23 103:24
mentions 64:16
menu 34:20,21,22,25 35:13,17,24 36:7
menu-driven 76:1 79:10
mere 10:22
met 6:24 7:6 49:8 54:15
method 9:21 32:17 45:8 52:20 74:20 98:25 99:6 109:20
methods 76:17
mice 85:24
Michael 1:14 2:14 3:5 4:3,14,17 5:2,9,12 111:8,13 112:5
michael.vanhandel@u... 3:7
mind 29:15
mine 29:5
minute 36:5
minutes 104:15

misleading 61:13
missed 14:16 41:17
misunderstood 31:12
mixed 106:8
MO 3:12
mode 83:18
modified 74:4 81:14
modify 74:11 80:8 81:19
moment 102:18
month 25:11,11
morning 5:10 92:23
Motion 4:20 95:3,6 96:18 97:12 99:9
motivate 18:11
motivated 65:25
motivation 32:13
mounts 11:16
mouse 82:14 83:12,13 83:14 84:7,8,12,12,13 85:22 98:15
mouth 41:15
move 33:6 34:1,2 37:11 82:8,9 89:3 94:7,16,19
movement 65:12
moving 63:16 65:1 74:18 74:20 81:25 82:2
multiple 15:17 38:21 48:13 71:23 92:24

**N**

N 3:1 4:1 5:1
N-E-X-T 37:10
name 5:7,10 9:11 17:7 40:5,19,20 66:18 89:13,17 90:1,4,9,11 93:2,6,18,21 105:7,15 105:22 106:1,14,21 107:5,8,11,13
names 7:2 43:2 50:18 56:7 62:15
narrative 87:10
nature 32:24
navigate 45:11,11 53:15 63:17,24 83:6 88:16 88:17,21 89:22 90:21 91:13 92:9
navigating 94:10
navigation 32:18 46:2,9 46:14 47:4,9,19,23 48:3,4,8,10,12,15 52:21 63:16,19,23 64:17,20 65:24 80:12 81:14,19 83:16,18 83:19,9 89:16,21 90:4,20 92:8 94:4 100:12,14,17,17,18 near 85:2
necessarily 20:10 29:14 40:20 51:18,20 54:24 59:13
necessary 31:14 70:5,6 70:9 10:19 12:5 12:15,16 30:23,24,25 37:2,14 64:6 69:4 83:14,17 100:13,17,17 100:18 108:1
needs 12:3 13:1,2 14:6 39:24

Neff 4:12 71:10,14,16,19 74:15 77:7,24 81:14 81:19,20 82:6,19 83:4 83:12 84:10,13,13 85:11
Neff's 84:15
negatives 47:22
neither 31:15 97:4,5
nervous 69:25
never 21:17 22:21 23:18 24:10,20 34:23 36:25 37:3 43:19
new 15:23 16:5 30:7,8 49:11,13
next' 65:24
Nguyen 4:9 51:5,7,15,16 51:25 52:6,9,13,17,19 53:1,7,18,21 54:3,9,12 55:4,9,10 56:8,10,11 57:1,9,11 58:18,18,21 59:13,24 60:15,25 63:5 64:14 68:22,25 69:7,11,14,23 70:4,6,8 70:12 71:22 81:14,19
nine 25:8
Nineteen 47:8
Nixon 88:19
non-confusing 11:25
non-touchscreen 97:18 98:6
normal 58:9
normally 23:25 62:6 65:21,24
notary 111:19 112:4,18
note 36:18
notion 65:6
novel 38:8 39:8 48:19 50:12 63:22
number 14:23 24:9 61:3 61:5,5,12,19 72:19 94:6 107:25 108:10
numeric 33:22
numerous 91:21
nuts 20:15

**O**

O 5:1 90:15,16,18
o'clock 70:19,20 110:11
oath 6:4
object 6:13 29:2,22 38:16 39:10 48:11,20 51:17 55:1 80:3 97:3 102:25
objective 110:2,4
obvious 43:16 49:22 50:4,5
Obviously 30:13
occasional 25:8
occasionally 24:25
occur 19:22 98:1
occurs 53:16 58:13
October 16:21 17:1,5
offer 30:8 31:9 39:15 43:7 44:4,22 70:10,12 74:22
offered 31:18 43:19 69:13
offering 39:20,23

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 117

**Atkinson-Baker, Inc.**
**www.depo.com**

office 1:1 2:1 112:15
offices 2:17 24:18 79:3
103:8
officials 24:11
Oh 14:19 15:17 16:11
36:8,16 39:11 41:15
62:24 69:2 72:14
75:22 77:3,8,11 87:11
103:19
okay 5:19 6:22 7:12,21
8:1,7 12:10 15:22
23:22 27:4 36:16 37:8
41:19 51:10,13 57:24
58:22 63:19 64:11
65:4 68:25 69:16 76:8
77:11 86:7 87:11
88:15,16 90:10 96:22
99:2 102:10,16 103:19
106:11
once 19:20 76:16 88:22
one's 83:1
ones 9:24 25:7,8 31:7,22
open 24:7 36:14
operation 9:21
opine 43:14 44:5
opinion 10:4 20:4 28:16
30:16 31:9 39:23 43:7
43:16,17,19,20 44:6
49:25 69:14 70:2 88:8
opinions 8:24,25 29:21
30:7,8 44:12 69:11,23
70:10,12
opportunity 29:19 30:5,8
53:2,23
opposing 5:21 52:2
option 40:17,24,25
74:25 75:2 79:21
80:23 83:5 105:25
106:2,12,14,15 107:5
107:7,8,11
options 39:16,17 40:4,7
40:13,16 42:15,17
45:14 50:11,14,15,16
55:5 60:24 62:3,14,18
64:21 69:18,22 70:5,7
71:17,23 72:10 73:9
74:21 76:16 77:15
78:14,17 79:4,16 82:2
91:2,6 93:1 94:6,7
100:1 101:7 106:8,13
106:20,22 107:2,16
107:18 109:9,15,20
110:1
orally 6:8
order 11:2 56:20 64:22
68:3 74:11 85:6,20,21
92:2,2,6,15,16,17
108:22
ordinary 28:7,7,9,11
31:5 40:3 41:9 66:2
70:10,13,14,16 73:19
79:25 80:6 81:22
100:5 107:21
original 101:12,15 102:2
originally 68:5
ought 31:20
outline 8:17
output 48:19 49:11

outside 7:9 14:4 34:12
42:21
overview 57:12
owner 1:7 2:7 8:16 29:6
31:15
owner's 4:19 95:3,6 99:9
Oxford 2:17

**P**

P 3:1,1 5:1
.p.m 70:20 110:11
pad 87:9
page 4:2 9:14 17:6,15
27:17 32:3 39:14 51:8
51:9 82:6 95:10,14,15
95:20,23 96:1,1,19
99:10 101:3 102:11,18
102:20 108:17
pages 18:6 51:12 95:14
96:17
pair 46:3,5 82:1
pairs 26:5 32:20
panel 23:5,6 25:4 46:16
46:16,23 90:4
paper 19:19 20:9 52:21
64:22
paper-based 18:24
papers 25:13
paragraph 9:11 10:1,3
18:16 27:23 28:4,6,14
28:16,19 32:9,12
34:17,20 35:6 40:1
52:22,25 53:21 58:22
58:24 59:14 60:2,17
68:24 69:19 70:15
75:19 81:11 82:16,19
82:20 84:23 85:2,10
96:5,9,15 102:14
106:18
paragraphs 9:9 28:8
parlance 84:15
part 57:20 62:24 99:18
participating 14:14
particular 13:4 15:10
16:10 34:10 50:19
61:14 69:10,16,24
76:3,5,6,12 77:18,19
78:4 79:12 83:5 98:1,4
109:14
particularly 61:6 84:22
parties 112:11
parts 8:7,9 54:17
party 56:19 61:5,8
passage 76:8
passed 21:15
patent 1:1,2,7,10 2:1,2,7
2:10 4:8,10,11,15,19
5:16,18,19 8:16 10:4
10:17 11:5 16:5,6
18:17 19:4 20:12,21
23:4 25:21 26:4,14,25
27:3,14,15 29:1,5
31:15 33:17 34:12,14
34:17 35:4,7 36:7,14
38:2,5,13,23 39:2,6,9
39:12 40:2 41:6,11,14
42:1,5,22 43:8,12,15
43:20 44:1 45:24 46:1

46:18 47:1,24 48:23
50:13 51:5 54:3 66:3,6
67:8,23 68:1,3,6,10,12
68:22 69:25 71:10
73:15,16,20,22 74:3
74:17 75:10,13 76:5,9
76:13,25,25 77:3,5,10
77:17 78:23 79:8
80:10,16 86:4,8,13
87:10 88:2,4 89:7,10
90:19 92:3,19,24 93:8
93:25 94:17 95:3
96:12 99:9 102:3,4
104:9,20 108:13 110:4
patents 7:7 17:7,9,11
25:24 36:19
patenty 48:14
patriotic 109:24
peace 24:23
Pennsylvania 1:14 2:16
2:18,21 21:15,17,22
21:24 22:16,21,24
23:5,9 24:6 112:1,5
people 14:8 19:24 40:21
84:8 100:6,18,19,25
percent 85:12
percentages 84:21
perfect 22:7
perform 33:2
peril 24:24
period 24:14
person 10:19 13:16
40:11,19 41:9 49:6,7
81:4,21 91:19 93:7
100:21 104:12 105:8
perally 23:17 84:6
persons 63:22
Petitioner 1:4 2:4,15
10:21 29:6 30:21
31:15 43:14 44:18,19
45:18 52:3
Petitioner's 27:25 28:2
44:13,14,16 45:20
Ph.D 1:14 2:14 4:3,14,18
5:2 111:8,13 112:5
phone 14:21 63:8,9
photograph 40:20
phrase 42:16 103:14
phrased 40:13,15
phrases 57:22,25 58:4
58:12 59:7,21
physical 6:18 15:3 64:14
64:19 98:19 103:2
physically 75:8 81:23,24
pick 22:12 41:4 50:19
picture 65:1 109:22
piece 22:9
Piper 3:5 5:11
Pittsburgh 1:14 2:18
place 23:16 53:17 54:2
62:8 98:1 100:20
112:7
placed 86:18
places 68:12 96:11 97:6
97:7,9
plain 28:6,9,11 31:4 40:3
70:9,13,14,15
Plaintiff 3:3 4:6

please 5:7 6:7,11 47:16
86:8 89:9 95:1 96:13
102:24
Plenty 13:21
plug 108:22,24,25
plugging 108:3,9
plurality 39:17,17 45:12
45:13
plus 25:9
point 45:17 83:3 102:5
pointed 59:15
pointing 46:16 54:17
points 8:17 52:3,3,5
poll 108:1,2
polling 53:17 54:2
polls 11:23
portion 35:16,23,23
49:23 53:5 54:5,8
64:14
portioned 8:13
portions 8:11 16:9
POSITA 10:4,13,14
11:10 12:1,3,7 13:16
20:16,17 25:16,17
28:4,10,15,17,19,22
31:9 39:21 40:2 72:21
72:24 73:8 74:4 81:13
81:18 82:12,25
position 37:13,23
positioned 46:3,5
positions 23:2 29:1,4,8
29:10 30:9,12,17
possibility 9:2
possible 21:1 75:8 81:23
81:24 92:13
Possibly 96:25
practice 53:3,15,23
practicing 68:17
pre-printed 75:24
precinct 61:5,14,16
precise 56:1
preclude 99:19
preferably 76:2 79:11
108:21
preferred 69:3
preparation 7:13,17
19:21
prepare 6:23 24:2
present 26:19 39:16
40:22 42:11,20 54:24
55:3,3,8,12,17 60:24
62:17,19 65:2 66:3,22
67:1 70:7 71:16 73:4
76:11 77:21,22 78:12
79:19 80:18 87:24
91:25 98:6 100:1
101:6,10 102:7 103:11
108:6
presentation 77:14 79:1
79:6,13,17,23 103:21
103:23
presented 31:25 34:23
36:22 37:6 38:14,24
56:6 67:24 68:5,7
71:19,24 72:15 107:18
109:9,16,21
presenting 18:6 38:6,8
39:15 40:3,23 42:14

42:15,17,19,25 50:11
50:14 55:14 67:8
69:17,21,21,22 70:4
79:18 105:6,14,21,25
106:12,13,19 107:4,7
107:15 109:25
presents 42:1,9 55:5
60:23 64:15 76:1 78:7
79:9 92:24 103:13
preserve 108:22
president 63:25 64:1
66:14 80:25 81:2
press 37:14,17,19 66:19
90:17 91:14
pressed 37:11 90:1
presses 91:5
pressing 84:4
Presumably 75:4
pretty 16:19,20 46:22
47:2
preview 53:3,9,19,23
54:9,13,13
previous 43:6,6 53:12
64:2 65:25 86:19,23
87:16 88:20 89:3,4
93:17
primary 25:7 61:6 62:5,7
Principally 9:20
principle 37:1
printed 67:21 77:12,12
93:7
prior 6:24 9:10 14:25
23:11,11,13,15 44:2
44:17,17 54:20
privacy 50:8 105:1
108:23 110:2
probably 7:6 20:7 30:4
31:2 36:8,14 46:19
49:15 70:18 89:2
91:17
problem 22:22 53:1 81:5
Procedure 2:16
proceeding 45:6 54:21
proceedings 41:20
104:17
process 8:15 19:25
21:19 45:22,22 56:18
produce 14:5 98:22
professor 22:5,11
program 13:25 14:1
15:24 16:2,2,3
programmer 15:18
programming 18:2
project 15:11
projects 14:3
prompt 37:10 67:17
86:15,18,22 87:2,8,12
87:14,16,21,24 88:4
88:24
prompts 86:19,23 94:1
properly 56:20
propose 30:5 45:21
74:12
proposed 21:22 23:9
28:2 29:5,6 31:16
69:12
proposes 53:1,21
proposition 40:15

**Atkinson-Baker, Inc.**
**www.depo.com**

prototype 14:5
provide 18:10 26:17 35:6
53:2,22 71:14 97:5,13
103:1
provided 8:16 21:18
35:20 58:25
provides 57:11
providing 99:11,12,25
101:5
public 2:20 11:21 12:2,5
23:25 24:7,9 26:10
111:19 112:4,18
Publication 4:12 71:10
punch 18:24
pure 18:23 19:18
purely 20:8
purpose 44:15 50:7
69:10
pursuant 2:15
push 11:17 26:1,3,6,6,8
26:10 28:13 32:19,20
32:21 33:1,9 46:2,3,4
46:5,6 48:2 75:4
pushes 75:3
pushing 33:5,5
put 8:17 21:25 33:8 92:1
109:18,22,23
putting 8:19

**Q**

question 6:9,11,12,12
12:19,20,24,25 29:3
29:23 30:18 32:7 39:3
39:4,19 41:13 42:22
43:2 47:17 52:12,16
66:5 80:14 95:17 99:2
99:8 106:10
questioning 6:13
questions 54:16 110:7
quickly 27:1
quite 34:4 67:6
quotation 53:20
quote 10:3,9 75:23 82:19
quotes 109:23

**R**

R 3:1 5:1
race 37:9,11,12 62:14
64:23 94:1,5
radio 18:8
ran 13:25 15:1
random 92:16
read 7:15 10:17 30:13
32:12,21 39:2,6,8,11
52:17 54:5,7,20 58:22
58:22 60:4,16 61:25
64:6,8 68:24 75:18,20
76:9 78:9 84:2 86:8,12
89:9 95:1 99:16
102:17,23 106:3
108:25 110:5 111:8
readable 103:2,2
reading 63:20 74:8
86:14 87:13 106:5
112:10
reads 66:18 78:8,9
really 8:21 17:14 31:12
31:20 39:20 61:13,19

69:25 108:25
reask 106:10
reason 16:19,20 37:2
40:12 51:21 54:14
65:7
reasons 105:1
rebut 43:13,16,23 45:21
52:4
Rebuttal 9:20 52:4
rebutting 9:22
recall 9:13,23 22:3 24:20
31:19,24 32:1 49:15
recess 41:20 70:19
104:16
recite 25:21 26:14
recites 99:24 101:5
recognized 98:2
recollection 25:5
recommendation 24:25
recommendations 25:2
record 5:8 17:3 36:11
52:21 57:25 64:7 75:9
76:24 86:10 101:19
102:23 110:5 112:8
recorded 57:22 58:3,4,5
58:12 59:8,22 112:7
recorder 58:5,11,11
recording 58:13
records 38:11 59:8
reduced 112:8
refer 5:18 7:25 37:8
83:25 107:2
reference 9:10,12 27:6,7
32:14
referendum 62:15
referring 9:18,24 47:1
referring 12:9 47:7 48:4
51:11 67:13 75:10
85:10
regarding 69:11 70:12
regards 98:23 100:11
107:2
registered 61:8
regular 34:1
regularly 15:12
related 52:9,11 59:16
68:11
relates 18:17
relational 63:3
relationship 42:23
relative 84:21 112:12
remainder 100:3
remaining 75:19
remote 28:18 32:3,6,8
32:13,19 33:12 34:11
34:14
remoteness 32:24
repeat 95:17 99:2
rephrase 52:12
replace 48:14
report 15:9 52:2
REPORTED 1:20
reporter 6:7 112:4
Reporter-Notary 2:20
reports 24:18 52:1
represent 5:11
representing 5:24 6:1
reprogram 80:20

Republican 62:6,9
require 17:14 26:7 44:6
44:25 45:2
required 11:2 14:5,7
16:6 21:20 23:22
55:16,20,22
requirement 26:11,12
49:9
requirements 11:24
14:22 21:23 22:10
48:25 55:25
requires 44:11 45:9,10
45:12,13 69:22 81:25
respect 10:4 94:17
respective 24:18 40:6
106:22 107:3 112:11
response 8:15
rest 99:15
restricted 25:14 68:21
resume 4:17 16:21 22:13
reverse 92:16
review 7:13 9:15 25:10
27:2 36:9 42:10 43:3
44:17 67:4 71:21 93:3
99:21 110:8
reviewed 6:25 9:17 15:6
15:7 24:1
reviewing 9:23
Richard 88:19
rid 109:17
right 6:4 30:22 35:2 36:2
37:10 39:4,14 46:5,12
46:19 48:1 56:20
61:24 65:9 67:14
69:10 75:1,3 77:11
81:2 82:4,7 83:8 88:22
88:25 89:4 90:17
94:16 97:10,10 100:20
105:23 106:24
Robert 3:10 6:1
robert.evans@stinson...
3:12
role 22:2 43:22,23
room 33:8,10,10
row 33:4 61:4 72:16
88:21
Rules 2:16

**S**

S 3:1 5:1
S-H-A-M-O-S 5:9
sale 23:9
sales 18:12
Samsung 15:4
satisfy 68:19
saw 38:23 71:22
saying 12:3 27:24 37:18
39:21 53:18 56:8
74:13 94:15
says 16:21 43:12 46:19
51:3 53:21 60:18
61:12 63:20 64:18
66:13,15 67:18 68:7
69:10 70:15 71:8
75:23 78:11 79:9
82:25 85:3,14 89:20
92:20
scans 75:24

scenario 24:4
scenes 101:1
scheduled 2:19
scheme 63:3
school 22:6
science 10:6
screen 11:16 14:22,24
26:18 36:23 37:4,7,16
37:22,24 38:6,8,15,24
39:3,7 41:25 42:8,10
42:13 43:3 71:14,17
71:22,23,24 72:8,19
73:6,17,25 77:18,22
78:5 83:1,4,5,9,10,11
83:23,25 84:17 85:1
86:14,24 87:14 88:23
90:25 92:24,25 93:3
93:14,20,23,25 97:22
97:23 98:1,12,17
103:13,21,24 109:10
109:12,12,14,17,18,22
screens 71:20 79:7,7
93:1,5 98:11 104:22
scroll 18:9 36:14 37:3,5
64:1 66:14,15,15,17
91:5
scrolling 26:20 28:1,1,2
28:5,5 73:2
scrolls 105:16,23 106:2
106:15
seal 112:15
search 16:5 27:4
searcher 16:7,8
searching 16:6
second 26:5 32:20 36:22
37:15 46:4 87:3 94:5
Secretary 21:19,20
24:19,24 25:1 49:18
section 4:21 27:18,23
28:1,6,8,12,16,18
34:16 69:19 95:4,25
see 7:23 15:22 22:10
23:25 27:21 41:6 46:8
46:19 49:8 50:9 52:1
53:15 60:9 68:4 73:2
74:23 77:13 81:18
83:21,22,22 92:5
99:17,21,22 100:22
seeing 22:3 77:11
seen 39:2 79:19 87:23
sees 78:8
segments 8:14
select 40:18 64:4 66:19
82:9 83:5 85:3,13,16
85:18 89:12,25 90:6,7
90:15
selected 22:14 82:21
90:13
selecting 85:8
selection 41:5 60:21
66:13 67:20
selections 60:8 82:23
84:18 94:1
selects 85:5,14 104:23
semantics 75:1 80:22
send 98:13
sending 98:9
sense 25:25 33:16 84:10

85:23 98:3
sent 22:12
sentence 18:17 35:19
43:11 52:25 54:11
75:19 79:9 82:25
85:15,17
sentences 85:14
separate 34:22 36:22
76:19 104:13
separated 32:9 34:6
sequence 67:18
series 76:1 79:10
SESSION 70:21
set 9:25 33:2,7,13,15
62:2 105:12 107:16
112:14
setup 56:18 58:1 59:20
Shamos 1:14 2:14 4:3
4:14,18 5:2,9,10 77:1
111:8,13 112:5
sheet 79:22 111:10
sheets 8:2
show 14:24 58:12 72:10
93:2 103:7,8
showing 92:13
shown 43:18 48:3 57:14
58:7 59:5 61:24 63:3
63:10,18 68:20 72:25
74:3 76:12,22 78:5
80:1,9 81:20 93:20
94:5
shows 42:1,8,10 73:23
78:13 92:21 93:12,14
93:15
shutdown 109:3
shuts 108:21
side 61:21
sighted 100:19 107:21
sign 110:8
Signature 110:12
significance 41:12
signing 112:10
Sikoski 1:20 2:19 112:4
112:18
Silently 86:10,11
similar 98:7
simple 53:1,21
simply 54:19 108:16
Singh 3:4 4:3 5:6,11,23
6:3 7:20 16:15 27:12
29:9 30:2 38:20 39:13
41:17,21 48:16,22
50:24 51:19 55:6
70:17,22 71:4 77:2
80:5 94:21,24 97:11
101:24 104:14,18
110:7
single 34:25 38:14,24
39:7 50:15 63:24 72:5
72:8,24 73:4,9,21
77:25 79:7
site 18:11
sitting 36:6,11 86:23
97:20
situation 73:7
six 7:6,9 25:7
size 14:22 87:22
skill 28:7 41:9 66:2

**Atkinson-Baker, Inc.**
**www.depo.com**

72:18 73:19 79:25
80:8 81:21,22 105:8
112:9
**skilled** 88:12 104:12
**slightly** 19:10
**small** 14:22,23 24:9
**Smartmatic** 1:4 2:4 5:11
111:1
**Smith** 90:11
**software** 1:6 2:6 10:7
12:12 26:15,16,19,21
26:24 27:7,8,9 58:1,1
59:21 98:3 111:4
**solely** 10:23
**solve** 53:1 81:5
**somebody** 14:24 20:8
39:23 50:9 57:24 59:8
73:19 74:9,11 78:21
80:20
**sophistication** 11:22
**sorry** 14:16 32:7,8 34:18
41:17 46:10 52:11
57:17 59:24,25 64:9
66:5 72:12 77:3,8
81:10 86:6 93:10
95:16 101:16 105:17
**soup** 20:15
**source** 23:23
**space** 32:9 33:11 93:16
**spacing** 33:13,19
**speak** 58:15 59:17
**spec** 66:1
**special** 63:13,15
**specialist** 15:10
**specialized** 69:4
**specific** 45:14 102:25
**specifically** 18:18
**specification** 10:15 11:6
36:10 54:18 74:8
103:24 104:5,9 108:12
**specifications** 27:7
**specified** 47:13,15
**spectrum** 13:2 15:2
**spell** 90:11
**spend** 8:19 24:16 25:4
**Spiro** 88:19
**spits** 58:4
**sponsor** 14:6,15 15:5,23
15:23
**sponsored** 14:3
**sponsors** 14:4 15:3 16:4
**spot** 41:18
**St** 3:12
**stage** 45:5
**standard** 93:15
**staring** 77:6
**start** 21:12 36:19 45:7
55:14
**start-ups** 15:3
**started** 21:11 25:1
**starting** 21:11
**starts** 95:14,19
**state** 5:7 21:25 24:11
25:9 40:1 49:7 52:25
60:7 82:19 90:20
106:19
**state-of-the-art** 50:2
**stated** 8:25 14:16 110:4

112:7
**statement** 28:4
**states** 1:1 2:1 19:10
55:23,24 56:1 66:14
107:4,7 109:24
**stating** 43:20
**station** 103:4
**statistics** 84:20
**status** 60:22
**statute** 21:18 56:2
**statutes** 55:23,24
**statutory** 48:24 49:9
**stenographically** 112:7
**step** 69:21
**steps** 19:22
**stick** 8:25
**STINSON** 3:11
**store** 62:19
**stored** 63:2
**straightforward** 90:2
**strange** 35:18 57:21
58:8 74:14,14
**Street** 3:6
**strictly** 72:16
**strike** 31:23 38:7 69:12
70:11 72:3 76:9 84:1
85:1 91:2 107:6
**structure** 46:24
**student** 15:8
**students** 14:2,4,12
**stuff** 58:3
**style** 61:13,16,19,20,22
61:23,25 62:1,2,4,10
75:25 76:3,5,7,12,14
76:15,15,17,20,22
77:14,18,20 78:4,9,10
78:12,15 79:1,2,3,12
79:14,14,14,17,23,24
80:1
**styles** 61:15
**sub-panel** 37:11 47:2
48:14 89:21 90:20
92:8
**subject** 46:21
**submit** 23:23
**submitted** 5:15 24:1
**subsection** 9:9
**subset** 19:12,14,17 21:8
**substance** 41:22
**substantially** 9:17 23:10
96:8 97:14 98:23 99:3
101:2 102:13 103:16
105:5,14 107:14
**successive** 75:3
**suck** 74:7
**sudden** 9:11
**sufficient** 10:24
**suggested** 31:20,22
**suggesting** 44:10
**suitable** 82:13
**Suite** 3:11
**summarizes** 93:25
**summary** 34:17
**summer** 14:3
**supervised** 14:9
**supplied** 49:17
**support** 8:15 92:3,5,7,7

92:18,20 95:12,13,19
95:23 96:1,8,10 97:6,7
97:8,14,16 101:12
102:10,12 108:14,15
**suppose** 28:3 53:25
60:21 74:23 80:11
**supposed** 8:15 44:19
50:19 78:12 82:8 99:3
**sure** 5:23 9:8 12:21
13:24 18:4,22 19:8
20:23 30:11 33:25
36:16 39:11 41:13
47:14 56:19 77:13
78:22 80:20 81:8
83:13,20 92:4 95:18
**surprised** 30:7
**switch** 32:21 46:3,4,6
**switched** 9:11
**switches** 26:1,6,6 28:13
32:19,20 33:6,7 46:3,5
**sworn** 5:3 112:6
**symbols** 109:24
**system** 11:14 18:4 19:3
19:5,15,16,21 20:3,13
20:14,22,25 22:18
23:8,9,14 49:8 52:7,9
52:10,14,20 53:8,10
53:12,13,15,19 54:10
54:13,24,24 55:7
56:12,13 57:1,4,8,12
57:14,25 58:13 63:22
63:23 64:17 71:12,16
76:11,21 77:16 78:3
78:18 80:1,8 82:14
91:6,10 95:8 99:1
103:1
**systems** 1:6 2:6 10:22
10:23,24 11:4,5 14:2,7
14:19 15:1,6 18:18,19
18:22,24,25 19:17
20:5,20 21:3,9,16,21
21:22 22:15 23:13
39:2 48:17 55:11,11
55:14 66:21,22,24,25
67:1,2 100:24 111:4

---

T

**T** 90:14,16,18
**table** 61:3,4,11
**tables** 61:10,21 62:12,13
62:17
**tabulating** 20:2
**take** 6:16 11:15 24:25
35:9 41:18 42:6 46:17
57:9 58:20 59:23
60:25 67:5 68:22
70:18 72:1 73:19 75:4
77:20 82:16 85:2 86:1
86:3 88:20 89:2,6
93:24 96:13 104:14,19
**taken** 2:15 112:7
**takes** 57:15 107:20
**talk** 6:8 25:24 55:13 64:5
64:20 102:17 107:23
107:24
**talked** 103:25 104:7
**talking** 9:10 18:2 42:23
47:11 64:16 66:24

67:3,3 69:17 99:2
102:21
**talks** 58:24 59:16 103:20
109:7
**taught** 17:16,25
**teams** 14:10,11 15:8,12
**technical** 21:23
**technically** 90:6
**technology** 14:1 15:11
16:2 17:20 22:8,9
**telephone** 69:1,3
**tell** 21:14 55:20 56:10
108:1
**tells** 78:10
**ten** 23:7 104:14
**term** 28:9,17 31:10,12
34:20,21 39:22,25
41:14 42:23 43:1
82:22 84:18 85:19
**terminal** 75:23 99:7
103:5
**terminology** 83:2
**terms** 27:20,21 28:15
30:14 31:6,17,24
40:15 41:10,10,44:5
44:21 45:5,16 70:10
70:13
**terrible** 85:25
**test** 49:5
**testified** 5:4
**testify** 112:6
**testifying** 6:5,19
**testimony** 6:6 28:22
41:22 45:15 70:24
111:9 112:8
**testing** 56:18
**Texas** 23:10 25:6
**text-to-speech** 58:13
**thing** 23:10 67:21 76:19
77:13,22 79:18
**things** 11:3 12:11,16,17
18:9,9 85:25 108:16
**think** 9:25 12:11,14,22
13:11,14,18 17:11
28:10 32:17,21 35:25
35:25 36:13 38:12
39:8 41:8,18 43:11,11
44:8,8 45:1,9,10,11,12
46:18,18,22 47:19
48:5,24 50:12 51:24
55:13,19,20 58:8
62:24 64:6 69:16,18
70:14 74:8 75:6 77:1
78:11 87:22 88:1,8
91:24 95:7 97:4,15
99:24 100:4 102:1,1
104:25 106:3,3,7,8
108:24
**third** 17:20 75:4
**Thirty-nine** 21:4
**thorough** 96:25
**thought** 11:1 17:4 41:15
88:14
**thousands** 67:6
**three** 12:11,15 21:21
22:15 23:2,2,5 25:6
72:22,25 102:16
**tight** 14:21

**time** 6:25 8:19,22 9:19
14:9 16:23 21:17 22:6
23:20 24:13 34:23
36:11 38:14,23 39:1,4
39:8,11 48:21 49:13
50:2,3,13,21 57:6 62:8
67:6 70:17 77:22
91:14 93:4 104:22
112:7
**timeframe** 55:14 66:24
67:3
**timeline** 49:19
**times** 25:6,7,8 60:22
83:7,7 90:17
**title** 52:19 95:1
**today** 5:15,19 6:19,20
7:11 29:18 50:4,5
**today's** 6:22 7:13
**toggles** 67:18
**told** 84:21
**Tom** 90:11
**top** 64:23 65:5 78:11
88:18
**total** 12:16
**totally** 33:2 34:11 42:21
**touch** 83:6,11 84:15
85:21 86:14,19 97:22
98:2,3,24 99:5,18,19
99:23 100:20 101:1
**touched** 90:1
**touches** 100:2
**touching** 83:9 85:1
89:15 98:14,21 100:23
100:25
**touchscreen** 11:16
67:22 76:2 79:11
82:23 83:15,17,22,22
84:3,4,5,13,19 87:1,5
87:19,20,24 89:12,23
92:10 93:19 97:17,22
97:25 98:5,12,21,25
99:6,11,13,14,25
100:5,7,10,13,20,22
101:5 102:6 103:5,7
103:10 108:20 109:8
109:15,16,19
**touchscreen's** 87:15
**touchscreens** 101:10
**touchtone** 63:8,9
**TRADEMARK** 1:1 2:1
**trained** 14:2
**training** 12:6
**transcribe** 6:7
**transcript** 111:8
**transport** 26:1
**trial** 1:2 2:2 30:6 45:1
**tried** 73:4
**trouble** 54:14 95:16
**true** 100:23 111:9 112:8
**Trump** 66:15
**truth** 112:6,6,6
**try** 6:8 13:13 24:15 49:8
**turn** 10:1 45:24 47:16
49:22 52:22 54:3
56:10 63:5 75:12
95:10 96:3,5 105:2
109:11
**turning** 62:11

**Michael I. Shamos, Ph.D., J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 120

**Atkinson-Baker, Inc.**
**www.depo.com**

turns 108:21
TV 15:4
Twenty-three 102:9
Twenty-two 64:10
two 6:24 10:6 12:8,10,13
  12:15,16 25:17 34:22
  37:25 42:1,9,11,20
  51:6,14 55:24 74:5
  75:3 78:1 80:2 81:6
  85:13 94:7 98:8,16
  107:1
two-dimensional 74:22
  77:24
twos 64:12
type 12:9,18 17:22 18:7
  90:4
typed 57:7
types 13:6
typewriting 112:8
typical 93:18
typically 18:4 23:22
  56:13 57:6 64:22
typo 109:1
typographical 9:3,5,7
typos 35:25

**U**

U 90:18
U.S 4:9,15 5:16 51:5
  71:10 102:3
ultimately 59:6
underlying 16:12
underneath 61:21
understand 5:14 6:10
  10:15 11:19 13:3 26:8
  26:12 28:5,11,15,17
  28:19,22 29:3,23
  39:21,25 40:2 45:15
  74:1 78:20 83:1 84:11
  84:24 100:4
understanding 10:14
  26:11 68:14
understandings 30:14
understands 26:10
  41:10
understood 6:12 31:10
undue 10:16
United 1:1 2:1 19:10
  66:14 109:24
universally 100:23
unusual 20:8 65:8,20,25
uppercase 93:16
USA 1:4 2:4 111:1
use 10:16 12:5 21:16,22
  23:17 26:13 33:24
  34:10,18,20 38:2
  41:14 43:4 49:1,8
  53:14 54:2 58:3 63:21
  65:8,20,21 79:25 84:6
  84:8,22 88:4,9 89:1
  90:3,23 94:7,18 98:14
  99:13 109:4
useable 11:24 100:6
useful 13:13 61:6
user 10:7 11:11,12,14,17
  12:4,8,23 13:2,5,6,19
  14:7,21 17:9,12,14,18
  17:22 18:4,10,11

23:23 32:25 60:18
  63:17 65:9 86:14 87:1
  87:2,4 88:3 89:12,16
  90:3,13,14,15,25,25
  91:2,4,4,9 94:4,15
  98:7,10,11,11,17
  104:23 105:2
users 13:5
uses 82:20 94:15 99:22
usual 32:10 33:12,13,18
  33:19,19
usually 24:9,16 31:8
  41:2 65:9
utilizes 103:1

**V**

V 91:17
valid 43:12,21 44:1,2
validity 43:7,17
Van 3:5 5:13
variety 14:19 18:6
various 13:4,5 24:11
  40:21 48:24 54:17
  68:20
vendor 23:22 24:11
  49:17
verify 16:17 43:4 51:2
version 36:13
vertical 50:11 65:12,18
  77:25
vertically 64:23
vice 81:1
videotape 24:6
videotaped 24:5
vis-a-vis 56:2
vision 29:16
visual 48:18 49:1
visually 26:19 71:16
  76:18 91:1 99:25
  101:6,10 102:7 103:11
  103:13 105:11 109:16
  109:21,25
visually-impaired 63:21
  64:18
voice 58:14
vote 33:10 40:7,12 43:5
  50:10 62:6,7 106:23
voteable 103:2
voted 23:14 42:11 58:17
voter 33:9 34:23 37:9,22
  38:24 39:16 40:4,5,24
  41:3 42:18 43:4 45:10
  45:10 50:8,12,15,16
  53:14 54:25 55:8,17
  56:4 59:17 60:20 62:3
  64:15,19 65:1 66:12
  67:9 68:8 71:17 79:5
  79:22 85:4,5,15,16
  86:1,13 87:21 89:22
  91:24 92:9 93:4,18,21
  94:1 98:13 100:2
  101:7 105:10,16,23
  106:1,15,20,21 107:16
  107:17,22,23 109:8
voter's 93:25 108:23
voters 11:22 34:24 40:22
  48:25 49:3,4 53:2,22
  55:21 61:7,18 62:4

65:12 69:5 85:24
votes 20:1 53:4,24
voting 10:8,22 12:13
  18:18,22,24,25 19:4,5
  19:5,8,11,12,13,14,14
  19:16,17,21 20:3,5,6
  20:11,13,17,20,21,24
  21:3,5,8,9,11,12,16,21
  22:15 23:8,11,12,14
  23:18 25:12,13,19
  33:11,24 38:22,22
  39:2 43:4 45:9,9 48:17
  48:17,25 49:8 52:6,10
  52:14 53:8,12,16,16
  53:19,25 54:10,13,23
  55:7,11,11,18,21 56:5
  65:19,21 66:25 67:18
  71:12 76:1 79:10,19
  93:22 99:7 103:1,3,4,5
  107:22 109:6
votomatic 22:18
vs 1:5 2:5 111:3

**W**

wait 34:18 80:13 87:3
waived 110:12 112:10
want 9:5 26:23 33:3,6
  36:16 39:19 40:12,18
  47:13 53:4 67:19
  75:18 76:23 77:9 83:4
  83:24 84:24 86:1
  88:23 90:11 92:17
  93:4 100:21 102:14,16
  102:23 107:22,24
  109:4
wanted 17:13 24:13,15
  31:24 33:23
wants 43:5 90:14
Washington 74:24 85:4
wasn't 25:13,14 39:11
  106:5
waste 93:4
wasting 36:11
watching 50:10
way 47:21 49:2,3 57:7
  65:8,11,11,14 68:16
  75:3 77:20 78:7,15,22
  78:23 80:18,21 81:16
  85:12 92:17,21 93:18
  98:17 100:24 105:4
  107:25 108:10 109:12
  112:13
ways 40:22 75:5 79:18
  107:25 108:11,13
  109:10,13
we'll 27:21 32:14 41:8
we're 11:20 32:15 42:23
  48:4 66:6,6,7,9 77:11
  80:15 99:2 100:7,8
  102:8,21 108:14
we've 16:5 69:17 70:23
  79:18 103:25 104:7
wearing 66:12
web 17:24,25 18:1,3,4,5
  18:5,6
weren't 87:24
WHEREOF 112:14
wide 14:19 15:2

widely 19:9 22:19
willing 97:8
witness 4:2 5:3 41:19
  112:5,9,11,14
word 8:9 26:16 28:18
  31:4 32:2,5,8 34:11,13
  34:15 35:3 38:2,4 41:2
  41:6,15 70:1 82:20
  84:6,22 104:5,7,11
words 8:10 31:2,4 44:10
  45:8
work 15:7 22:20 81:19
worked 49:6
worker 108:1,2
working 14:5 15:23
world 84:7
wouldn't 9:17 19:2 37:5
  41:4 50:4 54:24 59:17
  59:17 77:22 78:6
  85:20
write 16:12 24:18
write-in 88:17 89:1,13,19
  90:5 93:14 104:23
  105:4
writing 25:10
written 95:12,13,18,22
  95:25 96:7 97:13
wrong 97:10
wrote 25:13
www.depo.com 1:20

**X**

X 4:1
XY 98:4

**Y**

Y 90:18
Y-E-S 41:2
yank 85:24
yeah 10:14 47:1 49:14
  50:15 53:6 55:9 62:2
  93:14 102:2,22 103:12
  107:9
year 23:15 25:4,6,7,8,11
years 10:6 12:8,10 13:24
  14:20 15:18 21:2,5
  23:7,7 25:17 38:21
years' 12:14,15,16
yesterday 7:10 107:12
York 23:4
young 22:11

**Z**

zero 24:10
zoom 86:15,18,22 87:2,8
  87:12,14,21,24 88:4
  88:20,24 89:3,4 93:17

**0**

02110-1447 3:6

**1**

1 4:19 32:17 45:8 54:3,6
  56:10,11 94:21,22
  95:1,5,10,15,24 96:18
  96:24 97:13
10 8:22 56:11 61:20 83:7

108:17,18
10/454345 4:16 102:3
1001 4:8 27:10,13
1005 4:9 50:22,25 51:1,2
  51:4
1007 4:11 71:2,6,7,9
101 4:15 28:16
104 32:12,12
106 28:19 32:9
108 52:22,25 53:21
11 59:23 67:17 72:14
  73:3 74:16 83:7 87:12
  108:18
11:53 70:19
1100 3:11
115 102:11
12 8:22 14:3 63:8,20
  64:8 71:25 75:21
  95:15,23 96:2
12:53 70:20
120 14:11
129 84:2
12B 58:7 60:7
13 59:23,24,25 60:1,6
130 14:10 82:16 84:23
14 35:7,7,8,10,10,15,21
  75:12,12,16,16,21
  79:8,9 86:9
14th 2:17
15219 2:18
16 4:17 35:7,10 67:16
  87:12
17 37:8,21 86:9 89:9,20
  90:19
18 102:16,20
19 45:24 46:8,13 47:12
  47:13,15,16
1980 21:11,13,15 22:6
  22:13,17 23:7,12,19
1996 23:8
1999 13:25 16:1

**2**

2 17:15 57:9,11,15,21
  59:5 62:23 63:1,10
  64:6,24 65:8,20 73:23
  80:9 94:9,10,12 99:10
  112:20
2:28 110:10
20 1:15 2:18 96:13,23
  99:17,17 103:18,19
  105:5,14,21 106:12
20[E 105:19 107:4,7
200 31:2,16 44:9
2000 22:19 23:15
2001 4:13 7:18,22,23 8:1
  8:3 18:15
2002 19:10
2002/0078358 71:11
2003 4:15 101:18,20,21
  101:25 102:5
2004 4:17 16:13,16,18
  17:2,6,15
2018 13:25 15:25 16:1,2
2019 1:15 2:19 16:22
  17:1,5 112:15
2019-009527 5:16
202 81:11

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 121

**Atkinson-Baker, Inc.**
**www.depo.com**

**2020** 112:20
**20th** 16:22 17:1,5
**21** 68:23
**22** 64:8
**23** 46:22 48:5,6,9 99:21
  101:2,5 102:8,16,21
  103:17 107:14 108:17
  109:7
**23[D** 108:15
**246** 96:5,9,15
**2470S** 97:21
**25** 86:3,5,9 93:8,9
**25a** 36:20 86:6 88:16,16
  104:1
**25b** 104:1
**25c** 36:20 104:1
**25d** 36:21 104:2
**25e** 104:2
**25f** 93:10,13,20 104:19
**25g** 89:6 104:19
**25h** 104:2
**25i** 42:6,20 43:3 93:24
**25j** 104:2
**26** 58:1 59:21 63:1
**26th** 3:6 112:15
**27** 4:8 63:21 64:8,10
  87:13
**273** 5:18 10:4 11:5 18:17
  19:4 20:12,21 25:21
  26:4,14,25 27:14,15
  29:1 34:14,17 35:3,7
  36:6 38:1,2,13,23 39:6
  39:9 40:2 41:6,14 42:1
  43:8,12,20,25 45:24
  46:1 47:24 48:23
  50:13 66:3,6 67:8,23
  68:1,6 73:15,15,22,24
  74:3 75:10,12 76:5,9,9
  76:11,12,21,25 77:3,5
  77:10,16,17 78:3,18
  78:23 79:8 80:1,9,16
  83:17,19,20 86:3,8,13
  87:10 88:2,4 89:6,10
  90:19 91:6 92:3,19,24
  93:8,25 102:4 104:20
  108:13
**2751** 17:20
**28** 35:8,16,19 37:8

──────── 3 ────────

**3** 17:6 72:15 95:10,14,20
  96:1 101:3 102:20,20
**30** 35:8,16 61:24
**300** 75:23
**304** 76:2 79:11
**306** 75:24
**31** 87:13
**312** 37:11 46:13,15,16
  46:18,20,21,23 47:2,4
  47:9,19,23,23 48:5,14
**316** 108:21
**318** 108:22
**32** 57:23
**322** 46:11 89:21 92:8
**324** 46:11 89:22 92:9
**326** 46:12
**328** 37:10 46:10
**33** 3:6

**330** 46:11,12
**34** 108:18
**35** 27:17
**37** 4:20 18:16 95:4
**38** 10:1 35:8 39:14
**39** 21:5

──────── 4 ────────

**4** 32:17 63:10,23,25 64:2
  65:21,24 96:17
**40** 35:8
**41** 35:21
**42** 89:9,20 90:19 92:8
**42.121** 4:21 95:4
**43** 82:20 85:2
**44** 35:8,21
**46** 34:17,20 35:6
**47** 89:10
**48** 32:3

──────── 5 ────────

**5** 4:3 14:3 48:6 63:10,19
  64:3 86:9 96:17
**50** 4:9 55:22,23
**510** 87:14
**514** 67:17
**516** 87:14
**518** 37:22 87:15
**520** 87:16
**522** 37:10 87:16
**530** 37:13,23
**532** 37:13,23,24
**534** 37:14
**54** 58:20 59:15
**548** 94:5
**56a** 78:11

──────── 6 ────────

**6** 37:21 48:6 58:20 59:15
  60:25 61:2,10 62:11
  63:4,10,23,25 64:3
  65:22,24 72:1,2,3,5,7
  72:10 73:2,22,23
  74:15,23 76:4,5,12,22
  76:24,25 77:4,9 78:5
  78:19 80:2,9,15 82:6
  83:4 95:25
**60** 85:12
**601** 85:5
**621** 85:6
**63015** 3:12
**67** 63:20

──────── 7 ────────

**7** 4:13 34:16 60:17 63:5
  63:12
**7,753,273** 2:10
**71** 4:11 51:8,12
**7128263** 4:10 51:5
**75** 51:9,12
**7700** 3:11
**7753273** 5:16

──────── 8 ────────

**8** 63:10 64:6,24 65:8,20
  68:23 94:7,9,10,12
**8,096,471** 1:10

**80** 27:23
**800)288-3376** 1:19
**85** 28:4
**86** 28:6
**87** 28:8 69:19
**89** 28:8 40:1 69:20 70:15
  106:18
**8c** 60:18

──────── 9 ────────

**9** 66:9 68:4
**9:30** 2:19
**94** 4:19
**95** 28:14
**97** 82:6

**Michael I. Shamos, Ph.D, J.D.**
**December 20, 2019**

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 122

Michael I. Shamos, Ph.D., J.D.
December 19, 2019

```
 1    SMARTMATIC USA CORPORATION

 2    vs.

 3    ELECTION SYSTEMS AND SOFTWARE, LLC

 4                       - - - -

 5                     CERTIFICATE

 6

 7         I, MICHAEL I. SHAMOS, PH.D, J.D., do hereby
      certify that I have read the foregoing transcript of my
 8    deposition in IPR2019-00527, and it is a true and
      correct copy of my testimony, except for the changes,
 9    if any, made by me on the attached Deposition
      Correction Sheet.
10
                        _____
11
                        MICHAEL I. SHAMOS, PH.D, J.D.
12

13

14                     _____January 3, 2020_____

15                           (Date)

16

17

18

19

20

21

22

23

24

25
```

143

Atkinson-Baker, Inc.
www.depo.com

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 123

ERRATA SHEET
Deposition of Michael Ian Shamos, Ph.D.
Date of Deposition: December 20, 2019
Caption: Smartmatic USA Corporation v. Election Systems and Software, LLC
Patent Trial and Appeal Board IPR2019-00527

I, MICHAEL IAN SHAMOS, do hereby certify that I have read the foregoing transcript of my testimony, and further certify that it is a true and accurate record of my testimony (with the exception of the corrections listed below).

| PAGE:LINE | CHANGE/ADD/DELETE |
|---|---|
| 11:16 | Change "mounts" to "mouse".  Reason: transcription error. |
| 15:2 | Change "gambit" to "gamut".  Reason: transcription error. |
| 15:11 | Change "book of field" to "look and feel".  Reason: transcription error. |
| 17:20 | Change "2751" to "20-751".  Reason: transcription error. |
| 17:23 | Change "bases" to "interfaces".  Reason: transcription error. |
| 18:18 | Change "the" to "voting".  Reason: transcription error. |
| 22:13 | Change "low" to "lo".  Reason: transcription error. |
| 24:23 | Change "peace" to "piece".  Reason: transcription error. |
| 29:18 | Change "end" to "and".  Reason: transcription error. |
| 40:20 | Change "of" to "for".  Reason: transcription error. |
| 41:9-11 | Eliminate quotation marks.  Reason: transcription error. |
| 44:22 | Change "acquire to" to "require".  Reason: transcription error. |
| 44:24 | Change "acquire to" to "require".  Reason: transcription error. |
| 45:18 | Change "with" to "with a".  Reason: transcription error. |
| 46:1-6 | Eliminate quotation marks.  Reason: transcription error. |
| 46:1 | Change "acquire to" to "require".  Reason: transcription error. |
| 50:20 | Change "Markson's" to "mark sense".  Reason: transcription error. |
| 51:5 | Change "A" to "Uh".  Reason: transcription error. |
| 52:4 | Change "Rebuttal" to "Rebuttable".  Reason: transcription error. |
| 61:25 | Change "contests to read" to "contest three".  Reason: transcription error. |
| 65:8 | Change "an" to "a".  Reason: transcription error. |
| 74:7 | Change "suck" to "suss".  Reason: transcription error. |
| 75:24 | Change "ballot. 306" to "ballot 306 and".  Reason: transcription error. |
| 88:6 | Change "expressed" to "express".  Reason: transcription error. |
| 92:2 | Change "KWERTY" to "QWERTY".  Reason: transcription error. |
| 93:15 | Change "KWERTY" to "QWERTY".  Reason: transcription error. |
| 98:25 | Change "claims" to "claimed".  Reason: transcription error. |
| 99:6 | Change "claims" to "claimed".  Reason: transcription error. |
| 106:3 | Change "were read" to "read".  Reason: transcription error. |
| 106:5 | Change "clean" to "claim".  Reason: transcription error. |
| 106:12-15 | Move first quotation mark so it recedes the word "wherein" instead of "Presenting".  Reason: transcription error. |
| 107:15 | Change "In audibly" to "Audibly".  Reason: transcription error. |

Petitioner's Exhibit
EXHIBIT 1027 - PAGE 124

ACKNOWLEDGMENT OF DEPONENT

I, Michael Ian Shamos, Ph.D., do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on this sheet signed by me.


EXECUTED this 3nd day of January, 2020 at Pittsburgh, Pennsylvania.


_____
Michael Ian Shamos
January 3, 2020